UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-md-3010 (PKC) |

*This Document Relates to:*

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-CV-07001 (PKC) |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S OPPOSITION TO
ADVERTISERS' MOTION FOR CLASS CERTIFICATION**

## **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 2

   A.     Buy-Side DRS, Project Bernanke, and Global Bernanke increased the value and number of impressions won by some Google Ads advertisers.................................................. 3

   B.     UPR increased impressions and lowered prices for some advertisers. ........................... 5

   C.     Named Plaintiff Hanson. ............................................................................................ 7

   D.     The Proposed Class. ................................................................................................... 8

III.    LEGAL STANDARD........................................................................................... 10

IV.     ARGUMENT ....................................................................................................... 11

   A.     Hanson has not proven that his lone Bernanke claim is typical of absent class members' UPR claims. ................................................................................................................... 11

   B.     Hanson cannot fairly and adequately represent the proposed class. ............................ 15

   C.     Common questions of law or fact do not predominate over individualized questions of impact and damages. ......................................................................................................... 17

     1.   There is no common proof that all proposed class members suffered antitrust injury. . 18

       a)   There is a substantial number of uninjured class members. ..................................... 19

       b)   The net effect of an optimization on an advertiser is an individualized question. ... 20

       c)   Hanson's experts fail to put forward any valid common methodology that could assess impact........................................................................................................................ 22

         (1)   Dr. Zona does not provide a common methodology that could assess impact. .... 23

         (2)   Dr. Singer does not provide a methodology that could show impact to all class members because he purports to measure effects from UPR only................................. 30

     2.   Common proof cannot demonstrate that measurable damages result from Google's conduct.......................................................................................................................... 31

   D.     A class action is not a superior means of adjudicating Hanson's claims. ...................... 33

V.      CONCLUSION..................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ................................................................................ 14, 22

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ...................................................................................................... 10, 15

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ................................................................................................ 32

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ............................................................................................... 28

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
   429 U.S. 477 (1977) ............................................................................................................. 18

*Caridad v. Metro-N. Commuter R.R.*,
   191 F.3d 283 (2d Cir. 1999) ............................................................................................... 12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ..................................................................................................... passim

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ............................................................................................... 15

*Fernandez v. UBS AG*,
   2018 WL 4440498, (S.D.N.Y. Sep. 17, 2018) .................................................................. 18

*Garcia De León v. New York Univ.*,
   2022 WL 2237452, (S.D.N.Y. June 22, 2022) .................................................................. 13

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ............................................................................................................. 11

*Harris v. Initial Sec., Inc.*,
   2007 WL 703868, (S.D.N.Y. Mar. 7, 2007) ..................................................................... 16

*In re Alcoholic Beverages Litig.*,
   95 F.R.D. 321 (E.D.N.Y. 1982) ......................................................................................... 13

*In re Aluminum Warehousing Antitrust Litig.*,
    336 FRD 5, (S.D.N.Y. 2020)......................................................... 17, 18, 23, 24

*In re Asacol Antitrust Litigation*,
    907 F.3d 42 (1st Cir. 2018) ............................................................... 19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ................................................................ 11

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) .............................................. 21

*In re Lamictal Direct Purchaser Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020) .............................................................. 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................... 15, 16, 17, 21

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) .............................................................. 15

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    338 FRD 527 (S.D.N.Y. 2021) ................................................... passim

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016) .............................................................. 16

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017) .............................................................. 21

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ............................................. 13, 14

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    934 F.3d 619 (D.C. Cir. 2019) .......................................................... 19

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) .............................................................. 33

*Lavoho, LLC v. Apple, Inc.*,
    232 F. Supp. 3d 513 (S.D.N.Y. 2016) ............................................... 21

*Maroney v. Woodstream Corp.*,
    2025 WL 945874, (S.D.N.Y. Mar. 28, 2025) .................................... 15

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016) ............................................................................ 11, 12

*Metcalf v. TransPerfect Translations Int'l Inc.*,
    2023 WL 9510777, (S.D.N.Y. Nov. 6, 2023) ........................................................ 33

*Miami Products & Chem. Co. v. Olin Corp.*,
    2023 WL 8946114, (W.D.N.Y. Dec. 28, 2023) ..................................................... 31

*Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Ass. Co., Inc.*,
    2019 WL 3409882, (S.D.N.Y. July 27, 2019) ................................................. 33, 34

*Pablo v. Servicemaster Glob. Holdings, Inc.*,
    2011 WL 3476473, (S.D.N.Y. Aug. 9, 2011) ....................................................... 34

*Reid v. A-Plus Care HHC Inc.*,
    2024 WL 5443182, (S.D.N.Y. Nov. 27, 2024) ..................................................... 18

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ............................................................................... 31

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) .......................................................................... 11, 14

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010) ................................................................................. 33

*Stafford v. Bojangles Rests., Inc.*,
    123 F.4th 671 (4th Cir. 2024) ............................................................................ 17

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .......................................................................................... 11

*Van v. LLR, Inc.*,
    61 F.4th 1053 (9th Cir. 2023) ............................................................................ 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................................. 10, 11, 13

**Rules**

Fed. R. Civ. P. 23(a)(3) ............................................................................................ 11

Fed. R. Civ. P. 23(b)(3) ........................................................................ 10, 11, 31, 33, 34

iv

## I.    INTRODUCTION

Google's ad tech innovations have brought tremendous growth to the advertising industry. In pursuing these innovations, Google considers the interests of advertisers, publishers, and consumers. Google operates in a highly competitive space, whereby advertisers allocate their resources among different advertising channels based on perceived return on ad spend and are agnostic to particular platforms or channels. As a result, it is only through delivering value to its customers that Google can successfully win their business.

Although Google's advertiser customers have benefited from Google's innovations for well over a decade, a single advertiser, Christopher Hanson (who has not used Google Ads since 2016), now seeks to certify a putative class of over two million advertisers. That plaintiff alleges multiple, different Google optimizations harmed competition in two different proposed markets, self-service ad buying tools and ad exchanges, causing injury to Google Ads advertisers over a nine-year period.

Hanson's proposed class cannot be certified for four independent reasons. *First*, Hanson's claims are not typical of those of the proposed class under Rule 23(a)(3), when he used Google Ads for only a few months in 2016, spent less than $500 in that time, and could not possibly have been impacted by UPR (one of the optimizations at issue that was not introduced until 2019). *Second*, Hanson cannot fairly and adequately represent the proposed class under Rule 23(a)(4) because he does not have the same interest as class members allegedly impacted by UPR or those who might seek injunctive relief. *Third*, Hanson cannot use common proof to demonstrate injury or measurable damages under Rule 23(b)(3): the sheer number of uninjured class members by itself fails the predominance requirement; substantial heterogeneity among advertisers who may have been affected by Google's conduct necessitates individualized inquiries; and Hanson's experts fail to put forward any valid common methodologies to assess injury or damages. *Fourth*,

a class action is not a superior means of adjudicating Hanson's claims under Rule 23(b)(3) where the majority of proposed class members will need to arbitrate their claims outside a class trial.[1]

While each individual flaw precludes class certification by itself, collectively these issues highlight the vast shortcomings of Hanson's motion.

## II.    FACTUAL BACKGROUND[2]

Advertisers use buying tools to help them place their advertisements on websites and apps. On the other side, content creators may use various tools to help them monetize their content, including using sell-side tools that help them auction off advertising opportunities on websites and apps. Google Ads is one of two buying tools that Google offers to advertisers. On the sell-side, Google offers several monetization tools, including Google AdSense, Google AdX (now part of Google Ad Manager), and Google AdMob. An advertiser using Google Ads may purchase advertising space from publishers who have made inventory available via AdSense, AdX, AdMob, as well as inventory made available via non-Google ad exchanges; in other words, Google Ads bids on ad impressions from AdSense, AdX, AdMob, and third-party ad exchanges. As Hanson acknowledges,"[a]ds bought [] from a third-party publisher using Google's AdSense ad network are *not* routed through AdX," ECF No. 962 ("Mot.") at 4 n.2 (emphasis added), nor are they routed through any other exchange.

