# EXHIBIT 3

# REDACTED

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 1

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2

3        _____:
         IN RE: GOOGLE ADVERTISING    : Case No.
4        ANTITRUST LITIGATION         :  1:21-md-03010(PKC)
                                       :
5        _____:
6        _____
                                       :
7        GANNETT CO., INC.,            :
                                       :
8                      Plaintiff,      :
                                       :
9             - against -              : Case No.
                                       :  1:23-cv-5177(PKC)
10       GOOGLE LLC and ALPHABET       :
         INC.,                         :
11                                     :
                       Defendant.      :
12       _____:
13
                      HIGHLY CONFIDENTIAL
14                 UNDER PROTECTIVE ORDER
15
16               Tuesday, April 9, 2025
17
                 Video Deposition of HAL SINGER, PH.D.,
18
         taken at the law offices of Axinn Veltrop &
19
         Harkrider, LLP, 1901 L St NW, Washington, DC,
20
         beginning at 9:34 a.m., EDT, before Ryan K.
21
         Black, Registered Professional Reporter,
22
         Certified Livenote Reporter and Notary Public in
23
         and for the District of Columbia.
24
25       Job No. CS7279661
```

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 22

1      Q.   And so your opinions on classwide

2   impact and damages are limited only to a class of

3   advertisers that used Google Ads to purchase ads

4   through AdX since September 2019; is that right?

5      A.   So when you put in, "limited to a

6   class," if I could just modestly amend that,

7   because we're fairly close, because I -- I think

8   that the class may be defined more broadly than

9   the scope of advertisers who -- who I've

10  demonstrated to be injured.

11          So maybe a -- an alternative way of

12  putting it -- and I don't mean to split hairs --

13  is, perhaps, a subclass of advertisers that went

14  through the Google Ads, AdX channels, from

15  September 2019 forward.

16     Q.   And your opinions are limited to a

17  subclass of advertisers that went through the

18  Google Ad AdX channels from September 2019

19  forward and that were impacted or damaged by UPR,

20  correct?

21     A.   Correct.

22     Q.   And one of the materials you relied

23  upon, Doctor, in drafting your report was the

24  Proposed Advertiser Classes' Consolidated

25  Complaint, right?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 28

1    course, you know, I -- I'm gonna be partial to

2    anything that -- that I conceived.  But that

3    would be like asking me if I, you know, favor my

4    daughter over -- over your daughter.  But -- but,

5    yes, I'm sure he -- he could do a fine job.  But

6    I -- I have not assessed what he's done.

7    BY MR. JUSTUS:

8        Q.   Do you know that Dr. Zona has calculated

9    multiple different damages numbers attributable

10   to UPR using his methodology?

11            MR. GRZENCZYK:  Objection; form.

12            THE WITNESS:  It's not surprising,

13   but so I have as well, right?  I -- I've done

14   a -- one analysis -- I have two different

15   analyses that I offer, as you know, in my initial

16   report; and then I have refined the analyses in

17   light of criticisms that I've received from

18   defendant's experts.  So it's -- it's standard

19   and par for the course for a plaintiff's expert

20   to offer multiple estimates or a range of

21   estimates of demand associated with a particular

22   type of challenged conduct.

23   BY MR. JUSTUS:

24       Q.   Well, do you think that it's

25   confusing for the finder of fact that experts for

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 29

1      advertisers have been -- have offered multiple

2      different estimates of damages from UPR using

3      different methodologies?

4                 MR. GRZENCZYK:  Objection to form.

5                 THE WITNESS:  No.  I mean, even -- even

6      within this single expert I've offered two

7      methodologies.  So I don't -- I don't think

8      -- and I'm -- I'm really -- at least at this

9      stage of this proceeding, I'm -- I'm focused on

10     the methodology, or methodologies, not so much

11     the quantum of damages.

12                 It sounded like your question is what --

13     what to do about the quantum, and -- and could

14     there -- could the differing methodologies

15     engender confusion with regard to the quantum.

16                 Is that fair?

17     BY MR. JUSTUS:

18         Q.   Sure.

19         A.   Okay.  I guess you're -- you're worried

20     about something that's so far down the road that

21     it's really hard for me to focus on that right

22     now.

23                 The quantum is just not on my -- at

24     This point, it's not really top of mind.  It's

25     something that our models can produce and we

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 40

1           A.    Okay.

2           Q.    And so in May 2019, there is an open

3     beta for UPR; is that correct?

4           A.    Correct.

5           Q.    And this UPR open beta applied only to

6     publishers who opted to participate, right?

7           A.    Correct.

8           Q.    And not every publisher using DFP

9     participated in the -- let me restart that

10    question.

11          Not every publisher using DFP chose to

12    participate in the UPR open beta in May 2019,

13    right?

14          A.    Correct.  It was still in -- in beta

15    form, so it wasn't necessarily ubiquitous; but,

16    nevertheless, we still begin to see effects

17    starting in May.

18          Q.    Do you know which publishers using DFP

19    participated in the open beta?

20          A.    I mean, sitting here, I don't, no.

21          Q.    Did you do an analysis of that in any of

22    your reports?

23          A.    No.

24          Q.    Do you know how many publishers

25    participated in the UPR open beta?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

1        A.   I don't have a -- a count, but it -- it

2      appears from the -- the reaction, in terms of

3      price diversions, that it seemed to be enough to

4      engender a price dispersion.

5         Q.   But you don't do an analysis in your

6      reports of how many publishers were actually

7      participating in the open beta, right?

8         A.   I think that's fair.

9         Q.   And Google fully launched UPR in

10     September 2019; is that right?

11        A.   Correct.

12        Q.   And so fair to say in 2019, different

13     publishers using DFP received the UPR feature at

14     different times depending on whether they opted

15     into the open beta?  That's what we've been

16     talking about, right?

17        A.   Yes.

18        Q.   In doing your impact analysis, Doctor,

19     did you identify which impressions were purchased

20     from publishers that willingly opted into UPR

21     through the open beta in May 2019?

22        A.   No.  I'm not -- I'm not trying to

23     -- it's -- it's not that granular.  I think I'm

24     looking at monthly aggregated data.

25        Q.   In conducting your impact and damages

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 42

1      analysis, did you identify which impressions

2      were purchased from publishers that sold their

3      inventory through AdX but did not use the DFP ad

4      server?

5          A.   Would you mind just giving that -- that

6      back to me?  It was long.

7          Q.   Yeah.  It was a long question.

8          A.   Okay.  Thank you.

9          Q.   Let me try -- let me try that again.

10         A.   Okay.

11         Q.   In conducting your impact and damages

12     analysis, did you identify which impressions

13     were purchased from publishers that sold their

14     inventory through AdX but did not use the DFP ad

15     server?

16         A.   No.

17         Q.   Prior to the implementation of UPR, were

18     there publishers that did not set different price

19     floors for ad exchanges in DFP?

20         A.   Oh, I'm sure there were some who

21     did not.  But I think that the -- the record

22     indicates that -- that Google observed that they

23     were, and Google was worried about what effects

24     that would have on -- on the success of its

25     exchange.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 43

1      Q.   Did you quantify in your report how

2      many -- let me restart that question.

3           Did you quantify in your report what

4      percentage of publishers did not set different

5      price floors for ad exchanges in DFP prior to

6      UPR?

7      A.   No.

8      Q.   And do you identify any publishers

9      that actually did set differential floors for

10     ad exchanges in DFP prior to UPR?