The putative class includes all advertisers that used Google Ads, regardless of the path that the impression was purchased through. Thus, the putative class and Hanson's impact models include advertisers and transactions that did not involve Google AdX, and transactions that did not

---

[1] Given the very small proportion of Google Ads users who have opted out of their arbitration agreement with Google since 2016, it is nearly certain that the vast majority of proposed class members will have to arbitrate their claims. *See* Sharp-Wolfson Decl., Ex. 38 (Zweifach Jan. 31, 2024 Letter) ¶¶ 2, 4.

[2] Google disagrees with many of the assertions in Hanson's "Statement of Common Facts," but will not dispute every so-called fact in this brief as most are irrelevant to class certification.

involve any ad exchange at all.

Google Ads runs several processes before submitting bids to a sell-side auction. Sharp-Wolfson Decl., Ex. 9 (Jayaram Decl., GOOG-AT-MDL-008842383) ¶¶ 3-5. First, Google Ads translates an advertiser's input to the system (which could be a target cost per click, cost per acquisition, etc.) into an appropriate eCPM (expected cost per mille) bid, based on Google's prediction of how likely an ad is to be clicked on (or lead to a conversion, etc.). *Id.* ¶¶ 4-5. Google Ads then runs an internal auction to determine the best eCPM bids to submit to the further auction. Before 2021, Google Ads operated as a second-price auction, meaning that the winning advertiser would be charged the higher of the price needed to beat the next runner-up in the Google Ads auction or the next runner-up in the AdX auction (if applicable). *Id.* ¶ 6.

### A. Buy-Side DRS, Project Bernanke, and Global Bernanke increased the value and number of impressions won by some Google Ads advertisers.

Over the years, in response to changing auction dynamics, Google made a number of updates and improvements to the process Google Ads uses to determine which bids it sends to AdX. Sharp-Wolfson Decl., Ex. 6 (Milgrom Rpt.) ¶¶ 112, 146. Buy-Side DRS, Project Bernanke, and Global Bernanke are examples of these improvements. *Id.* It is undisputed that Buy-Side DRS, Bernanke, and Global Bernanke applied only to bids that Google Ads submitted to AdX; these improvements did not apply to bids submitted to third-party exchanges, AdSense, or AdMob.

Since 2008 and prior to Google's move to a Unified First Price Auction in September 2019, Google Ads frequently submitted two bids into the AdX auction. Sharp-Wolfson Decl., Ex. 9 (Jayaram Decl., GOOG-AT-MDL-008842383) ¶ 7. The "high" bid represented the maximum bid amount for the highest-scoring advertiser, and the "low" bid represented the bid of the second-highest scoring advertiser. The two-bid policy ensured that Google Ads would receive a consistent

proportion of the revenue from each impression.  Sharp-Wolfson Decl., Ex. 6 (Milgrom Rpt.) ¶ 150.

In 2012, Google observed a large percentage of auctions on AdX were going unmatched because of publishers' high price floors.  Sharp-Wolfson Decl., Ex. 13 (GOOG-DOJ-13469175) at -175.  To address this inefficiency, Google implemented a series of bidding optimizations across Google Ads.  The first of these optimizations was Buy-Side DRS.  Google launched Buy-Side DRS in January 2013.  Sessions Decl., Ex. 18 (GOOG-AT-MDL-002390899) at -899.  Under Buy-Side DRS, Google modified how Google Ads submitted bids to AdX in order to increase the number of impressions won by Google Ads advertisers and decrease the number of unmatched auctions.  *Id.*; Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 70 ("Under the BS-DRS, Google can deliver a buyer for space that otherwise would have gone unfilled or to win an auction that would have cleared on a rival exchange on which the publisher set a lower floor than on AdX."); Sessions Decl., Ex. 5 (Zona Dep.) 129:22-130:1.  To do so, it allowed Google Ads to lower the revenue share it deducted from each high bid.  Sessions Decl., Ex. 18 (GOOG-AT-MDL-002390899) at -899.  Hanson concedes that Buy-Side DRS "reduced Google's take-rate from Google Ads advertisers" and "increas[ed] the number of impressions that Google Ads won on AdX."  Mot. at 5.

In November 2013, Google updated and replaced Buy-Side DRS with Project Bernanke.  Sharp-Wolfson Decl., Ex. 6 (Milgrom Rpt.) ¶ 158.  Project Bernanke enabled Google Ads to modify both the high and low bids it submitted to the AdX auction, again in order to increase the number of impressions advertisers won while using Google Ads and reduce the number of unsold impressions on AdX.  Sessions Decl., Ex. 44 (GOOG-DOJ-14952787) at -787.  This was good for advertisers, who received more clicks and conversions on their ads, as well as publishers, who

received more revenue from selling more impressions. *Id.*; Sharp-Wolfson Decl., Ex. 11 (GOOG-AT-MDL-002051655) at -655 ("Bernanke results in higher revenue, publisher payout, advertiser conversion volume, and profit,' increasing 'GDN [Google Ads'] advertiser conversion volume [by] +10.8%.").

Google launched an update to Project Bernanke, called Global Bernanke, in August 2015. *Id.* ¶ 10. Global Bernanke further improved the optimization process by allowing the revenue share collected by Google Ads to vary across different publishers' inventory. Sharp-Wolfson Decl., Ex. 6 (Milgrom Rpt.) ¶¶ 146(c), 160; Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 57; Sessions Decl., Ex. 46 (GOOG-DOJ-15637938) at -938. This again increased the number and value of impressions won by Google Ads advertisers and reduced unsold impressions. Sessions Decl., Ex. 46 (GOOG-DOJ-15637938) at -938; Sessions Decl., Ex. 35 (GOOG-DOJ-04320717) at -717-718.

The manner in which Google determined the amount each advertiser paid Google Ads remained unchanged by any of Google's bidding optimizations. Sharp-Wolfson Decl., Ex. 9 (Jayaram Decl.) ¶ 9; Mot. at 5 ("[Bernanke] did not change the amount paid by Google Ads advertisers."). Indeed, for impressions that an advertiser would have won without Buy-Side DRS, Project Bernanke, or Global Bernanke, the advertiser paid the *same amount* as it would have paid absent the optimization. Sharp-Wolfson Decl., Ex. 9 (Jayaram Decl.) ¶ 9. If an advertiser won any additional impressions because of Buy-Side DRS, Project Bernanke, or Global Bernanke, it paid no more for that click than the bid it offered to Google Ads (in other words, its expressed willingness to pay). Sessions Decl., Ex. 50 (GOOG-DOJ-AT-02467209) at -209; Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 66.

### B. UPR increased impressions and lowered prices for some advertisers.

In the mid-to-late 2010s, many ad exchanges moved from a second-price to a first-price auction. Sessions Decl., Ex. 9 (Korula Decl.) ¶ 13. Google followed suit in 2019, transitioning

Google Ad Manager to a unified first-price auction. *Id.* In the unified first-price auction, all ad exchanges and other demand sources that the publisher opted to call would compete once for an impression. Sharp-Wolfson Decl., Ex. 6 (Milgrom Rpt.) ¶ 142. The clearing price would be the price of the highest bid. *Id.* Google rolled out several product changes associated with this transition, including Unified Pricing Rules in September 2019. *Id.* ¶ 143; Sessions Decl., Ex. 9 (Korula Decl.) ¶ 58. Prior to UPR, a publisher using Google's ad server and working with multiple demand sources would need to set pricing rules individually in each exchange or buyer's user interface. *Id.* ¶ 56. Hanson contends that publishers were using differential price floors to set higher floors for AdX and/or for Google Ads. *See, e.g.*, Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶¶ 87, 112-113.