11     A.   I -- I'm not identifying them by name.

12     I -- I know that when you look in the documents

13     you see Google giving examples.  But -- but even

14     in those examples, I don't know if -- if -- if

15     Google is necessarily calling out a particular

16     publisher.  They might just be talking about

17     examples, generally, of publishers doing that.

18     Q.   Do you agree that you also don't

19     identify any publishers that would have set

20     different price floors for ad exchanges in DFP

21     if not for UPR?

22     A.   Yes.  I -- I -- I think that the record

23     reveals publishers who expressed concern

24     and dismay over the -- their inability to

25     differentiate their -- their floors as they

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 44

1    were accustomed to.

2        Q.   Do you do any sort of systematic

3    analysis of publishers that would have used

4    different price floors if not for UPR?

5        A.   The option was extinguished for -- for

6    all of them.  But you're asking me do I know

7    which ones would have used it?  No, I -- I don't

8    -- I don't attempt to predict which ones would

9    have used it.  I think a safe inference is the

10   propensity to avail oneself of the option was

11   revealed.  We already know that it was being

12   done.  And so a good prediction of -- of what

13   life would have looked like in a counterfactual

14   world is just they would have continued to avail

15   themselves of the same option, to the same

16   degree, as they had been doing during this

17   clean benchmark period.

18        Q.   But you also don't know what percentage

19   of publishers used different price floors

20   pre-UPR, correct?

21        A.   I do not -- I do not have a count of the

22   percentage.  No, I do not.

23            MR. JUSTUS:  We've been going for a

24   little less than an hour, but I'm about to do

25   something that might take us a bit of time.  So,

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 50

1      Let's set aside the Revenue Equivalence Theorem

2      for now.  We may come back to that.  We may not.

3          A.   Okay.

4          Q.   So -- and let's just talk about -- and

5      it seems more comfortable for you to talk about

6      it in the context of the direct method, so let's

7      just say let's talk about the direct method

8      context.  And I want to really focus on what

9      you just said about, "In my direct method, this

10     confounding effect I can separate out because of

11     the different time periods."  That's not a

12     question, so you don't have to agree to it.

13         A.   Okay.

14         Q.   Because I'm sure there might have been

15     ways you said that more precisely, but I just

16     wanted to set the stage.

17         A.   You did a pretty good job.

18         Q.   Okay.  So you -- so we already talked

19     about that you don't know how many publishers

20     participated in the UPR open beta, right?

21         A.   Correct.  And you don't need to know

22     that in order to measure these effects.

23         Q.   And you don't know the size of the

24     publishers that participated in the UPR open

25     beta; is that right?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 51

1        A.    Correct.

2        Q.    So you don't know the number of

3   impressions attributable to publishers that

4   participate in the UPR open beta during the

5   period between the open beta and full launch of

6   UPR in September 2019, right?

7        A.    Well, I would say that the effects that

8   we're observing is -- must be coming from those

9   who participate; that we see -- we see a

10  deviation from prior patterns.  And so I think a

11  reasonable inference is that it's the -- it's the

12  implementation of UPR in beta form that is

13  causing those deviations.

14       Q.    Why must they be coming from the

15  implementation of UPR in beta form and not the

16  introduction of UFPA?

17       A.    Well, because we see these effects in

18  May, and UFPA is not implemented until September.

19       Q.    So, your understanding is that UFPA did

20  not have a beta rollout?

21       A.    I don't know about the -- the precise

22  date of its beta rollout.  I just know that it

23  was implemented in September -- in full form, in

24  September of 2019.

25       Q.    So if UFPA was rolling out in a beta

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 52

1       form at roughly the same level that UPR was

2       rolling out in a beta form, that would confound

3       your results, right?

4            A.   I mean, it -- it could -- it could make

5       it harder.  But if you think about the arguments

6       that -- that your team is making, your economists

7       are making, it's not necessarily that it's

8       affecting impressions.  They are -- they're

9       making an argument that it could have an effect

10      on prices.

11           Q.   Right.  So setting aside what Google's

12      economists may be arguing, I'm just -- seems like

13      we agree that if the UFPA beta was rolling out at

14      the same time as the UPR beta, this beta period

15      could have a confounding effect, right?

16               MR. GRZENCZYK:  Objection; form.

17               THE WITNESS:  If you -- if you could

18      also link that up with some theory as to how the

19      transition from a second price to a first price

20      would affect impressions on AdX.  And if I grant

21      you that the beta, hypothetically, for the first

22      price came out concurrent in May, then that could

23      have confounding effects.  But I don't think

24      either one of those conditions are satisfied.

25      BY MR. JUSTUS:

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 53

1          Q.   So you're not aware of a Google program

2      that rolled out a combined UFPA plus UPR

3      beginning in June 2019?

4          A.   I'm not aware of that program, no.

5          Q.   All right.  Let's look at -- let's look

6      at a document.

7              MR. JUSTUS:  Can I have Tab 13?

8              (Singer Exhibit No. 4, a document

9      Bates-stamped GOOG-AT-MDL-019740145, was

10     introduced.)

11             MR. JUSTUS:  And we're going to mark

12     this Singer Exhibit 4.

13     BY MR. JUSTUS:

14         Q.   So, do you see that this is a Google Ad

15     Manager Comms Doc.  And it says, "Ad Manager

16     Unified First Price Auction."  Do you see that?

17         A.   Yes.

18         Q.   Have you ever seen this document before?

19         A.   Sitting here, I don't -- I don't recall

20     seeing it.

21         Q.   Let me direct your attention to this

22     docu -- to -- to the second page of this

23     document.  And there's a box that says

24     "Timeline/Next Steps."

25              Do you see that?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 54

1          A.    Okay.  Second page.

2          Q.    And then second box.

3          A.    Yes, I see it.

4          Q.    And it says, "May 6th, Unified Pricing

5     Rules available to publishers open beta."

6                Do you see that?

7          A.    Yes.

8          Q.    And then do you see where it says

9     "June 10th, 1 percent of publisher traffic to be

10    diverted to a first price auction experiment"?

11         A.    I see it.  And I'll just note that

12    that's far away from May 1, and it seems like it

13    only is applying to 1 percent of the traffic.

14         Q.    And then you see June 26th, 5 percent of

15    publisher traffic to be diverted to a first price

16    auction experiment?

17         A.    Yeah.  So now you would have had two --

18    almost two clean months with just the UPR beta in

19    effect, if you were trying to study the impact on

20    impressions or prices.

21         Q.    And then July 29th it goes to

22    10 percent, right?

23         A.    Right.  Only 10 percent.  And so now we

24    have May, June and almost all of July to kind of

25    tease out these differences in impact.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 55

1          Q.   Do you know that more than 1 percent of

2     publishers participated in the UPR open beta?

3          A.   I don't know the percentage that

4     participated in open beta.

5          Q.   So it could be the case that, as

6     of June 10th, the same number of publishers are

7     participating in UFPA as are participating in the

8     UPR open beta, right?

9          A.   It could be, but it -- that doesn't seem

10    to comport with -- with the data that we observe.

11         Q.   And if it is the case that, as of June

12    10th, a roughly equal proportion of publishers

13    are subject to UPR as are participating in

14    this UFPA beta, then setting aside the Revenue

15    Equivalence Theorem, you couldn't separate out

16    the effects of UPR from UFPA in the data, right?