Under UPR, buyers faced the same reserve prices in Google's unified first-price auction across different buying channels. *Id.* ¶ 60. As a direct result of UPR, AdX floor prices decreased for certain auctions. Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 90. This allowed advertisers on AdX (including proposed class members, buying via Google Ads) to buy more impressions on AdX at a lower price than they would have absent UPR. *Id.* (explaining that "a decrease in AdX floor prices was output enhancing, allowing impressions that would have otherwise gone unsold to be sold to advertisers bidding on AdX"). And with lower floor prices, advertisers bidding in AdX could buy impressions that would have otherwise gone unsold. *Id.*

Hanson's experts acknowledge these benefits. For example, both Dr. Singer and Dr. Zona cite ordinary course documents that show UPR resulted in lower floors and reduced CPM for Google Ads advertisers by over 9%. Sharp-Wolfson Decl., Ex. 3 (Singer Op.) ¶ 178 (citing Sessions Decl., Ex. 40 (GOOG-DOJ-11729166) at -192 (CPM for Google Ads advertisers decreased by over 9% in part to due to lower floors post-UPR)); Sharp-Wolfson Decl., Ex. 1 (Zona

Op.) ¶ 87 n.98 (citing Sessions Decl., Ex. 43 (GOOG-DOJ-14549757) at -787 ("for [Google Ads],
the mean applicable publisher-configured floor price has gone down from $3.31 under the old
pricing rules (which includes [Google Ads]-specific floors) to $1.01 under the Unified Pricing
Rules")); *see also* Sharp-Wolfson Decl., Ex. 27 (GOOG-DOJ-09713317) at -321 ("Median
AdWords floors have decreased from $0.7 under the legacy pricing rules to $0.45 under Unified
Pricing Rules").  Dr. Zona likewise notes that UPR "unlock[s] inventory" for advertisers on AdX,
allowing proposed class members to win more impressions.  Sharp-Wolfson Decl., Ex. 1 (Zona
Op.), ¶ 112 n.111.

UPR was a feature of AdX, and did not apply to impressions from publishers that used
AdSense or a non-Google ad server.  *See* Mot. at 6 ("UPR was implemented and applied to all
publishers accessing AdX through GAM").  Hanson is incorrect to conclude from this fact that
UPR "impacted all Google Ads users in the same fashion," Mot. at 6, as there are Google Ads
users that did not source impressions from publishers that used DFP, and there are Google Ads
users that did not source impressions through AdX.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 39.

### C.  Named Plaintiff Hanson.

Six named plaintiffs originally represented the proposed class.  Five out of six plaintiffs
have since dismissed their claims or been compelled to arbitrate.  ECF Nos. 511, 512, 882, 903.
The sixth—Plaintiff Christopher Hanson—is the successor in interest to the Hanson Law Firm,
which advertised using Google Ads for only a three-month period in 2016.  In total, Hanson Law
Firm allegedly spent $487.78 with Google on third-party display advertising, from June 1 to
September 6, 2016.  *See* ECF 701 (Opinion on Google's MTD) at 21-22 (citing Compl. ¶¶ 14-16).
Hanson never used any tool other than Google Ads to buy display advertising.  Sessions Decl., Ex.
11 (Advertisers' First R&Os) at 8-9, 23.  Hanson Law Firm no longer exists, and therefore cannot
use Google Ads (or any other display advertising tool) in the future.  Despite spending only a few

hundred dollars via Google for just a few months of the proposed nine-year class period, Hanson is the sole representative of the proposed class and seeks to represent over two million advertisers.

### D.  The Proposed Class.

The Google Ads advertisers that comprise the proposed class are heterogenous. Advertisers are differentiated across multiple dimensions, including presence during the class period, the inventory sources they used to source impressions, and size, among other characteristics.

- *Timing of Google Ads usage.*  Large portions of the proposed class were not active on Google Ads during the time that a challenged optimization was in effect.  Specifically, 94% of proposed class members did not use Google Ads when Buy-Side DRS was active, 90% did not use Google Ads when Project Bernanke was active, 60% did not use Google Ads when Global Bernanke was active, and at least 16.4% did not use Google Ads when UPR was active, including named Plaintiff Hanson.[3]  Sessions Decl., Ex. 1 (Haider Rpt.), Exhibit 2, ¶ 82; Sessions Decl., Ex. 6 (Haider Dep.) 27:23-28:4.

- *Inventory sources.*  More than 50% of proposed class members' impressions were purchased through AdSense.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 39; Sharp-Wolfson Decl., Ex. 1 (Zona Op.), Tbl. 2, ¶ 130.  230,000 putative class members (approximately 9% of the class), never paid for an impression sourced through AdX.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 39 n.19.  Over 9,000 members of the putative class had no transactions through AdX and did not use Google Ads while Buy-Side DRS, Bernanke, and Global Bernanke were in effect.  *Id.* ¶ 39.

---

[3] UPR did not apply to impressions sold by publishers that did not use DFP and therefore could not affect advertisers who transacted with such publishers; as such, the 9,248 advertisers who transacted exclusively outside of AdX and the additional others who transacted exclusively with publishers not on DFP could not be subject to any of the optimizations.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 39.

- *Size and spending*.  Advertisers vary significantly in their size, as measured by total display ad spend, impressions, and clicks.  Total ad spend among proposed class members varies from $0 to more than ███████, with 636,764 advertisers (24.9%) paying less than $12 over the entire proposed class period and 93,130 advertisers (3.6%) paying $10,000 or greater.  *Id.* ¶ 41.  Similarly, the count of total impressions per advertiser ranges from 0 to more than ███████, and the count of total clicks received ranges from 0 to almost ███ ████.  *Id.* ¶¶ 42-43.

- *Industry*.  Advertisers compete in different "verticals" depending on the industry or audience they target with their ads.  These verticals include Automotive, Business & Industrial Markets, Classifieds & Local, Consumer Packaged Goods, Education & Government, Finance, Healthcare, Media & Entertainment, Retail, Services, Technology, and Travel.  *Id.* ¶ 118.  Competitive conditions change over time within each vertical, such as when impressions for Healthcare and Retail spiked during the COVID-19 pandemic, while impressions for Travel and Automotive declined.  *Id.* ¶¶ 159, 161.

- *Competitiveness of ad auctions*.  Competitive conditions in the auction vary from advertiser to advertiser, as well as over time for each individual advertiser.  Dr. Haider studies this empirically by looking at the monthly average CPC for each of the top 100 Google Ads advertisers on AdX or third-party exchanges (by ad spend).  Her analysis shows that the CPC across these advertisers varies dramatically over the proposed class period.  *Id.* ¶ 108, Exhibit 7; *see* Sessions Decl., Ex. 6 (Haider Dep.) 29:2-19, 48:16-49:16; *see also* Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 108, Exhibit 8 (showing similar results within the Google Ads-AdSense pipeline).  Even each individual advertiser's average CPC fluctuates significantly from month to month.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 108.

9

- *Advertisers as Publishers*.  Advertisers accounting for 10.3% of the class's total ad spend also sold impressions (as publishers) using AdX or AdSense during the proposed class period.  *Id.* ¶ 44.

Empirical evidence further demonstrates that the average prices advertisers paid before and after the challenged optimizations went in different directions for different advertisers, and varied substantially.  For example:

- 54% of advertisers bidding through Google Ads on AdX paid less per click for impressions acquired in the three months post-Bernanke as compared to the three months pre-Bernanke. *Id.* ¶ 75.

- Almost 50% of advertisers bidding through Google Ads on AdX paid less per click for impressions acquired in the three months post-Global Bernanke relative to the three months pre-Global Bernanke.  *Id.* ¶ 76.