17         A.   Well, you'd have two things happening at

18    the same time to the same degree.  But, you know,

19    we -- we -- for the UPR we have a theory as to

20    how it would affect impressions, how it would

21    protect AdX.  We don't have a theory as to why

22    the move from a second price to a first price

23    would lift impressions on AdX.  No theory for

24    that.

25              So when -- when economists goes looking

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 59

1    to competition from other exchanges could cause

2    the Revenue Equivalence Theorem to be upset.

3    I -- I -- I grant that, and I think I testified

4    to that five minutes ago.

5              The Revenue Equivalence Theorem,

6    however, is focused on pricing.  And what my

7    regression is doing is estimating impressions.

8    And so I -- I don't -- I have yet to hear an

9    articulation of how the move to the first-price

10   auction was in any way meant to bolster or lift

11   Google's exchange vis-a-vis rival exchanges, in

12   terms of impressions.

13       Q.   Your basis for suggesting that UFPA

14   might not lead to an increase in impressions is

15   the Revenue Equivalence Theorem.  That's what

16   we're talking about right now?

17       A.    That -- that's not my basis.  I think --

18   I think your experts are putting forth a basis

19   that this transition to the first price could

20   confound what I think is an effect caused by UPR;

21   that is, the first price affected the number of

22   impressions, right?  And I -- and what I'm

23   putting back to you is I don't see an

24   articulation of that theory.  I see a related

25   theory, which is the movement to first price

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 60

1      could have affected the prices, right?  But I

2      don't necessarily see a -- an articulation as --

3      as to how it could have affected impressions

4      over AdX at the expense of its rivals.

5          Q.   You agree that an empirical finding that

6      a movement caused revenue to change is a finding

7      the Revenue Equivalence Theorem does not hold,

8      correct?

9          A.   I think that if you could demonstrate

10     that -- that prices changed, controlling for

11     all other things that are changing, which is

12     difficult here, that -- that you could -- you

13     could find conditions, either theoretically or

14     empirically, that the Revenue Equivalence Theorem

15     did not hold.

16         Q.   And in your reports, Doctor, do you do

17     any analysis to refute the Despotakis paper and

18     show that, in these conditions you're talking

19     about, the Revenue Equivalence Theorem, at least

20     as to impressions, ought to hold?

21         A.   I point out that Dr. Chevalier has not

22     established the conditions necessary to believe

23     that revenue equivalence does not hold.

24     I -- I'll put it that way.

25         Q.   Setting aside what Professor Chevalier

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 61

1        did, you don't do your own analysis, correct?

2            A.    Correct.  It's not my thesis.  I

3        think it's her thesis that -- that RET, Revenue

4        Equivalence Theorem, would not hold.  That's not

5        my thesis.  That's her -- her thesis.

6            Q.    Doctor, do you know who Paul Milgrom is?

7            A.    Yes.

8            Q.    Who is he?

9            A.    He is an auction economist.  And I think

10       that he ultimately went over to Google at some

11       point; left academia and went over to Google at

12       some point.

13           Q.    Did he win a Nobel Prize for auction

14       theory?

15           A.    I believe so, yes.

16           Q.    So are you aware that he is a -- an

17       expert -- an outside expert for Google in this

18       case?

19           A.    Yes.

20           Q.    Did you read his report?

21           A.    Yes.

22           Q.    Did you read his finding that the

23       Revenue Equivalence Theorem -- that he believes

24       the Revenue Equivalence Theorem does not apply in

25       the factual circumstance we've been discussing?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 62

1          A.   Yes.

2          Q.   And -- but you disagree with Paul

3     Milgrom on that?

4          A.   I just pointed out that he didn't

5     establish empirically that the conditions that

6     are needed for the Revenue Equivalence Theorem

7     not to hold were satisfied.

8          Q.   And you -- not to be pedantic -- also

9     don't do an empirical analysis?

10         A.   That is correct.  I -- I am able to

11    separate out these effects by employing a

12    separate alternative method -- that's the direct

13    method, or the DID method -- that allows me to

14    estimate the impact of UPR in its beta form

15    before the first-price transition occurred.

16         Q.   And we've talked about -- we've talked

17    about that.

18         A.   Yes.

19         Q.   So we've been talking about this already

20    some, but you employed two methods to identify

21    common impact in damages, right?

22         A.   Correct.

23         Q.   Direct Method/Indirect Method?

24         A.   Correct.

25         Q.   And you claim that the econometric

Page 69

1          out that optionality, and it succeeded in doing

2          so.  It did, you know, post-UPR analyses to

3          document the profitability of UPR.  And then we

4          see it -- we see it, of course, in the data, as

5          well.

6                  So I feel like -- I hope I'm answering

7          the question, but it seems like the record

8          evidence is pointing and supporting the empirical

9          findings that we're -- we're arriving at.

10          Q.   To ask a more pointed question, Doctor,

11      are you aware of any piece of record evidence

12      where Google contemplated lowering its take rate

13      as an alternative to implementing UPR?

14          A.   They -- I -- I'm aware, sitting here,

15      of documents where Google contemplated lowering

16      its take rate to compete.  I'm not sure if those

17      documents necessarily reference UPR.  But

18      lowering its take rate was something that Google

19      was contemplating, continuously, modeling via

20      simulations; and even implementing via DRS, when

21      necessary, to win auctions.

22          Q.   So let me come back to that, but just

23      I want the record clear -- to be clear on this.

24      You're not aware of any piece of evidence that

25      Google was contemplating lowering its take rate

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 70

1        as an alternative to implementing UPR, correct?

2                MR. GRZENCZYK:  Objection; form.

3                THE WITNESS:  I -- I liked my answer

4        the last time.  I don't know if I -- if I want to

5        amend it.  But I -- it's with the caveat, I'm

6        aware of documents where Google was contemplating

7        lower its take -- lowering its take rate to

8        compete.  But I'm not aware, sitting here, if

9        those same documents make reference to UPR.

10               I hope we can still be friends, but

11       that's -- that's how I'd like the record to wind

12       out.

13       BY MR. JUSTUS:

14           Q.   You mentioned DRS briefly.  One thing

15       that I found interesting in your reply report is

16       you noted that DRS increased AdX output, right?

17           A.   Sure.  I mean, you were -- by lowering

18       the take rate -- or just to make sure we're

19       talking about the AdX DRS.  That's very confusing

20       -- there's two of them.  But by lowering the take

21       rate, it created matches and won auctions that it

22       otherwise would not have.

23           Q.   That it otherwise would have gone

24       unmatched?

25           A.   Unmatched or it could have lost to

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 71

1           another rival exchange.

2               Q.   Your indirect method for determining

3           impact in damages depends upon your conclusion

4           that UPR is anticompetitive, right?

5               A.   Depends upon?  I mean, I -- it certainly

6           is my opinion that UPR was anticompetitive, but

7           not just because of how the regression turned

8           out, but also because of all the record evidence

9           and my understanding of economic theory as

10          applied by Most-favored Nations employed by

11          dominant platforms.

12               I think it's -- rather than saying that

13          one depends on the other, I'd say they're all

14          -- we have an -- we have an anticompetitive

15          hypothesis to test that is informed by theory and

16          record evidence, and we go test it empirically;

17          and we find that the predictions that are made by

18          theory are upheld.