## III.    LEGAL STANDARD

Plaintiffs "seeking to maintain a class action 'must affirmatively demonstrate [their] compliance' with Rule 23."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  To do so, a plaintiff must prove by a preponderance of the evidence "that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."  *Id*. (cleaned up).  In addition, a plaintiff must demonstrate "through evidentiary proof at least one of the provisions of Rule 23(b)."  *Id.*

Here, Hanson proposes a Rule 23(b)(3) class.  Mot. at 1-2.  The (b)(3) class  is "the most adventuresome innovation" of the class-action mechanism*,* and requires that common questions predominate over individualized ones, and that class resolution be superior to other methods of adjudicating the controversy.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592, 615 (1997)

(cleaned up).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.* at 623-24 (noting the predominance requirement "is far more demanding" than Rule 23(a)'s commonality requirement).  "[W]here members of a proposed class will need to present evidence that varies from member to member," individual questions predominate over common questions, precluding certification.  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up).  To determine whether a plaintiff has satisfied Rule 23's requirements, courts must conduct a "rigorous analysis" of the motion and the evidence upon which it relies.  *Wal-Mart*, 564 U.S. at 350-51 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

## IV.    ARGUMENT

### A.  Hanson has not proven that his lone Bernanke claim is typical of absent class members' UPR claims.

Under Rule 23(a)(3), a class can be certified only if the plaintiff proves that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "A plaintiff seeking certification of a Rule 23(b)(3) damages class action has the burden to establish . . . typicality."  *Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016).  "To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).  Hanson's claims rest on different legal and factual issues than those of other putative class members, and for this reason the class cannot be certified.

Hanson's claims are factually distinct from those of a large portion of the class.  Hanson used Google Ads for only a few months in 2016 and spent less than $500 during that time.  While

the putative class covers a period of more than nine years, Hanson's purchases were limited to the first few months of the class period. Hanson used Google Ads while Global Bernanke was in effect,[4] but stopped well before UPR was instituted in 2019. Unlike Hanson, other class members could claim impact and damages only from UPR and not from Bernanke, while some others could claim impact and damages from both. *See supra* at 8 (94% of proposed class members were not present when Buy-Side DRS was active, 90% were not present when Project Bernanke was active, 60% were not present when Global Bernanke was active, and at least 16.4% were not present when UPR was active).

The alleged facts of Bernanke and UPR are not remotely the same: Bernanke was an optimization within Google Ads concerning the bids sent to AdX, while UPR was a feature of Google's publisher ad server concerning auction price floors. This factual distinction also makes for a legal distinction: the theories as to why Bernanke and UPR were anticompetitive differ, and the theories of anticompetitive effects and impact to Google Ads users differ as well.

Hanson's claims are not typical of the entire class because his Bernanke claim is neither factually nor legally the same as absent class members' UPR claims. "Typicality requires that 'the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" *Mazzei*, 829 F.3d at 272 (quoting *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999)). Here, disputed

---

[4] Hanson repeatedly refers to "Bernanke" in its Motion, without ever clarifying whether he means Buy-Side DRS (in effect from January 2013 to November 2013), Project Bernanke (in effect from November 2013 to August 2015), Global Bernanke (in effect from August 2015 to September 2019), or some combination of the three. *See* Mot. at 3-6. Hanson's proposed class period begins on January 1, 2016. *Id.* at 9. In his Motion, as well as in his Complaint, Hanson does not allege any mechanism through which conduct that ended before the proposed class period (such as Project Bernanke and Buy-Side DRS) could impact proposed class members after that period begins. For this reason, Google's Opposition generally refers to Global Bernanke as the only iteration of "Bernanke" that could possibly have impacted proposed class members. Moreover, Buy-Side DRS is not alleged as anticompetitive (or even mentioned) in the Complaint. Nonetheless, Google notes that all of its arguments pertaining to Global Bernanke would likewise apply to Project Bernanke and Buy-Side DRS.

issues of fact and law with respect to UPR occupy **no part** of Hanson's claim. And since Hanson cannot claim any injury relating to UPR, resolving his claim would do nothing to resolve the UPR claims of absent class members. This again makes his single claim atypical of the class's multiple claims. *See Garcia De León v. New York Univ.*, 2022 WL 2237452, at *13 (S.D.N.Y. June 22, 2022) (if the named plaintiff is "unable to establish that she suffered any injury at all . . . that would necessarily doom the claims of other class members"); *cf. In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 325 (E.D.N.Y. 1982) (distinguishing a case where "the plaintiff was the only representative, and the fact that he was incapable of prosecuting certain claims meant that they would not be prosecuted at all"). Put simply, Hanson's claims are not typical of the class because he has only half of the claims that the class seeks to bring.

Hanson recognizes that "Bernanke and UPR are different actions," Mot. at 12, even as he attempts to characterize them as "part of the same overarching course of conduct." *Id.* But that observation does nothing to prove typicality. Whatever "course of conduct" Hanson's claim arises from, it necessarily ended in September 2016, when he ceased using Google Ads. *See* ECF 701 (Opinion on Google's MTD) at 21-22.

Hanson resorts to arguing that Bernanke and UPR concern the same antitrust claim; in this case a Sherman Act Section 2 claim. But one claim is not typical of another simply because both involve alleged violations of the same law. *See Wal-Mart*, 564 U.S. at 350 ("Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once."). His argument that "[t]ypicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants" is inapposite because this is not a conspiracy or price-fixing case. Mot. at 14 (quoting *In re Playmobil*

*Antitrust Litig.,* 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998)).  *Playmobil* involved one single alleged price-fixing agreement affecting the entire class.  35 F. Supp. at 240-41.  Indeed, in the sentence before the one Hanson quotes, the *Playmobil* court made clear that its analysis was limited to price-fixing cases.  *Id.* at 241 ("[C]laims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices.").  Here, Hanson does not challenge a single conspiracy; instead, he asserts a series of distinct allegedly anticompetitive actions, some of which occurred long after he stopped using the product. He cannot represent absent class members with claims based on fundamentally different conduct.

Hanson also argues that typicality "is 'usually met irrespective of minor variations in the fact patterns underlying individual claims,'" Mot. at 12 (quoting *Robidoux*, 987 F.2d at 936-37). He omits the beginning of the relevant sentence, which caveats that the observation applies "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented."  *Robidoux*, 987 F.2d at 936-37.  That is not the case here, as Hanson seeks to represent plaintiffs challenging different conduct across different time periods.  The differences between Hanson and the rest of the putative class range far beyond "minor variations" and implicate different sets of facts and analysis.  *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) (typicality requirement is not met where "there is sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative of whether other class members were overcharged"). Proof that Hanson was impacted by Global Bernanke would not prove that a different advertiser was impacted by UPR.

Because Hanson's claims are limited to a brief three-month period in 2016, and because his experience differs markedly from advertisers whose purchases were subject to different optimizations, Hanson cannot meet his burden of showing typicality.

### B.  Hanson cannot fairly and adequately represent the proposed class.

Hanson bears the burden of showing that "the representative parties will fairly and adequately protect the interests of the class."  *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). "To satisfy Rule 23(a)(4), the named plaintiffs must 'possess the same interest[s] and suffer the same injur[ies] as the class members.'"  *Id.* (quoting *Amchem*, 521 U.S. at 625-26).  "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).  Hanson cannot meet either prong.

Hanson neither possesses the same interest nor has suffered the same injury as class members allegedly affected by UPR.  Hanson cannot claim injury from UPR, nor any other optimization subsequent to 2016, and therefore has no interest in pursuing claims related to such optimizations.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018) (plaintiffs failed to establish adequacy because "a named plaintiff has no incentive to establish trader-based manipulation on a day on which it had no exposure to EDFs"); *see also Maroney v. Woodstream Corp.*, 2025 WL 945874, at *7 (S.D.N.Y. Mar. 28, 2025) (finding putative class representatives inadequate where their interest in recovering for a subset of claims not available to all class members reduced their incentive to pursue other, less potentially lucrative claims).  Hanson similarly has an incentive to seek to establish anticompetitive effects of optimizations only insofar as they affected his advertising purchases over three months in 2016,

and no incentive to try to prove the impact of Google's optimizations, including UPR, on class members' purchases made in the years since.