19               Q.   All right.  We're going to have to break

20          that down a little bit.

21               A.   Okay.

22               Q.   So you say that -- and tell me

23          whether I get this wrong.  You say that UPR was

24          something that -- well, let me ask the question

25          differently.  So let me withdraw that.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 72

1          If UPR was a product feature that

2     advertisers and publishers liked, AdX could have

3     realized an increase in impressions as a result

4     of building a better product through UPR,

5     correct?

6          A.   I mean, it -- the question just,

7     respectfully, doesn't make any sense, because

8     they already had the option of not varying the

9     floors prior to UPR.  So UPR didn't give them

10    something new.  They -- if they wanted to do

11    that -- if they wanted to charge the same floors

12    across rival exchanges, they could have done that

13    without UPR.

14          So it's hard for me to -- to conceive of

15    this as being a benefit.  We are deprecating, we

16    are -- we are abrogating.  We're removing a right

17    that publishers used to exercise.  We're removing

18    optionality that they used to exercise.

19          And economists recognize that, when you

20    take away a right, particularly one that was

21    valuable and was exercised and the expected

22    effect would be harm, not benefit.

23          Q.   So I'm going to have to ask you to

24    suspend disbelief for a moment.  And suspending

25    your disbelief, if UPR was a feature that

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 73

1     advertisers and/or publishers liked, the increase

2     in impressions you measure could be because

3     advertisers and publishers transacted more in

4     response to a better product, right?  Suspending

5     your disbelief.

6          A.   Yeah.  I mean, this one's tough because

7     you're asking also to suspend everything I know

8     about the facts.

9          I mean, if -- if all UPR did was -- you

10    know, was increase output, you would -- you would

11    expect that you'd see an impression lift that

12    didn't come at the expense of its -- of its

13    rivals.  And, you know, we're seeing -- we're

14    seeing that they all -- UPR also impaired its

15    rival's ability to compete.  So it's just a lot

16    of -- it's a lot -- it's a lot to take in that

17    -- in that assumption.

18         I mean, if you want me to assume away

19    theory and record evidence in my findings, and

20    assume that UPR is a good thing, could -- could

21    it be a good thing, it becomes almost

22    tautological.

23         I will agree with you in kind of an

24    Orwellian form that, if you want me to assume

25    it's good, then is it good?  Yes.  How about

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 74

1    that?

2         Q.   If it is good in this Orwellian world

3    that you say I'm asking you to hypothesize,

4    then the benefits of UPR could have caused the

5    impression increase, correct?

6              MR. GRZENCZYK:  Objection; form.

7              THE WITNESS:  If you want me to assume

8    -- I'm sorry.  But if you want me to assume it's

9    beneficial, then -- then the impressions would be

10   beneficial.  The lift impressions would be

11   beneficial.

12             But as an economist, it's not beneficial

13   to take away someone's optionality.  They used to

14   have optionality, they availed themselves of it

15   and now it's gone.  That tends to be a bad thing.

16   BY MR. JUSTUS:

17        Q.   I take it that there are no controls in

18   your indirect method for impression increase that

19   could have been caused by advertisers and

20   publishers preferring UPR, correct?

21        A.   The regression just knows when the UPR

22   starts.  The regression doesn't know if it's a

23   good thing or a bad thing.  The regression just

24   is trying to associate the imposition of UPR with

25   the impressions, controlling for other things

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 75

1         that may have affected impressions at the same
2         time.
3             Q.   So assuming there was a publisher and
4         this publisher liked UPR, and, as a result, put
5         more impressions onto AdX, and that caused the
6         post-UPR impressions to go up, your model would
7         attribute that increase to anticompetitive effect
8         and assumed that Google would have needed to
9         lower the price, but for the anticompetitive
10        effect, to achieve that increase, correct?
11            A.   No.  The model is not assuming an
12        anticompetitive effect.  All the model is doing
13        is associating UPR with impressions, controlling
14        for other things that affect impressions.  The
15        model doesn't tell us anticompetitive effects.
16                 To understand and -- and, ultimately,
17        reach a conclusion of anticompetitive effects,
18        you need record evidence, you need economic
19        theory, and you need to combine it with the
20        model.  It's this holistic approach that allows
21        to you make that inference.  The model by itself,
22        at least stage one of my indirect model showing
23        the lift, isn't going to distinguish between
24        pro- or anticompetitive theories.
25            Q.   Let's break that down a little

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 76

1      more.  You measure something like 740 million or

2      so lift in impressions per month due to UPR in

3      your indirect model, correct?

4          A.   Correct.

5          Q.   And you say that, but for UPR, if Google

6      wanted to win those same impressions, Google

7      would have needed to -- let me -- let me --

8          A.   It was good.

9          Q.   But you -- but you say, "but for the

10     harmful effect of UPR."  So you're not measuring

11     this lift of UPR being the product of harm from

12     UPR.  According to your model, it could just as

13     well have been due to the benefits of UPR.

14         A.   If we're only considering the model in

15     isolation and we're ignoring what economic theory

16     tells us and ignoring the record evidence and

17     what Google's motivation was, the model can only

18     tell us directionally what the -- what the impact

19     of UPR was on impressions, controlling for things

20     like the take rate.  That's -- that's all the

21     model can do.

22              So the model is -- by itself can't

23     distinguish between a pro- and an anticompetitive

24     hypothesis.  To do that you need more.  You need

25     record evidence.  You need economic theory.  You

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 77

1    need to look at other empirical analyses: the
2    DID.  You need to see how it was coming at the
3    expense of rival exchanges who could no longer
4    compete on the price dimension.  So I'll leave it
5    at that.
6        Q.   So we've just been talking about the
7    impression lift that your model calculates,
8    but, of course, there's, what I would call, an
9    elasticity component of your model, right?
10            Well, let me be more specific.  The
11   second part of your model that says, "I found
12   this level of impression lift, what sort of
13   decrease in AdX take rate would otherwise be
14   required to generate this impression lift,"
15   correct?
16       A.   Pretty close.  You'll note that I'm
17   using the total take rate on the right-hand side.
18   But, yes, I ultimately solve for the decrease in
19   the AdX take rate that would be needed to
20   engender the same lift.  That would be a
21   procompetitive response.
22       Q.   And your model actually can't rule
23   out the fact that the UPR impression itself --
24   impression lift itself was a procompetitive
25   response to a better product feature, as much as

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 78

1      you may doubt that being true?

2          A.   The model can only tell you that

3      impressions went up.  The model can't tell you

4      pro- or anticompetitive.  That's why you need to

5      supplement the model with economic theory, record

6      evidence, and other empiricism outside of this

7      model.

8          Q.   Got it.

9               And you conclude that these increases

10     in impressions following UPR were reflective of

11     anticompetitive effects of UPR by reviewing

12     record evidence?

13         A.   Well, among other things: record

14     evidence, economic theory.  I mean, what the

15     -- what UPR is doing, just to be clear, is it

16     -- it impairs a rival exchange's ability to

17     compete via lower take rates, whereas before,

18     when -- when publishers had the freedom or the

19     optionality to change their -- their price

20     floors, they at least had the possibility of

21     steering advertisers to the lower-cost platform

22     by saying, "hey, hey, come over here and you'll

23     get the same inventory at a lower price."

24               Once that optionality is removed, you

25     know, they no longer can do that.  And so you

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 79

1    would expect that there would be an ill-gotten

2    lift in Google's exchange, and you would expect

3    that to come off the backs of rival exchanges.