Nor does Hanson have any interest in pursuing (or ability to pursue) claims for injunctive relief that might be available to current Google Ads advertisers. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 227-40 (2d Cir. 2016). In *Payment Card Interchange Fee*, the Second Circuit vacated class certification on adequacy grounds, noting that "many members of the . . . class have little to no interest in the efficacy of the injunctive relief because they no longer operate, or no longer accept Visa or Mastercard, or have declining credit card sales" and that "class counsel and class representatives . . . were in the position to trade diminution of [injunctive] relief for increase of [monetary] relief." *Id.* at 233-34. Other courts in the circuit have similarly found putative class representatives inadequate where those representatives have no interest in injunctive relief potentially available to other class members. *See, e.g.*, *Harris v. Initial Sec., Inc.*, 2007 WL 703868, at *6 (S.D.N.Y. Mar. 7, 2007) ("Plaintiffs are no longer employed by Defendant and would thus not benefit from any sort of injunctive relief. Their interest in receiving back-pay, compensatory, and punitive damages might prevent them from adequately protecting the interests of those class members who are still employed by Defendant and who might be more inclined to receive injunctive, rather than monetary relief.").

Hanson's interests are also antagonistic to absent class members that are also publishers. Over 3,800 advertisers, comprising 10.3% of the ad spend by the class, are publisher-advertisers. Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 44. Hanson, an advertiser, claims that increased ad prices constitute anticompetitive harm. The advertiser-publishers in the class, however, may be seeking to maximize the price of the ads they sell and would therefore not endorse a theory that viewed higher ad prices as harmful. Like the antagonistic class members in *LIBOR-Based Financial*

16

*Instruments*, Hanson's interests conflict with some class members where he has a disincentive to show harm to publishers by Google's optimizations that might indicate benefit to advertisers (and vice versa). 299 F. Supp. 3d at 539 (finding proposed class inadequate where named plaintiff "has active disincentive to establish trader-based manipulation when the direction of that manipulation benefited its trading positions—even if that manipulation harmed more class members or harmed class members in the aggregate.").

### C. Common questions of law or fact do not predominate over individualized questions of impact and damages.

Hanson identified nine purported common questions in his class certification motion. Mot. at 11. While Google agrees that some of these questions are common, the most important ones are not.[5] In particular, the two dispositive questions of impact and damages require proof that will vary from class member to class member. Multiple courts have either held or assumed that an antitrust Rule 23(b)(3) class fails if impact and damages cannot be established through common evidence. *See, e.g.*, *Comcast*, 569 U.S. at 30 ("The District Court held, and it is uncontested here, that to meet the predominance requirement respondents had to show (1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that [was] common to the class rather than individual to its members'; and (2) that the damages resulting from that injury were measurable 'on a classwide basis' through the use of a 'common methodology.'"); *In re Aluminum*

---

[5] In Hanson's issue 7 (whether Google's actions relating to UPR and Bernanke constituted anticompetitive conduct), he conflates the Complaint's allegations that two distinct types of conduct (Global Bernanke and UPR) harmed competition in two distinct alleged markets (self-service buying tools and ad exchanges). In considering whether common proof can demonstrate impact or damages, the Court must separately consider the proffered proof of the effect of each optimization, the antitrust impact of each optimization, and the method of calculating damages from each optimization, as "conflating differing theories risks applying a theory of injury applicable only to certain class members to others who may not have been injured by that specific theory." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 FRD 527, 553 (S.D.N.Y. 2021); *see also Stafford v. Bojangles Rests., Inc.*, 123 F.4th 671, 680-81 (4th Cir. 2024) (holding that plaintiffs' identification of a common question with respect to pre-shift work could not satisfy predominance where the class also included other claims, such as time-shaving and off-the-clock wages at other times).

*Warehousing Antitrust Litig.*, 336 FRD 5, 56-57 (S.D.N.Y. 2020) (plaintiffs did not satisfy Rule 23(b)(3) where individual issues existed as to impact and plaintiffs' expert model merely averaged impact across the class period); *Reid v. A-Plus Care HHC Inc.*, 2024 WL 5443182, at *12-*13 (S.D.N.Y. Nov. 27, 2024) (plaintiffs did not satisfy Rule 23(b)(3) where individual inquiries were necessary into whether each class member was entitled to be compensated based on their hours worked); *Fernandez v. UBS AG*, 2018 WL 4440498, at *13 (S.D.N.Y. Sep. 17, 2018) (plaintiffs did not satisfy Rule 23(b)(3) where individual inquiries were necessary into whether defendant breached its contractual obligation to each class member).

Here, class certification is precluded under Rule 23(b)(3) because Hanson fails to offer any way to show (1) injury caused by Bernanke or UPR across the class or (2) measurable damages from Bernanke or UPR.

### 1. There is no common proof that all proposed class members suffered antitrust injury.

Individualized inquiries must be made to determine whether the proposed class suffered antitrust injury, thus precluding certification. Antitrust injury requires both (i) injury-in-fact; and (2) that such injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977).

Hanson cannot use common proof to demonstrate that all proposed class members have suffered the same injury-in-fact or antitrust injury because (a) upwards of 60% of proposed class members were unaffected by each at-issue Google optimization active during the class period; (b) the net effect of an optimization on an advertiser is an individualized question; and (c) Hanson's experts fail to put forward any valid common methodology to assess impact.

### a) There is a substantial number of uninjured class members.

The substantial number of uninjured class members by itself precludes Hanson from showing common impact. "If many class plaintiffs cannot link their specific injury to one of the theories articulated by the lead plaintiff, then there is no guarantee that common issues predominate across the class." *Namenda*, 338 F.R.D. at 553. Although the Second Circuit has not opined on this specific question, courts in other circuits have held that a proposed class with a significant number of uninjured members cannot be certified. In *In re Asacol Antitrust Litigation*, the Court held that upwards of 10% of uninjured class members was sufficient to preclude certification under Rule 23(b)(3). 907 F.3d 42, 53 (1st Cir. 2018). There, "any class member may [have been] uninjured, and there [were] apparently thousands who in fact suffered no injury. The need to identify those individuals will predominate and render an adjudication unmanageable." *Id.* Similarly, in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, the D.C. Circuit affirmed denial of class certification for failure to meet the predominance requirement where 2,037 class members suffered no injury. 934 F.3d 619, 626 (D.C. Cir. 2019); *see also Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023) (plaintiff was unable to prove predominance where inquiry requiring assessment of whether setoff left class members uninjured "cannot be described as de minimis"). This case involves far more uninjured class members than *Asacol* or *Rail Freight*–so many that the class could not be certified under any formulation of this rule.

The following categories of class members could not have been injured by Buy-Side DRS, Project Bernanke, Global Bernanke, and/or UPR:

- **Class members that had no transactions through AdX.** It is undisputed that the Bernanke optimizations only applied to Google Ads bids into AdX. Hanson also alleges that UPR affected competition between AdX and other exchanges. Class members who never used AdX transacted outside of the allegedly monopolized ad

exchange market, and therefore could not have suffered antitrust injury from an alleged reduction in competition in that market.[6]  This is over 230,000 advertisers and approximately 9% of the class.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 39 n.19. More than half of the transactions by the putative class occurred on AdSense and did not involve an ad exchange.  *Id.* ¶ 39.

- **Class members that did not buy ads while the optimization in question was in effect.**  A class member that did not buy impressions while UPR was active could not have suffered injury from UPR.  Likewise, a class member that did not buy impressions while Global Bernanke was active could not have suffered injury from Global Bernanke.  94% of proposed class members were not present when Buy-Side DRS was active, 90% were not present when Project Bernanke was active, 60% were not present when Global Bernanke was active, and at least 16.4% were not present when UPR was active.  *Id.* ¶ 63, Exhibit 2, ¶ 82; Sessions Decl., Ex. 6 (Haider Dep.) 27:23-28:4.  The significant number of uninjured class members with respect to any particular optimization means that a single class covering all the optimizations cannot be certified.