4    And, in fact, that's exactly what we see in the

5    data.

6        Q.   Even with UPR, rival exchanges can

7    increase their chances of winning versus AdX

8    by low -- lowering the revenue share, right?

9        A.   Not -- not to the same degree, no.

10   I -- just respectfully, I think that what it's

11   -- what UPR does is it blunts that dimension of

12   competition.  Whereas, before, a rival exchange

13   with a lower take rate created, effectively, an

14   arbitrage opportunity for a publisher.  They

15   could -- they could now -- to the extent they

16   could steer an advertiser over to the lower-cost

17   exchange, they could share in that -- that

18   savings with the advertiser.

19           Once -- once UPR comes into effect and

20   you've -- you've eliminated that optionality, the

21   publisher can no longer share in the benefits of

22   steering, and So steering would stop.  And I

23   would expect, if you're a rival exchange, you'd

24   say, "What am I doing here?  Why am I" -- "Why am

25   I even competing on that dimension?"

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 115

1          A.    I think it's a generalized effect.  I

2     think that's fair, yes.

3          Q.    And you aggregate data across those 13

4     verticals, correct?

5          A.    I mean, I -- I'm conducting a model

6     across different verticals, but I'm -- I'm

7     controlling for verticals by including these

8     vertical fixed effects.

9          Q.    So, vertical fixed effects, what do

10     those do?

11          A.    Well, if there's some innate property of

12     a -- of a vertical that doesn't change over time,

13     then -- then the fixed effect can capture that

14     attribute on the variable -- the dependent

15     variable and outcome variable: in this case,

16     impressions.

17          Q.    But to the extent there's an attribute

18     of the vertical that changes over time, fixed

19     effects don't control for that.  That's why

20     they're called "fixed effects," right?

21          A.    Correct.

22               Whatever is in these fixed effects,

23     they -- they seem to be highly correlated with

24     impressions.  That is, they improve the fit of

25     the model in a material way.  They do a very nice

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 118

1          Q.   And it's the expert deposition -- I'm
2     sorry.  It's the expert report of Dr. Haider
3     served on December 13th, 2024.  Do you see that?
4          A.   Yes.
5          Q.   All right.  Now, I want to direct your
6     attention to Exhibit 11 in Dr. Haider's report,
7     which is on Page 89.
8          A.   Okay.
9          Q.   So, this is a table that Dr. Haider puts
10     together, and she just shows the pre-UPR and
11     post-UPR difference in impressions across these
12     advertiser verticals, right?
13          A.   Yeah.  I remember this one.  Yeah.
14          Q.   And setting aside critiques you may have
15     of the methodology, you don't suggest she has the
16     numbers wrong, correct?
17          A.   She -- she hasn't, you know, performed a
18     proper analysis, in my view, but -- but she
19     hasn't made a mathematical mistake.
20          Q.   And of these 13 advertiser verticals,
21     four of them have an increase in impressions
22     post-UPR versus pre-UPR, right?
23          A.   I'm looking at the positive numbers.
24     Yeah.  And it looks like there's four positive
25     numbers in this -- in this table.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 119

1       Q.   What are they?

2       A.   Looks like business and industrial

3   markets, healthcare, retail and services, all

4   verticals; and with the caveat that this is

5   assuming that you could tease out this effect

6   just with a simple comparison of the -- of the

7   averages, yes.

8       Q.   So, let's look at -- well, you would

9   agree, right, Doctor, that there are a lot of

10  reasons why an advertiser may choose to buy more

11  or less impressions for a particular vertical

12  over a given period of time, right?

13      A.   Sure.

14      Q.   So, let's talk about one of the

15  verticals -- healthcare.

16      A.   Okay.

17      Q.   So let's go to -- let's stay in

18  Dr. Haider's report, and let's look at her

19  Exhibit 12, which is on Page 94.

20      A.   Okay.

21      Q.   So, this is a graph from Dr. Haider's

22  report depicting monthly toll impressions for

23  advertisers using Google Ads transacted through

24  AdX in the healthcare vertical from January 2017

25  to March 2024, right?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 120

1         A.   Yes.

2         Q.   And setting aside disputes over the

3    import of these numbers, you don't dispute that

4    she's accurately graphed this line, correct?

5         A.   Correct.

6         Q.   So, in the pre-UPR period for

7    healthcare, the peak number of monthly

8    impressions seems to be a little bit over

9    ██████, right?

10        A.   Right.

11        Q.   And then, if you look post-UPR,

12   impressions begin to exceed ████ around

13   January 2020; is that right?

14        A.   Correct.

15   █ ████████████████████

16   ████████████████████████

17   ██

18   █ ██████████████████████

19   ██████

20   █ █████████████████

21   ██████████████ Does that

22   look right -- is that right to you?

23        A.   Yes.  Yes.

24   █ █████████████████

25   ████████████ again, right?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 121

1      A.   Give me the date again.  I can see what

2   happens, but give me --

3      Q.   ███████████

4      A.   Yeah.  It looks like that's when you go

5   back to the ███████.

6      Q.   ██████████████████████████

7   ████████████████████████████████████

8   ███████████████████████████; is that

9   right?

10      A.   From -- sorry.  Give me the two dates.

11   The beginning of -- the beginning of UPR --

12      Q.   ████████████████████████████████

13   █████ -- let me restart this question.

14          So withdrawn, and I'll restart it.

15   ██████████████████████████████████

16   ████████████████████████████████████

17   █████████████████████, right?

18      A.   I -- I think that's fair, that -- that,

19   yes, up until -- yes, I'm looking at, like,

20   █████████████████████████████████████

21   ████████████████   Yes, not controlling for

22   anything else, that's correct.

23   ████ █████████████████████████████

24   ███████████████████████████

25      A.   Yes.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 122

1      Q.  ████████████████████████████

2   ████████████████████████████████████

3   ███████████  right?

4      A.  I see one -- █████████████████

5   that looks like it's -- this is hard to do, but

6   it looks like it's, maybe, ████████████.  And

7   then thereafter there's no -- no more points

8   above ████████████.

9      Q.  ████████████████████████████████

10  ██████████████████████  right -- barely above █

11  ████████,  right?

12     A.  Correct.

13     Q.  So, looking at this graph, can we agree

14  that the ████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████

17  ████?

18     A.  Visually, the -- the -- the lift appears

19  to be limited to, basically, the first half of

20  this period from, looks like, October 2019 -- or

21  September 2019 █████████████████████████

22     Q.  And during that period, Doctor, was the

23  height of COVID, right?

24     A.  We definitely have COVID going from

25  March of 2020 -- yeah.  I would say that -- that

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 123

1    certainly covered the height of -- of COVID.

2        Q.    And this is the healthcare vertical?

3        A.    Yes.

4        Q.    So, not shocking that COVID caused a big

5    increase in spending in the healthcare vertical?

6        A.    Or -- or certainly was associated with

7    a -- an increase in spending, yes.

8        Q.    All right.  Let's take a look at another

9    graph.  Let's go to Exhibit 13 on Page 96 of the

10    Haider report.

11        A.    Okay.  I'm there.

12        Q.    So, this graph depicts monthly toll

13    impressions for advertisers using Google Ads

14    transacted through AdX in the education and

15    government vertical from January 2017 to

16    March 2024, right?

17        A.    Correct.

18        Q.    And you don't dispute the line that has

19    been charted on this graph, right?