        **b) The net effect of an optimization on an advertiser is an individualized question.**

Given the substantial heterogeneity across the proposed class, *supra* Section II.D, the resolution of whether proposed class members were negatively impacted by Google's

---

[6] To the extent that Hanson intends to argue that changes to competitive conditions in an ad exchange market had an indirect or downstream effect on non-ad-exchange transactions, this theory of impact is not cognizable in a federal antitrust damages case because the AdSense advertisers are not direct purchasers of any product in—or even downstream of—an ad exchange market.

optimizations cannot be achieved through generalized proof and instead requires individualized inquiries as to each advertiser.

Critically, determining each advertiser's presence during the proposed class period and the inventory source used by that advertiser at the relevant time is necessary to determine whether an advertiser could even possibly have been subject to an optimization, let alone harmed. This "fatal dissimilarity" alone dooms predominance. *See In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017).

Even if an advertiser was subject to an optimization, determining impact nonetheless requires an individualized inquiry because advertisers who benefited from Google's optimizations cannot have suffered antitrust injury. *See* Sessions Decl., Ex. 6 (Haider Dep.) 11:7-13:5, 46:12-48:5. "[T]he fact that a class member benefitted from the defendants' conduct . . . simply means that the class member has not suffered an injury." *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019); *see also Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 525 (S.D.N.Y. 2016) ("[A] plaintiff cannot establish antitrust injury where it 'actually tended to benefit' from the alleged conduct."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 543-44 (assessing harm to class required netting plaintiff traders' relevant transactions, making the damages inquiry highly individualized such that common issues did not predominate over individual ones). The record evidence demonstrates that many advertisers benefited from the optimizations at issue, which Hanson's own experts acknowledge. *See supra* at 6-7. Dr. Haider's empirical analysis of prices before and after each optimization further highlights that advertisers not only faced disparate price movements, but over half of proposed class members benefited from the optimizations in the sense that they paid lower prices afterwards. *See, e.g.*, Sessions Decl., Ex. 6 (Haider Dep.) 35:7-36:23; *supra* at 10.

Despite this evidence, in assessing impact, Hanson and his experts nowhere consider potential benefits to individual advertisers resulting from Google's optimizations. For example, both Dr. Zona and Dr. Singer emphasize that AdX gained impressions due to UPR. Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 87; Sharp-Wolfson Decl., Ex. 3 (Singer Op.) ¶ 96. However, they fail to consider that additional impressions won by proposed class members would benefit those advertisers because they gained access to additional inventory and received additional conversions. Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 92. Indeed, neither Dr. Zona nor Dr. Singer identifies which advertisers were able to purchase more impressions or obtain more conversions, and they do not offer any methodology to weigh individual class members' benefit against others' alleged harm. *See Allied Orthopedic*, 247 F.R.D. at 177 (C.D. Cal. 2007) ("[M]ost courts share the view that a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."). Moreover, for advertisers who are also publishers, an additional inquiry (not undertaken by Hanson or his experts) is needed to weigh each optimization's effect on the proposed class member as both an advertiser (buying an impression) and as a publisher (selling an impression). *See* Sessions Decl., Ex. 1 (Haider Rpt.) ¶¶ 30-31.

### c) Hanson's experts fail to put forward any valid common methodology that could assess impact.

Hanson references two economic experts who together offer five different methodologies to assess impact, with each method arriving at a different damages estimate. Sessions Decl., Ex. 5 (Zona Dep.) 111:5-12 (reply model is "different data, different methodology" from his opening model); Sessions Decl., Ex. 3 (Singer Dep.) 28:24-29:11 (opening report by itself includes two methodologies), 170:23-171:16 (reversing direct method methodology in his reply report). In his Motion, Hanson does not tell the Court which of these five different methodologies he would

actually use to attempt to prove common impact and damages. The sheer number of internal differences and inconsistencies among Hanson's own expert reports is evidence of the lack of any proffered common method and demonstrates why the proposed class should not be certified.

None of Hanson's potpourri of methods is capable of proving impact to all or nearly all class members. Following *Comcast*, district courts must "carefully examine, at the class certification stages, the soundness of an expert's model relied upon to establish classwide impact," and "where an expert's model of classwide injury fails . . . such deficiencies will preclude class certification under Rule 23(b)(3)." *Aluminum Warehousing*, 336 FRD at 47, 49; *see also In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (vacating decision to certify class based on expert's average-pricing model when the district court did not sufficiently analyze whether that expert's model masked individualized injury). If the model is unsound, the Court "risks certifying a class of uninjured plaintiffs, or a class of plaintiffs who were not injured in the same way such that common issues of law or fact predominate." *Namenda*, 338 FRD at 554.

### (1) Dr. Zona does not provide a common methodology that could assess impact.[7]

Dr. Zona offers no methodology that is capable of proving common impact. His model does not *test* for impact to all or nearly all class members, but rather *imposes* it by design. Basic testing of his model shows that it improperly masks, rather than accounts for, substantial differences among proposed class members. It is based on highly aggregated averages that are driven by the experiences of just two class members; Dr. Zona never reported results of testing his

---

[7] Google's motion to exclude Dr. Zona's testimony discusses in detail the fatal errors in his analysis. If the Court grants Google's *Daubert* motion, Plaintiff would have no methodology to prove impact or damages and the class could not be certified. For purposes of this brief, Google takes Dr. Zona's models as given and explains why, on their face, they are incapable of showing common impact.

models against any class member's actual data. Additionally, his model cannot be used to prove that advertisers who sourced impressions via AdSense were impacted whatsoever.

**Dr. Zona's models do not test for or show common impact; they require it.** In his opening report, Dr. Zona does not offer any model to test common impact but simply argues that all or substantially all Google Ads advertisers were impacted because approximately 99% of proposed class members paid for the placement of at least one ad using either a CPC or eCPM cost model from 2016 to present. Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 141. His regression models purported to show that CPC and eCPM transactions, on average, cost more if AdX had a higher "win rate." *Id.* ¶ 120; Mot. at 27. His finding that Google Ads advertisers had transactions using one of two cost types amounts to saying that Google Ads advertisers paid to use Google Ads at some point during the class period. And his finding that CPC and eCPM transactions were higher *on average* says nothing about any individual advertiser's experience; any given advertiser might pay lower prices even though the overall average was higher. *See, e.g.*, *Aluminum Warehousing*, 336 F.R.D. at 62-63 (reliance on averages yields false positives); *see also* Sessions Decl., Ex. 5 (Zona Dep.) 189:4-24 (admitting he estimated one single coefficient on AdX share variable that is an average across all advertisers). Dr. Zona's opening model is incapable of showing whether Global Bernanke or UPR caused injury to any individual class member.

In his reply report, Dr. Zona offers a new model that also imposes rather than tests for common impact, and that omits half of the class altogether. He argues that his new model "statistically" establishes common impact on all Google Ads advertisers "because each advertiser included in the analysis will always have a transaction for which the but-for CPC is less than the CPC they actually paid." Sharp-Wolfson Decl., Ex. 2 (Zona Reply) ¶ 99. Notably, Dr. Zona's reply model excludes observations for approximately 1.3 million advertisers–amounting to fifty

24

percent of all proposed class members. *Compare* Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 33 (estimating a proposed class of approximately 2.6 million unique advertisers), *with* Sharp-Wolfson Decl., Ex. 2 (Zona Reply) ¶ 86 (analyzing impact and damages for "about 1.3 million advertisers"). His model does not show impact for 50% of the class because that 50% of the class is not "included in the analysis;" his model says nothing about the omitted advertisers' experience and he does not purport to claim otherwise.

Dr. Zona's statement that every advertiser will have at least one transaction where the but-for CPC is less than a CPC actually paid is not proof of common impact, it is simply a description of how he designed his model. By construction, Dr. Zona's reply regression requires that every included class member will have a transaction with a CPC lower than his "but-for CPC." That is because the "but-for CPC" in Dr. Zona's model is the actual CPC an advertiser paid, minus Zona's estimated overcharge. As a matter of arithmetic, if the overcharge is positive, the actual CPC minus the overcharge will yield a number smaller than the actual CPC. Sessions Decl., Ex. 5 (Zona Dep.) 213:14-215:3, 215:8-15. Zona does not purport to assess the overcharge on an advertiser-by-advertiser basis, but instead determines *one* overcharge number at every point in time for the entire class. *See id.* 197:11-15, 198:17-25. Since he *assumes* a uniform positive overcharge across the class, his model will always show that every advertiser had at least one "impacted" transaction—regardless of that advertiser's actual experience.