20        A.    I do not.

21        Q.    Do you agree that this graph shows an

22    increase in impressions on AdX beginning in

23    January 2020?

24        A.    Sure.  Sure.  I'll agree with that.

25        Q.    And looking at the graph, the increase

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 124

1      in impressions seen in the post-UPR period lasted

2      approximately ████████████████.  Does

3      that sound right?

4          A.   I mean, by -- by eyeball, it looks like

5      that's when the -- when the -- the spike goes

6      away.

7          Q.   ████████████████████████████████

8      ██████████████████████████████████

9      ████████████████████   correct?

10         A.   Correct.

11         Q.   And there was a U.S. presidential

12     election right between January 2020 and January

13     2021, right?

14         A.   January 20 -- there was an election in

15     November of '20, so, yes.  Yes.

16         Q.   And does your regression have a control

17     meant to account for the impact of a presidential

18     election?

19         A.   No.

20              I mean, it would -- not -- not

21     explicitly.  I'm just looking at my controls --

22         Q.   All right.  Let's look at another --

23         A.   Well, I'm sorry.  You know, to the

24     extent the election would -- would work its way

25     through GDP or consumer sentiment, perhaps.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 125

1        But I don't have an explicit control for a

2        presidential election.

3            Q.    Let's go to another chart.  This one is

4        Page 97 of Dr. Haider's report, and that's

5        Exhibit 14.

6            A.    Okay.

7            Q.    Doing a very longwinded description,

8        once again, this graph depicts monthly toll

9        impressions purchased by Meta and other

10       advertisers combined, in the services vertical

11       in January 2017 to March 2024, right?

12           A.    Yes.

13           Q.    And, again, you don't dispute that this

14       graph is accurate?

15           A.    Correct.

16           Q.    And do you see that blue represents

17       impressions purchased by Meta?

18           A.    Well, it says, "Meta and other

19       advertisers."  I don't think it's just

20       Meta.

21                 Oh, I'm sorry.  I'm sorry.

22                 Is blue just Meta?

23           Q.    That's my understanding.

24           A.    Oh.  I can't see the -- the "other"

25       here.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 126

1        Q.   I think if you look very closely, you

2    can start to see gray in, like, July of '22?

3        A.   Oh.  Oh.  Just within this vertical.  I

4    see.  Just within this vertical.  "Services."

5    Okay.

6        Q.   So, the -- the graph -- so the blue

7    reflects Meta, right?

8        A.   Yes.

9        Q.   And the "other" is reflected in gray?

10       A.   Yes.

11       Q.   And most of the graph is blue?

12       A.   Yes.

13       Q.   So, fair to say that most -- that almost

14   all of the impressions that were purchased from

15   2019 onwards via Google Ads on AdX in the

16   services vertical belonged to Meta, not other

17   advertisers within the services vertical, right?

18       A.   I think that's fair.

19       Q.   Do you -- did you review any record

20   evidence concerning the reason that Meta

21   substantially increased its purchases of

22   impressions?

23       A.   No.

24       Q.   So, if there's an idiosyncratic reason

25   why Meta bought more, you don't know what it is?

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 127

1          A.   I don't know what it is.  No, I do not.

2     I don't see how it's related to UPR, but I don't

3     -- I don't -- I didn't have a specific control

4     for Meta, other than this vertical.

5          Q.   And just so I'm clear, this huge spike

6     in impressions purchased by Meta, driving a huge

7     spike for the vertical, began around April 2020;

8     is that right?

9          A.   It's hard to say by eyeball, but

10    it's -- it's starting to spike -- it's starting

11    to spike, it seems like, earlier than that.  It's

12    hard for me to say.  Maybe January of 2020 it

13    starts to go up.

14         Q.   And then, following that, monthly

15    impressions grew from about, let's say, a little

16    over 2 billion in December 2019 to over 16

17    billion in April 2020, roughly, --

18         A.   Yes.

19         Q.   -- correct?

20         A.   Yes.

21         Q.   And then that monthly impressions

22    subsequently █████████████████████████████

23    right?

24         A.   Well, it looks like they were forever

25    higher.  But -- but they did ████████████

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 128

1 ████████████████████████████████████

2 ████████████████████████████

3      Q.   And then ████████████████████

4 right?

5      A.   Yes.

6      Q.   Okay.  Let's look at the last one of

7 these graphs, for both of our sakes.  Let's go to

8 Page 98 and look at the com -- retail vertical?

9      A.   Mm-hmm.  Yes.

10      Q.   So, do you recognize this graph as

11 monthly toll impressions purchased by Temu and

12 other advertisers combined in the retail vertical

13 from January 2017 to March 2024?

14      A.   Yes.

15      Q.   Again, you don't dispute the graph

16 itself?

17      A.   Correct.

18      Q.   And the blue on this graph is Temu?

19      A.   Correct.

20      Q.   And the gray is other?

21      A.   Correct.

22      Q.   ████████████████████████████

23 ████████████████████████████████; is that

24 right?

25      A.   For Temu, yes.  I mean, but the pattern

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 129

1      -- we see -- we saw a similar pattern, you know,

2      in the 20 -- in the period 2020.  But, yes, for

3      Temu, in particular, ███████████████████████

4      ██████████████████████████████████████████████

5      ████████████

6          Q.   And they drive a ██████████  in

7      impressions in this -- as shown in this chart?

8          A.   Right.  Right.  And you recall from my

9      report that Temu is a bit special in that they

10     appear to be buying on behalf of a -- of a

11     collection of advertisers, on their own site.

12         Q.   And Temu first entered the U.S. retail

13     industry in late 2022; is that right?

14         A.   I don't -- sitting here, I don't know

15     the date.  I don't know the date when they

16     entered.

17         Q.   Do you have any reason to doubt it's

18     late 2022?

19         A.   No.  No.

20         Q.   And so just so I'm clear, the entry

21     of Temu as a major new advertiser wouldn't be

22     accounted for by fixed effects, right?  It's

23     something that changed?

24         A.   Correct.  It wouldn't be accounted for

25     by fixed effects.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 130

1    Q.    And the big spike by Meta itself isn't
2    controlled by fixed effects, right?
3    A.    Not by a services vertical fixed
4    effects, that's correct.
5    Q.    So, if you look at this graph, if you
6    were to remove Temu from the graph, the gray --
7    and you were getting to this earlier -- would
8    show an ███████████████████████████
9    ████████████████████    is that right?
10    A.    Correct.
11    Q.    And that is also the height of COVID?
12    A.    Correct.
13    Q.    And there's a lot of eCommerce spending
14    during the height of COVID?
15    A.    Well, these are impressions.  So,
16    I'll grant you that people were -- didn't have
17    anything better to do than play on their
18    computers.
19    Q.    And so, perhaps, advertisers wanted
20    more retail impressions because they saw there
21    was more business to get because of all the
22    eCommerce shopping?  That make sense to you?
23    A.    Yes.  I don't know if it translated
24    necessarily into eCommerce shopping, but it
25    certainly translated to people spending more time

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 131

1     on their -- on their computers.

2         Q.   And then following mid-2020 to early

3     ████████████████████████████████████████████

4     ███████████████████████████████.  Is that

5     fair?