Even taking Dr. Zona's model at face value, it shows that the net impact on advertisers is individualized. His model shows observations where the but-for CPC (*i.e.*, absent Google's optimizations) for each advertiser is *higher* than the actual CPC paid, meaning there are instances where advertisers *pay more* in his but-for world. *Id.* 216:15-217:21; 218:9-16. An advertiser that would pay *more* absent the challenged conduct is not impacted. Dr. Zona does not purport to

reconcile the transactions where an advertiser was better off versus worse off, so his model cannot test for net impact to any class member.

**Dr. Zona's models elide, rather than accommodate, substantial variation among proposed class members.** The class consists of very large and very small advertisers, across a very broad range of injuries, all of whom paid wildly disparate prices for ads. The difference in pricing reflects the fact that different advertisers value advertising opportunities differently, and that competitive conditions within an auction (*e.g.*, the number and identity of other bidders) can influence the price. Dr. Zona's model does not hold up when tested against the substantial heterogeneity found in the proposed class. In her rebuttal report, Dr. Haider conducts three tests that each highlight how Dr. Zona's models mask variation across advertisers:

- First, Dr. Haider applies Dr. Zona's models to his pricing data for all but the top 0.1% of advertisers, finding that removing the two largest advertisers (Facebook and Temu) from his sample completely overturns his result. Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 123, Exhibit 10. In other words, when Dr. Haider removes the 0.1% largest advertisers from Dr. Zona's sample, his model shows that the remaining 99.9% of proposed class members did not experience any overcharge. *Id.* ¶ 123, Exhibit 10; Sessions Decl., Ex. 6 (Haider Dep.) 46:3-11. This demonstrates that his conclusion of common impact as to all or substantially all Google Ads advertisers is driven by the pricing experience of a negligible proportion of the proposed class. Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 125.

- Second, Dr. Haider finds that Dr. Zona's model masks substantial variation among the ad prices paid by advertisers associated with different verticals.[8]  Applying Dr. Zona's methodology to advertisers in different verticals demonstrates that, for the majority of verticals (accounting for over one million proposed class members), an increase in AdX share is not associated with an increase in ad prices paid by advertisers in the vertical.  *Id.* ¶ 118, Exhibit 9; Sessions Decl., Ex. 6 (Haider Dep.) 44:25-46:2.  As advertisers in different verticals faced disparate effects within Dr. Zona's own model, Dr. Haider shows how his model in fact demonstrates the *lack* of class-wide impact.  Dr. Zona claims to have accounted for this heterogeneity in his reply model, but he did not.  His reply model purports to control for the advertiser's vertical, but it actually only controls for characteristics of an advertiser that remained constant for the entire class period.  Sessions Decl., Ex. 5 (Zona Dep.) at 207:9-21.  He does not, therefore, control for time-bound heterogeneity, such as the impact of the COVID-19 pandemic, nor for changed competitive conditions within a vertical, such as the entry of a new advertiser.  As one example, Temu entered the U.S. retail industry in late 2022, which drastically increased the monthly total impressions for that vertical.  Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 161, Exhibit 15.  None of his models account for the entry and influence of Temu (or similar factors) on ad prices.

- Third, Dr. Haider finds that Dr. Zona's model masks the idiosyncratic nature of ad prices.  Looking at the monthly average CPC for each of the top 100 Google Ads

---

[8] *See* Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 117 n.178 (quoting ABA treatise on the application of econometrics to antitrust issues, which states that estimating the effect for different groups of customers "can yield additional insights into classwide impact and the existence and stability of a common method of proof.").

advertisers on AdX or third-party exchanges (by ad spend) shows that for a given advertiser, CPC fluctuates dramatically from month to month over the proposed class period, reflecting the idiosyncratic factors that vary on an auction-by-auction basis. *Id.* ¶ 108, Exhibit 7; Sessions Decl., Ex. 6 (Haider Dep.) 29:2-19 (whether an optimization had an effect on an advertiser's winning bid varies transaction-by-transaction), 48:16-49:16 (advertiser prices are affected by a number of idiosyncratic factors that must be considered when analyzing impact). Dr. Zona completely ignores these auction-specific factors when considering impact across the proposed class. Again, he claims to have fixed this problem in his reply model but only controls for differences that stay constant throughout the class period. Sessions Decl., Ex. 5 (Zona Dep.) 207:9-21. As the wild swings in CPC that an advertiser might pay from day to day or month to month indicate, the factors that influence CPC prices vary significantly over time and were not captured by Dr. Zona.

Dr. Zona's assumption that an overcharge is uniform across the class is invalid given the significant heterogeneity in ad prices from advertiser to advertiser and from month to month. *See, e.g.*, *Blades v. Monsanto Co.*, 400 F.3d 562, 570 (8th Cir. 2005) (affirming denial of class certification where "supply-and-demand conditions" for sales vary to a great extent, "the 'but-for' prices could be determined only through individualized inquiries for each potential class member").

**Dr. Zona's model cannot prove impact for AdSense advertisers, and his decision to combine ad exchange and AdSense transactions makes his entire reply model invalid.** Over 50% of the transactions by the proposed class took place on AdSense and not on any ad exchange. Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 130, Tbl. 2; *see also* Mot. at 4, n.2. (admitting AdSense

transactions do not involve an ad exchange). Hanson's theory of harm—and Dr. Zona's models—are all premised on the idea that the Bernanke optimizations and UPR affected the alleged ad exchange market. *See* Mot. at 21 n.7 (Hanson stating that his damages theories only depend on the alleged ad exchange market). Hanson and Dr. Zona offer no theory as to how AdSense transactions would have been impacted by Bernanke and/or UPR.

With no theory or economic logic to offer, Hanson and Dr. Zona fall back on the regressions as the "evidence" that the price of AdSense transactions is correlated with changes in Google's share of an ad exchange market. But a statistical model untethered to any logical theory is not evidence of harm. *See Comcast*, 569 U.S. at 35. Hanson's claim that AdSense transactions were impacted simply because the model shows impact is tautological and insufficient to serve as common evidence of impact.

Dr. Zona seems to have been aware of his AdSense problem, at least initially. In his opening report, he ran two separate regressions: one for ad exchange transactions and a different one for AdSense transactions, implicitly acknowledging that transactions on two platforms should be treated differently. Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 127; Sessions Decl., Ex. 5 (Zona Dep.) 197:22-198:3. But in his reply report he combined ad exchange and AdSense transactions into one mega-model.[9] Sessions Decl., Ex. 5 (Zona Dep.) 205:13-17. By combining price data from transactions that were allegedly affected with price data from unaffected transactions, Dr. Zona made his reply model unable to show impact to any class member, as it includes transactions that were not priced as a result of the wrong. *See Namenda*, 338 FRD at 554. Moreover, combining the data again elides significant variation. Dr. Haider's testing shows that when Dr. Zona's reply regression model is applied separately to AdX and AdSense transactions (as he does in his opening

---

[9] Dr. Zona never explains why he did this.

report), his results show no impact on AdSense transactions and substantially smaller impact to ad exchange transactions.  Sessions Decl., Ex. 8 (Haider Supp. Decl.) ¶¶ 2-3.

> ### (2) Dr. Singer does not provide a methodology that could show impact to all class members because he purports to measure effects from UPR only.

Dr. Singer's models likewise cannot be used to show impact across proposed class members.  Dr. Singer only considers the effects of UPR, Mot. at 28, so his opinions cannot possibly show impact across the entire class.  His models say nothing about impact to at least 16.4% of class members that did not buy ads while UPR was in effect, Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 36, with his indirect method not purporting to assess impact for 57.7% of proposed class members, *id.* ¶¶ 147-48.  Indeed, Dr. Singer's models cannot show that the only named plaintiff, Mr. Hanson, suffered any impact since Hanson did not purchase ads while UPR was in effect.  *See* Mot. at 28.