6         A.   Yeah.  I think that's fair.

7         Q.   All right.  We can put that aside.

8         A.   Okay.

9         Q.   Okay.  So, you used the result of your

10    regression -- your indirect model regression

11    -- to calculate the reduction in AdX take rate

12    that would be necessary to produce the same lift

13    in impressions that you attribute to UPR, right?

14    I've asked this question like four times.  And

15    for that, I apologize.

16        A.   That's okay.  The answer is still yes.

17        Q.   And you're aware that Dr. Haider reran

18    your indirect model removing Meta and Temu; is

19    that right?

20        A.   Yeah.  Inappropriately.  You can't --

21    can't throw out observations from the -- from the

22    database, but, yes, she did run it without Meta

23    and Temu, that's correct.

24        Q.   And Dr. Haider found that when she

25    applies the data for all advertisers but Meta and

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 162

1           A.   Correct.

2                MR. JUSTUS:  All right.  I'd like

3      to break a rule, and can we take a break now,

4      because we're about to go to the Direct Method?

5                MR. GRZENCZYK:  Sure.

6                THE WITNESS:  Sure.

7                THE VIDEOGRAPHER:  The time is 1:21 p.m.

8      This ends Unit 3.  We're off the record.

9                (Recess taken.)

10               THE VIDEOGRAPHER:  The time is 1:32 p.m.

11     This begins Unit Number 4.  We're on the record.

12     BY MR. JUSTUS:

13          Q.   So, Doctor, I'd like to now talk about

14     your direct method.  But before I get there, do

15     you offer your direct and indirect methods as

16     alternative methods of calculating damages or

17     additive methods of calculating damages?

18          A.   Alternative.

19          Q.   So to calculate your direct

20     method, you use a technique called

21     "difference-in-differences," right?

22          A.   Correct.

23          Q.   And you seek to use this

24     difference-in-differences technique to determine

25     damages by exploiting the variation between open

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 170

1      relative to the 2.13.

2          Q.   And I think that number is just the gap

3      between the before-UPR price for AdX and the

4      before-UPR price for open bidding, right?

5          A.   That -- that is the same gap.  That -- I

6      mean, it's the same 50 cents.  It's the same 50

7      cents, that's correct.  But I'm doing something

8      slightly different.

9          Q.   Well, where do you get the 50 cents

10     from, then?

11         A.   I think that -- that delta -- the 50

12     cents is that delta you just pointed out.  I

13     think that's the 2.15 minus 1.65.

14         Q.   Okay.

15         A.   Yeah.  You see Table 5?  That shows you

16     where the 50 cents comes from.

17         Q.   Yeah.

18         A.   Okay.

19         Q.   So to actually -- to come up with your

20     but-post-UPR number you norm --

21         A.   It's the but-for post-UPR.  It's a typo.

22     Okay.

23         Q.   To come up with your but-for post-UPR

24     number, you don't actually use your regression,

25     do you?  You just use this Google document source

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 171

1          GOOG_AT_58887 in Figure 10, right?

2              A.    I don't use the coefficients, I'll grant

3          you, from that interaction term "OB times UPR."

4          I don't use that.  That is correct.

5                  It's because I'm -- when I do the

6          regression, I'm treating open bidding as the

7          -- as the treatment.

8                  But ultimately, at the end of the day,

9          I don't want to count overcharges on what's

10          happening on open bidding.  I want to -- I want

11          to try to figure out the inflation on AdX.  And

12          -- and to me this is the best way of doing it.

13                  Now, as you know in my reply report,

14          I turnaround and treat the Google Ads to AdX

15          channel as the treatment so that we don't have to

16          do this -- this conversion.

17              Q.    Got it.

18                  So you cal -- so just -- so it's clear,

19          you calculate a regression for your opening

20          report, but your results of your regression

21          actually do not feed into the damages

22          calculation.  Instead, it relies upon the

23          Google document in Figure 10.

24              A.    No.  No.  I'm using -- I'm using Table 5

25          to get that difference, right?  I would say that

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 188

1          here on -- let's look at -- so look at Table 10.
2          And you're asking me could I just use that
3          difference -- I think the analog would be -- let
4          me see.
5                Q.   Well, I'm not trying to make this hard.
6                A.   No.  No.
7                Q.   He just -- yeah.
8                A.   Yeah, no.  No.  Now, in light of the
9          fact that that -- that -- that Google Ads came in
10         lower, --
11               Q.   Mm-hmm.
12               A.   -- that to get -- to get -- to get the
13         effect on Google Ads, which is what Dr. Chevalier
14         wants me to do -- she wants me to point the
15         machinery at Google Ads, not at open bidding,
16         right?
17                    The treatment group in the first run
18         was open bidding.  And she thought there was a
19         possibility I was looking for damages on open
20         bidding.  And we said, "Okay.  We're gonna cut
21         through the confusion.  We're gonna make the
22         treatment group Google Ads now."
23                    And when we make the treatment group
24         Google Ads, my best estimate of the effect of the
25         treatment on Google Ads is the 18 cents.  So

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 189

1      you'll see in Table 10 that 18 cents -- the

2      difference in the differences, --

3         Q.   Mm-hmm.

4         A.   -- right, is the same coefficient, I

5      believe, that comes out of -- yeah.  If you look

6      at the first column in the primary model, there's

7      the 18 cents.  That's the inflation on the price

8      of AdWords that results from UPR.  But I think

9      maybe we can cut through -- I'll -- I'll grant

10     you that the exact methodology that I use in the

11     first changes because I've changed the treatment.

12         But this effect right here, right, is

13     -- is the same methodology.  It's the same way

14     that I would, you know -- as -- now, in light of

15     this more granular data, this tells you what the

16     effect on AdWords -- it's unfortunate they

17     changed the name -- but Google Ads was, right,

18     owing to UPR.

19         Q.   So this -- and we're gonna talk about

20     that in detail.

21         A.   Okay.

22         Q.   But this precise methodology you have

23     in Singer 1 can no longer be used to calculate

24     damages using the new disaggregated --

25         A.   Oh.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 190

1          Q.   -- data; correct?

2          A.   I -- I think that we've changed the

3      treatment group, right, so that the methodology

4      has changed.  And so, yeah, now -- now it's the

5      difference-in-differences.

6               Whereas before, the treatment was open

7      bidding, so we couldn't use the coefficient -- we

8      couldn't use the coefficient in Table 4; that 57.

9      We were actually trying to be more conservative.

10     We used a different method.

11               If we used that same method here, right,

12     now we're -- you know, we can't.  We're doing

13     a -- we're making a -- Google Ads the -- the

14     treatment group.  But this is the -- this is my

15     best estimate of the effect of Google Ads now.

16          Q.   Okay.

17          A.   Yeah.

18          Q.   So in order to understand your belief

19     on how -- on what damages ought to be using the

20     direct method, we ought to be talking about

21     Singer 2, correct?

22          A.   Yeah.  I think that Singer 2 allows me

23     to get at the -- and isolate the effect on Google

24     Ads in a way that I couldn't in Singer 1.

25          Q.   All right.  So let's talk about Singer

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 191

1    2, then.

2         A.    Okay.

3         Q.    Before I get there, using Singer 1, you

4    had damages of 140 million, 256 million, right?

5    That's Paragraph 129 in Table 7 of your opening

6    report.

7         A.    Right, right.  141, correct.

8         Q.    And in your reply report, your new

9    direct method reduces damages to $98 million,

10   right?