As for the period after September 2019, for the reasons provided in Google's *Daubert* motion, none of Dr. Singer's direct method, indirect method, or analysis of "pricing structure" are capable of demonstrating impact.  Dr. Singer's direct method estimates damages to proposed class members based on a calculation driven solely by including advertisers outside the proposed class (those who purchased impressions via DV360 and Authorized Buyers).  *See* Sessions Decl., Ex. 1 (Haider Rpt.) ¶¶ 205-206.  When his direct method is limited to Google Ads' impressions relevant to the proposed class, his results are overturned, estimating no damages.  *Id.* ¶ 205.  His indirect method fares no better, as it is unable to distinguish the effect of UPR on proposed class members and the effect of other demand factors wholly unrelated to UPR, such as the effect of COVID-19 on impressions.  And his argument that Google's revenue share is a "rigid pricing structure," Mot. at 31, does not serve as common proof of impact because Dr. Singer fails to cite a single piece of evidence that Google would have lowered its AdX revenue share if it did not implement UPR.  *See*

*Miami Products & Chem. Co. v. Olin Corp.*, 2023 WL 8946114, at *19 (W.D.N.Y. Dec. 28, 2023) ("the existence of a pricing structure cannot demonstrate classwide antitrust injury" in the absence of common proof of a mechanism whereby the anticompetitive conduct could have raised prices to class members). A methodology based on such "speculative" inferences would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36.

> **2. Common proof cannot demonstrate that measurable damages result from Google's conduct.**

The Court should deny class certification for the independent reason that Hanson has not shown that he will be able to offer a damages model that can withstand scrutiny under *Comcast*. "[A] model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (citing *Comcast*, 569 U.S. at 35). District courts must conduct a "rigorous analysis" to ensure that plaintiffs satisfactorily "tie each theory of antitrust impact to a calculation of damages." *Namenda*, 338 FRD at 551.

Dr. Zona's and Dr. Singer's models do not measure damages attributable to the challenged conduct only. *See Comcast*, 569 U.S. at 32. Dr. Zona's models estimate damages from Global Bernanke and UPR for advertisers who transacted exclusively on AdSense, yet Hanson does not allege how these optimizations affected AdSense whatsoever. *See supra* at 28-30; Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 138, Tbl. 5; Sharp-Wolfson Decl., Ex. 2 (Zona Reply) ¶ 98. Dr. Singer's direct method shows no damages when limited to the proposed class (as opposed to including impressions purchased via DV360 and non-Google buying tools). Sessions Decl., Ex. 1 (Haider Rpt.) ¶ 205. His indirect method attributes "damages" to factors wholly unrelated to UPR. *See* Google's Memorandum of Law in Support of Motion to Exclude Expert Testimony of Dr. J. Douglas Zona and Dr. Hal Singer at Section IV.B.1.

Dr. Zona's model also cannot be used to measure damages because his model purports to measure both procompetitive and allegedly anticompetitive effects of Global Bernanke and UPR. "The true measure of damages . . . is the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979). "Accordingly, a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct." *Id.* Dr. Zona's model does not isolate the price increment attributable to the allegedly anticompetitive effects of Bernanke or UPR. Instead, Dr. Zona's model purports to measure damages attributable to the entire increase in market share brought about by Global Bernanke or UPR, regardless of whether the increase was a result of some procompetitive benefit. Dr. Zona concedes that these optimizations increased AdX's market share in at least two different ways: (1) they caused AdX to clear transactions that otherwise would have gone unsold; and (2) they caused AdX to win impressions that otherwise would have gone to other ad exchanges. Sessions Decl., Ex. 5 (Zona Dep.) 166:23-167:8. While (2) might (wrongly) be characterized as an anticompetitive effect of Global Bernanke or UPR, (1) cannot be so characterized. Causing AdX to clear transactions that otherwise would not have occurred at all is undisputedly output-enhancing, and not an anticompetitive effect. *See* Sharp-Wolfson Decl., Ex. 1 (Zona Op.) ¶ 82; Sessions Decl., Ex. 5 (Zona Dep.) 165:11-166:16 (conceding that part of an increase in AdX's "win rate" "represented the sale of impressions that would otherwise have gone unfulfilled," and that "this conduct also raised output"). Yet Dr. Zona's damages model fails to distinguish between supposedly anticompetitive and admittedly procompetitive effects of the optimizations at issue, and instead attributes damages whenever there is an increase in "win rate." *See* Sessions Decl., Ex. 5 (Zona Dep.) 166:23-167:8 (Dr. Zona did no analysis of the extent to

which Project Bernanke, Global Bernanke, or UPR's effect on "AdX win rate" was attributable to the sale of impressions that otherwise would have gone unsold).

### D. A class action is not a superior means of adjudicating Hanson's claims.

Where hundreds of thousands of proposed class members agreed to arbitrate their claims with Google, a class action is plainly not "superior to other available methods for fairly and efficiently adjudicating the controversy." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)). Among the non-exhaustive factors set out in Rule 23(b)(3), manageability "is by far 'the most critical concern in determining whether a class action is a superior means of adjudication.'" *Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Ass. Co., Inc.*, 2019 WL 3409882, at *4 (S.D.N.Y. July 27, 2019) (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015)); *see also Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) ("[M]anageability is an issue peculiarly within a district court's discretion.").

Hanson's expansive class—which does not carve out advertisers who agreed to arbitrate—is not manageable and therefore fails under Rule 23(b)(3). Hanson in his brief focuses exclusively on the irrelevant issue of the requisite timing of a motion to compel arbitration in class litigation, *see* Mot. at 34, rather than how the need for proposed class members to arbitrate their claims affects the superiority requirement. The law in this Court is well-established on this latter point. In *Metcalf v. TransPerfect Translations Int'l Inc.*, this Court held that certifying a proposed class that included just over 100 individuals who signed arbitration agreements was "inappropriate" under Rule 23(b)(3). 2023 WL 9510777, at *4, *9, *15 (S.D.N.Y. Nov. 6, 2023). Likewise, in *National Convention Services*, this Court held that a class action was not manageable (and failed the superiority requirement) where a portion of the proposed class had signed arbitration agreements

and class-action waivers.[10]  *See* 2019 WL 3409882, at \*4.  Here, where the majority of proposed class members—comprising hundreds of thousands of advertisers—signed arbitration agreements, a class action will not be manageable because "a significant portion of this litigation would be devoted to discovering which class members signed [arbitration] agreements and enforcing those agreements."  *Pablo v. Servicemaster Glob. Holdings, Inc.*, 2011 WL 3476473, at \*2 (S.D.N.Y. Aug. 9, 2011).

## V.    CONCLUSION

Hanson has failed to show that he can meet the typicality and adequacy requirements of Rule 23(a), and has failed to offer any method capable of showing common impact or damages under Rule 23(b)(3).  Additionally, by insisting on including advertisers who agreed to arbitrate and waived class-action participation, he has made the litigation unmanageable and his class an inferior way to manage this litigation.  *See* Fed. R. Civ. P. 23(b)(3).  Hanson's motion should be denied.

Dated: June 16, 2025                                  Respectfully Submitted,

*/s/ Justina K. Sessions*
Justina K. Sessions
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Email: justina.sessions@freshfields.com

Eric Mahr
Andrew J. Ewalt
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Email: eric.mahr@freshfields.com
andrew.ewalt@freshfields.com

---

[10] Class members who agreed to arbitrate also waived their rights to participate in a class action.  Sessions Decl., Ex. 34 (GOOG-AT-MDL-C-000058335) at -338, ¶ 13A.

Craig M. Reiser
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
Telephone: (212) 728-2218
Email: creiser@axinn.com

Bradley D. Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 469-3532
Email: bjustus@axinn.com

*Counsel for Defendants Google LLC
and Alphabet Inc.*