11        A.    Correct.

12        Q.    So about a 30 percent reduction in

13   damages?

14        A.    Correct.

15        Q.    And so we agree that, to understand what

16   you viewed damages are, we should be looking

17   At Singer 2, right?

18        A.    I think that Singer 2 allows you to get

19   precisely what the effect was on Google Ads.

20   Singer 1 assumed that the effects were the same

21   across Google Ads and DV360.  It was just

22   treating AdX as one monolith.

23             Here were able to disentangle the

24   effects and look at precisely what happened to

25   Google Ads.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 194

1          cents.  Let's see.

2                  There was -- if you look -- the same

3          story, I think is -- if you look at the pre

4          -- can you look at Figure 7?  You'll see that

5          open bidding in the pre period -- setting aside

6          the Last-Look, couple -- a few couple -- oh.

7          This is -- well, this is --

8              Q.   Yeah.  I think it's --

9              A.   Oh.

10             Q.   -- a really simple question.  The

11         open-bidding price before UPR and during UPR only

12         changes by 2 cents using your reply data set,

13         Singer 2, right?

14             A.   Right.  But I just want to -- yes, it

15         is true.  But I also just want to point you to

16         Figure 6.  You'll see that there were

17         opportunities -- compared to DV360 -- do you see

18         these high -- higher blue lines up here?  There

19         were opportunities in the pre period to get the

20         same inventory on open bidding at a substantially

21         lower price.  Do you see the difference between

22         DV360 and -- and open bidding?

23             Q.   Mm-hmm.

24             A.   Those opportunities are effectively

25         taken away in the post period.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 196

1    and during UPR, correct?

2        A.    Correct.  Correct.  Over this -- over

3    this period, that's correct.  That's correct.

4        Q.    From your opening report, the

5    open-bidding price goes up from $1.65 to $2.21,

6    correct?

7        A.    Correct.  Hold on one second.

8              Correct.

9              And I'm trying to figure out why those

10   are different.  I wonder if those are different

11   time periods.

12       Q.    Dr. Singer, have you heard of -- are you

13   aware in the data there's something called

14   ███████████████████ and there's something

15   called ███████████████

16       A.    Yes.

17       Q.    Are you aware that you used ████████

18   ███████████ instead of ████████████████████?

19       A.    I think in Singer 2 I did.  I was trying

20   to mimic, I think, what -- what one of your

21   experts were doing.

22       Q.    So your testimony today is that you used

23   ██████████████████ because you believed Google's

24   experts used ██████████████

25       A.    I was trying -- I have this -- we have a

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 199

1           (Reviews document.)

2           Yeah.  I just can't -- I remember having

3    this conversation.  I just can't remember the

4    basis sitting here why we did ████████

5    ████████████

6           Q.   Do you know whether your results are

7    sensitive to using ████████████████ or not

8    -- or ██████████████████

9           A.   No.

10          Q.   Do you agree that your incidence

11   analysis we talked about -- is your belief that

12   your incidence analysis we talked about in the

13   indirect method was reliable?

14          A.   Yes.

15          Q.   Are you aware that in that analysis

16   you used ████████████████, not ████████

17   ████████████?

18          A.   I can't -- sitting here I can't tell you

19   which one I used.

20          Q.   Are you aware of any basis to use

21   ████████████████████ in your incidence analysis

22   and your ██████████████████ in your Singer 2

23   analysis?

24          A.   I -- sitting here I can't tell you why

25   that was done, but I don't think it was -- I

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 222

1    for Singer 1 ended in 2022, which is why we ended

2    our analysis in 2022.  The -- the more granular

3    data that -- that we ended up using in Singer 2

4    went through 2024, right?  So we were just making

5    use of the data.

6            I know that the end dates changed.  But

7    it's possible that the start dates changed as

8    well; that is, we didn't -- we didn't have the

9    luxury of, I think, going before the start date

10    here.

11            I know this to be a fact, that the end

12    date, all right, was different between Singer 1

13    and Singer 2 because of a different data set,

14    right?

15            It also occurs to me, too, that we

16    didn't have ████████████.  We couldn't do

17    ████████████ in -- in the data set for

18    Singer 1, right?  You were asking me earlier did

19    I make these choices, you know, because I didn't

20    like matched and I liked matched.  I didn't have

21    the luxury.  I didn't have the choice of doing

22    ████████████ for the database that

23    undergirded Singer 1 DID.

24            You follow?

25        Q.   Yes.

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 348

1          questions on some of your testimony from earlier
2          today.
3              A.   Okay.
4              Q.   Do you recall earlier today being
5          asked about the use of data reflecting ████
6          ████████   versus   ████████████   in your
7          incident and DID analyses?
8              A.   Yes.
9              Q.   Do you have any understanding of how
10         which of those data sets is used would impact the
11         results of the incident analyses?
12             A.   Yes.
13                 I've -- during a break I found out that
14         the incident analysis would not vary depending
15         on whether you used ████████████   or
16         ████████   as the measure of price.
17                 I also -- and I also found out about
18         that the DID and Singer 2 is sensitive to whether
19         or not you use ███████   or  ██████████   for
20         your measure of price.  I wasn't aware of that.
21             Q.   So in -- you'll recall in Singer 2 --
22         why did you elect to use the ████████████████
23         for the DID model?
24             A.   Yeah.  So for -- for a few reasons.
25         I mean, first, the -- when we did DID in Singer 1

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 349

1    in that aggregated data, we didn't even have the

2    option of using ████████    The only data that we

3    had there was ████████.  So this was the first

4    time that we had the -- the luxury of using

5    ████████████████ as our metric.

6            Second, we noticed that Dr. Ganz, which

7    was the state expert in a related litigation,

8    used ████████████████ as his measure of price.

9    I think a DOJ expert may have done so as well.

10   And I think that Google's experts opposite

11   me -- and I can't remember if it was Haider or

12   Chevalier -- did it both ways, ████████ and

13   ████████.  And so we thought that -- that it

14   wouldn't be something controversial.

15           There's one other reason -- I didn't

16   know this until just now -- that when we looked

17   at open bidding data in 2021, we saw an anomaly

18   on impressions, where impressions, if I -- if I

19   understand correctly, just basically fall off the

20   floor in 2021.

21           And that -- that made us lose faith in

22   whether -- what kind of inferences could be drawn

23   using impression data as the measure of price, at

24   least for a period covering 2021.  So I think for

25   all of those reasons, my team thought that the

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

Page 353

1        impression, if that's what you're asking me.

2        But what --

3        BY MR. JUSTUS:

4             Q.   What is your interpretation of how the

5        -- of how the two data fields are different?

6             A.   I would think that a ████████ would be a

7        subset of the -- of impressions that -- 'cause --

8        because it would require a match.  And we have

9        observed some anomalous behavior in 2021 in open

10       bidding on just the -- the ████████████.

11       That was what was causing some nervousness about

12       using -- sticking with ████████ for the DID in

13       Singer 2, among other reasons.

14            Q.   You are just guessing the difference

15       between the two fields, right?

16            A.   No.  I'm telling you my understanding of

17       the two, but --

18            Q.   What is that based upon?

19            A.   I mean, I'm not the one who writes

20       the -- well, my conversation with the -- with --

21       with the folks who are coding and reading in the

22       data and -- and, you know, outputting the -- the

23       results.

24            Q.   A conversation that happened during a

25       break in the depo?