# EXHIBIT 67

**Phillip E. Areeda**
*Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Einer Elhauge**
*Professor of Law*
Harvard University

**Volume X**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**Little, Brown and Company**
Boston   New York   Toronto   London

nothing to do with tying or possible anticompetitive effects but only with the loss of a profitable arrangement when the contract was transferred to another.[11] This shift in identity of a market participant does not ordinarily affect competition.[12]

If the displaced plaintiff seeks the more speculative profit that he could make by selling directly to the defendant's customers but for the tie — the damages normally available, if proved, to a foreclosed rival — the question would be whether his prior participation in and profit from the very tie he attacks should bar his suit, as discussed in the first variation.

## ¶1769. Suits by Buyers

**1769a. Introduction and summary.** Throughout this Paragraph, "prices" are adjusted for changes in quality. Thus, diminished quality represents a price increase even when nominal prices remain constant.

Tying can sometimes bring about higher *market* prices that injure buyers in fact; this is antitrust injury. See ¶b. But in most tying cases a plaintiff buyer claims not that market prices have been wrongly elevated but only that tying forced him to pay above-market prices for the tied product. Increasingly, however, the courts recognize that an illegal tie does not actually injure a buyer unless the sum of prices for tying and tied products exceeds the bundle's market value. Although such injury-in-fact seldom occurs, it might. The question then arises whether it constitutes antitrust injury. Except for some metering cases considered in ¶d, we conclude that it does. See ¶c.

The most common situation in which a tie *might* allow a seller to collect more for the package than for the two products separately occurs when the tied product "meters" the intensity of

---

11. See ¶1653b on the legality of such dealer terminations themselves. In *Tire Sales Corp. v. Cities Service Oil Co.*, 637 F.2d 467 (7th Cir. 1980), cert. denied, 451 U.S. 920 (1981), the defendant purchased tires from the plaintiff, a Uniroyal dealer, and distributed them to its dealers. The defendant then switched to Goodyear, and plaintiff's overall sales declined. The Seventh Circuit found a fact issue on the plaintiff's claim that the defendant was tying tires to its dealer franchises. But whether or not this was true, the plaintiff was injured by its termination as a beneficiary of the tying arrangement, rather than by the tying arrangement itself. See also *Steuer & Latham v. National Medical Enterprises*, 672 F. Supp. 1489, 1502 (D.S.C. 1987), aff'd mem., 846 F.2d 70 (4th Cir. 1988) (plaintiff, former contract pathologist, replaced with different contract pathologist; court uses substantive law rather than standing doctrine and finds no injury to competition).

12. In different contexts, see ¶¶373e (rev. ed.) (standing and antitrust injury), 736.2 (essential facility claims), 1653b (manufacturer replacement of dealer).

¶1769　Tying Arrangements

the tying product's use. Such a tie typically forces the buyer to pay above-market prices for the tied product. The payment for use of the tying product thereby becomes proportional to his use of it. When the defendant's costs (such as for maintenance of a leased machine) vary with the intensity of the buyer's use, such variations are not discriminatory and would occur in perfectly competitive markets. More commonly, charges varying with use are discriminatory. Whether discriminatory or not, charging according to use may not cause injury-in-fact to buyers generally or even high-volume users. If it does, such injury should not be deemed antitrust injury. See ¶d.

Nonforeclosing ties are considered in ¶e. Because zero foreclosure results, such ties are ordinarily lawful.[1] (1) A buyer's claim that he was forced to take a tied product that he did not want at all is equivalent to a claim that he was made to pay a higher price for the tying product, but not ordinarily more than its market value. This case is thus governed by ¶b-c. If other customers need the tied product, foreclosure occurs and at least their ties can be unlawful. In that event, tying may discriminate against the buyer who does not want the tied product at all. His case is therefore governed by ¶d. (2) When the defendant sells to dealers or other intermediaries, the foreclosure of rival suppliers might be zero, or so close to it that the tie is lawful. In that event, the dealer buyers have no cause of action. If the tie is illegal, the dealer's standing is governed by the preceding paragraphs.

Indirect purchasers from a defendant practicing illegal tying and overcharging his immediate customers have no damage action. See ¶f.

**1769b.　Elevated market prices.**　A tie can foreclose rivals or potential rivals in the tied market, perhaps sufficiently to create a monopoly or oligopoly there, to facilitate oligopolistic coordination there, or impede entry into the tying market.[2] Diminished output, innovation, product quality, or cost-cutting might ensue — thereby burdening buyers in either market with higher prices (whether absolute or quality adjusted). Although such buyers do not pay more than the "market" price, which we emphasize in ¶c, the market price itself has been unlawfully elevated. In that event, the tied buyers would suffer injury-in-fact. This is also antitrust injury be-

---

¶1769　n.1.　See Ch. 17B. We thus occasionally note a tie's legality, although this subchapter generally assumes that an illegal tie has been (or will be) proven.
　2.　See ¶¶1705-1707.

cause injury to the market resulting from tie-based foreclosure is the very consequence that tying law seeks to prevent. Accordingly, those buyers are entitled to damages.[3]

Of course, those who purchase the tied or tying product from the defendant's rivals would also suffer from such market-wide detriments. They have no action against their suppliers, who have committed no offense. In principle, they should have an action against the defendant, for his conduct injured them just as much as if they had purchased from him. Though not forced to raise their prices, the other suppliers can be assumed to raise prices automatically when defendant's illegal conduct brings about market conditions favoring higher prices.[4]

While buyers are clearly entitled to damages when the sum of tying and tied product prices would have been lower (or quality higher) absent the tie, the proof is ordinarily elusive and seldom attempted. For example, a tie cannot have impeded entry that would have lowered prices or encouraged innovation unless entry would actually have occurred but for the arrangement. Nor would a tie have facilitated oligopoly pricing unless the market without ties would have operated more competitively at lower prices. To recover damages based on market-wide effects, therefore, the buyer must articulate a theory of how the challenged tie raised market prices (or reduced quality or innovation). He must then show that actual market conditions support such a theory and thereby explain the occurrence of an actual price rise.[5]

Such effects cannot be inferred from the illegality of a tie, for the per se rule condemns ties with only minor foreclosures.[6] And even the per se plaintiff must prove injury-in-fact caused by the violation in order to win treble damages. He must show that the illegal conduct caused an actual-price increase. Damages are based on the provable difference between the current price and the price that would have prevailed absent the illegal conduct. This is no less

---

3. With respect to those who would have purchased the product but for its elevated prices, see ¶1770.
4. See ¶372 (rev. ed.) for more about this conclusion and its limits.
5. For example, suppose the plaintiff shows an actual foreclosure of thirty percent in a relevant market where prices exceed those of a comparable "yardstick" market without tying. Ordinarily such a foreclosure would not seem large enough to explain the higher prices. See ¶1729. Alternatively, suppose a market with four sellers who had previously attempted unsuccessfully to coordinate prices, who all adopted tying, and whose prices then rose without inducing any entry. This could be enough to support a finding that tying caused higher market prices.
6. See ¶1720a.

¶1769    Tying Arrangements

true here than for plaintiffs seeking damages from a cartel of price-fixing competitors.[7]

Even proof that the market circumstances surrounding an illegal tie facilitated oligopolistic coordination or impeded entry would not tell the tribunal that prices would have been lower without tying. Still, such proof should entitle buyers to an injunction against the illegal tie.

**1769c. Above-market prices.** Most plaintiff buyers base their damage claims on proof that a tie forced them to buy the tied product from the defendant at higher prices than prevail in the tied market generally. Some courts have awarded damages on this basis.[8]

This is quite wrong, for a premium price on the tied product must generally be accompanied by a reduction in the price of the tying product. In one well-known case, for example, a fast-food franchisor licensed use of his trademark without charge but required franchisees to take various items such as paper plates from him at above-market prices.[9] The Ninth Circuit correctly recognized that basing damages on the plate premium would overcompensate the franchisee, who obviously would have paid a franchisee fee in the absence of the tie.[10] The court therefore required that a reasonable franchisee fee be deducted from the sum of price premiums before damages could be awarded.[11] In effect, the court held that the tied buyer is injured in fact only when he is forced to pay above-market prices for the sum of the tying and tied products.[12] An increasing number of courts so hold, as explained by the Eleventh Circuit:

> [I]njury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their com-

---

7. See ¶365b1 (rev. ed.).
8. E.g., *Kaiser Aluminum & Chemical Sales v. Avondale Shipyards*, 677 F.2d 1045, 1054 (5th Cir. 1982), cert. denied, 459 U.S. 1105 (1983) (damages based on excess value of tied product); *Crossland v. Canteen Co.*, 711 F.2d 714, 722 (5th Cir. 1983) (same); *Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1349 (8th Cir. 1976), cert. denied, 429 U.S. 1097 (1977); *Pogue v. International Indus.*, 524 F.2d 342, 344 (6th Cir. 1975); *Carpa v. Ward Foods*, 536 F.2d 39, 50 (5th Cir. 1976). Cf. *Esposito v. Mr. Softee*, 1983-1 Trade Cas. ¶65,336 (E.D.N.Y. 1983), cert. denied, 465 U.S. 1026 (1984) (franchisor unlawfully required franchisees to purchase toppings, novelties, and various paper goods from a designated source; no damages proven because plaintiff could not show that absent the tie he could have purchased the tied products for less).
9. *Siegel v. Chicken Delight*, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955 (1972).
10. Id. at 51-52.
11. Although the reasonable franchisee fee would be exactly what the plaintiff had implicitly agreed to pay, the court insisted that the jury should determine that fee.
12. *Carpa*, note 8, thus erred in refusing to take discounts on the tying product into account.

430

bined fair market value. The rationale behind this requirement is apparent: a determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed.[13]

Even more clearly, the plaintiff who cannot show increased prices or lower quality in either product and in the package has not suffered injury.[14] Moreover, tying law does not protect the non-economic preference of buyers who wish to obtain the tied product from a different supplier with, say, more appealing environmental, labor, or social practices.[15]

That such a lack of injury-in-fact can be quite common is illustrated by the paradigmatic fixed-proportion tie.[16] In that model, the tying defendant cannot charge above-market prices for the tied product without a commensurate reduction in the price of the tying product.[17]

Even when the products are not used exactly in fixed proportions, tied-product premiums are often offset by tying-product discounts below the price that would have prevailed without tying. No damage arises merely because a tying or combination price exceeds the perfectly competitive level, for even a monopolist is enti-

---

13. *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.), cert. denied, 459 U.S. 857 (1982). See also *Will v. Comprehensive Accounting*, 776 F.2d 671-672 (7th Cir. 1985), cert. denied, 475 U.S. 1129 (1986) (dismissing complaint where price of tied package not shown to be higher than price for two products purchased in separate markets); *Midwestern Waffles v. Waffle House*, 734 F.2d 705, 718 (11th Cir. 1984) (same); *Olmstead v. Amoco Oil Co.*, 725 F.2d 627, 629-630 (11th Cir. 1984) (same).

14. E.g., *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453 (5th Cir. 1979) (plaintiff required by franchisor to use particular contractor for its building; no damages where favored contractor's prices not shown to be higher than prevailing prices).

15. Cf. *Amey v. Gulf Abstract & Title*, 758 F.2d 1486 (11th Cir. 1985), cert. denied, 475 U.S. 1107 (1986) (granting standing to real estate developer claiming that bank's tying of title search and collateral services to mortgage financing resulted in a negligent title search).

16. As explained in ¶1706b1 and by W. Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L.J. 19, 21-23 (1957), imagine a monopolist of bolts whose profit-maximizing price is $10 per carton to customers who buy nuts in a perfectly competitive market for $1 per carton. Customers desire one nut for each bolt (and have no independent use for any other nuts) and thus see the combination as costing $11. If the monopolist sells bolts only to those who buy nuts from him, he will gain a monopoly in nuts as well as bolts. But if he attempts to charge $2 for nuts, the price for the combination would become $12, which exceeds the profit-maximizing price for the defendant. Were it otherwise, he could have charged $11 for the bolts when nuts cost only $1 in the previously competitive nut market.

17. See, e.g., *United States Steel Corp. v. Fortner Enterprises (Fortner II)*, 429 U.S. 610, 622 (1977) (plaintiff apparently tied its cheap financing to its overpriced houses).

431

tled to charge whatever he can profitably get for the tying product alone.[18] Rather, damages arise when the combination price exceeds the sum of individual prices that would prevail absent the tie — even when either the tying or tied product is priced far below pre-tie market prices.[19]

While uncommon (apart from some price-discrimination scenarios in ¶d), such injury-in-fact for buyers is not impossible. A defendant seller can miscalculate. Or he might extract more from buyers by limiting their use of substitute inputs, evading government price ceilings, or deceiving them as to true prices.[20]

When a buyer succeeds in showing an above-market price for the package, we must still ask whether that is antitrust injury. When such injury is itself a rationale for condemning ties,[21] the injury fits the rationale and is therefore antitrust injury.[22] Even though the primary reason for condemning ties is foreclosure with its longer-run threats to the welfare of customers (thus embracing the ¶b injuries), this rationale does not totally exclude other concerns, such as compensating buyers for their actual immediate injuries resulting from illegal tying. Therefore, such injuries constitute antitrust injury. In practice, of course, such injuries are rare apart from ¶d price discrimination, which presents rather different issues of antitrust injury.

**1769d. Price of tying product varies with intensity of use.** Whether or not they foreclose tied markets significantly, many ties measure or "meter" the intensity with which the customer uses — and therefore values — the tying product. In standard examples, a defendant monopolist of a copying machine leases it to users who must buy paper for it from the defendant at above-market prices; or a defendant franchisor requires franchisees to buy supplies from him at above-market prices. In such instances, the premium price on the tied product is, in effect, a supplemental charge for using the machine or franchise; the more it is used, the more the user pays in total (although all customers pay the same nominal price for each unit of the tied or tying product). The tie thus meters use of the

---

18. See ¶710.

19. For example, suppose that pre-tie prices are $20 for each product. If the tied buyer is charged $45 for one and nothing for the other, he is injured by $5 (assuming no offsetting cost savings on his part) even though one of the products is now priced far below its pre-tie price.

20. See ¶1712.

21. See ¶¶1710 and 1712, which consider whether these are good reasons for condemning ties per se and conclude they are not.

22. See ¶362 (rev. ed.) for a fuller statement of antitrust injury.

| Injury-in-Fact, Causation, Antitrust Injury, and Damages | ¶1769 |

tying product. Price discrimination is the typical consequence, although we begin with a case of nondiscriminatory variable pricing.

**1769d1. When defendant's costs vary with use.** In the nondiscriminatory metering situation, the seller's costs for the tying product vary with its use and are both measured and compensated by the buyer's purchases of the tied product at an above-market price. Suppose, for example, that a photocopier's maintenance and depreciation costs a defendant lessor precisely four cents per copy. Suppose further that the defendant requires that only his paper be used with the machine, and that he charges four cents per sheet above the market price for paper. In this instance, the paper overcharge compensates the defendant precisely for the costs imposed on him by customers using the machine more intensively. Even a perfectly competitive machine market will demand this four-cent per copy premium for high-volume users, whether measured by the hypothesized tie or by a meter on the machine.

Now let us assume that the tie is per se illegal because the seller has power in the tying market. Even so, the buyer is not injured by paying a cost-based per use charge that would prevail even without the tie. Thus, the buyer has not been injured in fact by the tie.[23] Like the ¶c buyer, he was overcharged for the tied product but not for the package.

In a final variation, assume that the tie is a more effective or feasible metering device than direct metering. As a result, without the tie the postulated four cents per use cannot be collected at all. This tie might seem to injure some buyers, who would pay a per use charge they otherwise would have avoided. But the costs of maintenance and depreciation would have to be reflected in the price of the tying product somehow, and since the alternatives are less efficient, buyers as a class will be worse off. Moreover, the seller might well increase the base price and offer a rebate to those who require few repairs, lease only to high-volume users, or charge a price based on the average use — each of which could be more costly and less efficient for society than some form of meter. Thus, injury-in-fact would not occur unless the defendant's nonmetering alternative would have cost the particular damage claimant less than he actually paid in effect for the tying product. The plaintiff

---

23. To be sure, power in the tying market may bring the defendant supracompetitive profits on his machine, but *not by virtue of the tie*, for the above-market revenue on the tied product is directly proportional to the defendant's costs. Though the machine and paper are not used in fixed proportions, like the ¶c bolt-nut model, the results are similar in the present instance.

will find it difficult to prove either. Indeed, we would recommend a presumption against injury-in-fact in this situation.

Were injury actually proved, it is not antitrust injury, for it is not antitrust's purpose to save buyers the costs they impose on sellers, which even a perfectly competitive tying market would demand.

*1769d2. Price discrimination.*[24]  (A)  *Mechanics and effects.* Much if not most metering discriminates in price by charging high-volume users more than low-volume users even though the defendant's costs do not vary. In the ¶d1 example, suppose that machine maintenance and depreciation do not much vary with use. Even so, a copying machine is presumably more valuable to a user who needs many copies. While perfect competition among machine makers will drive prices down to machine costs, a machine monopolist can maximize profits and bring output nearly to the perfectly competitive level by making the machine available at a price near his costs plus a per use charge.[25]

Another common instance of price discrimination occurs in the licensing of patents, copyright, and trademarks. A patentee often licenses others to manufacture a patented product by paying a specified sum per item made or sold. A fast-food franchisor licenses franchises to use his name and methods in return for a percentage of the franchisee's revenues.[26] The licensee values such a patent or trademark in rough proportion to the patronage he thereby gains.

While the output effects of price discrimination generally are indeterminate, intensity-of-use discrimination seems likely to be pro-competitive,[27] for it benefits the low-volume user who gets access to the defendant's tying product at relatively low prices. Variable-proportion price discrimination permits sellers to bring marginal buyers into the market without giving up higher returns to other buyers who are willing to pay more. The result is higher

---

24. Price discrimination is sales at different ratios of price to marginal cost. See ¶522a (rev. ed.) and ¶1711b explaining price discrimination and its various consequences and alternatives.

25. See ¶1711b4. Possible cases of such metering include *International Salt Co. v. United States*, 332 U.S. 392 (1947) (tying salt tablets to salt-injecting machines); *International Business Machines Corp. v. United States*, 298 U.S. 131 (1936) (tying paper cards to computing device that reads them); *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912) (tying ink and supplies to mimeograph machine).

26. See, e.g., *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980), cert. denied, 451 U.S. 970 (1981) (franchisor leases premises to franchisee with rent based on latter's revenue); *Carpa*, note 8 (franchisee must buy supplies from franchisor at above-market prices); *Siegel*, note 9 (same).

27. See ¶1711b4.

output of machines in one illustration or of sales volume in the franchise example where more franchises presumably mean more sales of the final product. When effected without tying, such price discrimination is perfectly lawful.[28]

When a tied product is the metering device — such as paper for a copying machine, some needed input for making a patented product, or paper plates used by a fast-food franchisee — we have questioned whether tying should be illegal *for that reason alone*.[29] Such a tie would pass muster under the rule of reason because the foreclosure would be insignificant[30] but could be per se illegal without any proof of significant tied-market foreclosure.[31]

(B) *Damage issues generally.* Assuming an illegal tie, do higher-volume users[32] suffer injury-in-fact constituting antitrust injury? No injury-in-fact occurs (1) when legal alternative metering devices would effect similar discrimination, or (2) when a nondiscriminatory uniform price would have been as high for the particular plaintiff. (3) Even were such injury proved, it should not be deemed antitrust injury in light of the difficulty of litigating the preceding facts, price discrimination's benefits for low-volume buyers, and the purposes of tying law.

(C) *Alternative lawful metering devices.* In most litigated ties involving discrimination against high-volume users, lawful alternative metering devices appeared to be available.[33] Even if alternative measures were less efficient, costing the defendant more to monitor use intensity,[34] high-volume users would still pay more than low-volume users. Though less efficient, alternative metering devices are likely to be used and, because more costly, to bring higher prices for all users and lesser availability of the tying product for low-volume users. We recommend a presumption, at least, that alternative metering devices are available. Hence, the price discrimination plaintiff would ordinarily be unable to prove that he

---

28. See ¶1711e1, g.
29. See ¶¶1710c, 1711f.
30. See ¶1711f (also concluding that the potential for price discrimination does not itself support the per se rule).
31. See ¶1720a, c.
32. If the seller's costs do not vary at all with intensity of use, then the *lowest* effective price for the tying product presumably covers his costs (which would be the perfectly competitive price). Hence *all* higher prices exceed the perfectly competitive level. Nevertheless, the seller is entitled to charge whatever the market will bear for the tying product alone. See ¶710.
33. This appeared to be true in the cases cited in notes 25 and 26.
34. Perhaps *Siegel*, note 9, was such a case. Monitoring whether a fast-food franchisee used unauthorized paper plates might be easier than judging the accuracy of his accounts. See also ¶1711e.

435

Case 1:21-md-03010-PKC    Document 1032-67    Filed 06/16/25    Page 12 of 18

paid above-market prices for the package though he did so for the tied product.

The Ninth Circuit's *Siegel* decision is in accord.[35] There a defendant fast-food franchisor charged nothing for licensing his trademark and providing related services (the tying product) but charged above-market prices for certain tied products, such as paper plates, whose use varied roughly with sales volume. The trial court based damages on the premium price for the tied product on the ground that it would not remake the parties' arrangement by deducting a reasonable franchise fee. The Ninth Circuit correctly reversed, holding that franchisees could recover nothing if the paper "overcharge" were offset by a reasonable franchise fee, such as one based on a percentage of the franchisee's revenues or profits.[36] The availability of such an alternative, lawful price discrimination meter accomplishing similar results had the effect of defeating the franchisee buyer's damage claim.

While a defendant's ability to accomplish a similar result by lawful means does not itself validate an otherwise unlawful tie,[37] a buyer's damage is the difference between what he paid for the package and what he would have paid absent the tie. That difference is likely to be zero most of the time in fact, and the presumption we recommend saves the parties and the courts from messy litigation on the point. Accordingly, the price discrimination plaintiff's damage claim can be dismissed unless alternative metering devices are somehow precluded in fact[38] or unwisely ignored as a matter of law. Even then the buyer cannot have damages unless he also prevails on the next two issues.

(D) *Plaintiff's payment relative to uniform price that would otherwise have existed.* A seller with market power who must charge a uniform price will almost always charge more than the perfectly competitive price that would be charged some low-volume users under price discrimination. Indeed, the uniform price could exceed the discriminatory price paid by many buyers.[39] In order to show actual injury from price discrimination, therefore, the tribunal must either presume or be persuaded that the package price for a particular buyer exceeded the uniform price that would have prevailed

---

35. *Siegel*, note 9.
36. Id., 448 F.2d at 51-52.
37. See ¶1711e3.
38. See ¶1711b3.
39. Paragraph 1711b4 explains and illustrates this point.

436

in the absence of price discrimination. There is no basis for such a presumption, and proofs will be very difficult.[40]

*(E) Additional policies affecting antitrust injury.* The preceding impediments to litigating about what a particular buyer would have paid in the absence of price discrimination effected by an illegal tie suggests that higher prices paid by some buyers (accompanied by lower prices to others) should not constitute antitrust injury. Indeed, we can hardly say that it is the purpose of antitrust law to prevent the use of practicable, low-cost devices that enable a seller to measure a buyer's use. More generally, we saw earlier that price discrimination, especially that based on intensity of use, is not so generally pernicious as itself to call for per se illegality and that its indeterminate results would seldom make a particular tie unreasonable. This suggests that price discrimination is *not* a valid rationale for condemning ties. Price discrimination does not itself foreclose any rival. Instead, the higher returns it generates for the defendant attracts entry into the market for the tying product. Moreover, price discrimination generally undermines rather than facilitates cartels or oligopolistic coordination, which is more likely with more easily monitored nondiscriminatory prices.[41] Accordingly, the rare net injury to a buyer that could be proved to result from price discrimination should not constitute antitrust injury.

As we discussed more fully in the last volume,[42] some cases suggest that tie-based price discrimination is undesirable, but none has condemned the arrangement on that basis.[43] Still other cases

---

40. Even if the court knows those numbers, it hardly seems fair to punish the tying defendant with treble his overcharge to some buyers without taking into account the socially beneficial, output-increasing benefits for low-volume users who paid less than the alternative uniform price and who therefore would not have received the product at all in the absence of price discrimination.

41. See ¶404b3 (rev. ed.).

42. See ¶¶1710-1711.

43. E.g., *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 14 (1984) (dictum: tie facilitating price discrimination can increase the social cost of market power); *Fortner II,* note 17, 429 U.S. at 617 (dictum: antitrust laws would not tolerate tie that facilitated price discrimination); *Eastman Kodak Co. v. Image Technical Service,* 504 U.S. 451, 498 (1992) (dictum by dissenter: certain previous ties condemned only because they metered intensity of use, thereby facilitating exploitation of pre-existing tying-product power; citing *International Salt,* note 26; *International Business Machines,* note 26; and *United Shoe Machinery Corp. v. United States,* 258 U.S. 451 (1922)); *Town Sound and Custom Tops v. Chrysler Motors Corp.,* 959 F.2d 468, 476 (3d Cir. 1992, en banc), cert. denied, 113 S. Ct. 196 (1992) (dictum: price discrimination effected by tying arrangements "disfavored by the antitrust laws"); *Mozart Co. v. Mercedes-Benz of N. Am.,* 833 F.2d 1342 (9th Cir. 1987), cert. denied, 488 U.S. 879 (1988) (dictum: tie-ins might be unlawful when they facilitate price discrimination); *Construction Aggregate Transport v. Florida Rock Indus.,* 710 F.2d 752, 781 (11th Cir. 1983) (dictum: tying harmful because it facilitates price discrimination); *Moore v. Jas. Matthews,* 550 F.2d 1207, 1213 (9th Cir. 1977) (dictum:

say that price discrimination itself is not a rationale for condemning ties.[44]

*1769d3. Other price discriminations.* While use-intensity is not the only form of price discrimination,[45] the damage principles stated above seem generally applicable.

*1769d4. Allocating risks or costs.* Variable proportion ties are one of the numerous ways in which firms allocate risks or costs. The situations are several. *First* is the standard price discrimination model previously discussed. Rather than charge a uniform supracompetitive price that would repel customers who value a machine or franchise modestly — perhaps because they cannot predict how much they will profit from using it — a defendant monopolist of a machine or franchise would make his product available to those uncertain customers at a modest up-front price, provided that those who use the product more intensely and successfully pay more later. In this sense the defendant bears the risk that a particular customer will use it only a little or unsuccessfully. Whether the later payments are collected via a tie or another form of metering, this remains a classic instance of price discrimination because the usage charge is an alternative to a higher initial supracompetitive payment. Even so, those who pay the larger sums do not suffer antitrust injury, for the reasons already explained.

*Second* is a form of financing that would occur even in a perfectly competitive market. It is not discriminatory, although it may appear so after the event. Suppose a franchisor invests directly in a particular franchise by providing capital, training, land or even a restaurant structure. He does so because his interests in many franchisees spreads the risk of failure so that he can obtain capital more cheaply than the franchisee. In addition, he may be more efficient in selecting and buying appropriate locations and building. As compensation the franchisor might insist on an initial payment plus a secured note, some shares in the franchise, or a tie of a complementary product whose sales vary with the success of the fran-

---

price discrimination creates potential for abuse of defendant's power over tying product); *Martino v. McDonald's*, 625 F. Supp. 356, 359 (N.D. Ill. 1985) (dictum: "little doubt" that price discrimination would warrant condemnation of tie); *JBL v. Jhirmack*, 509 F. Supp. 357 (N.D. Cal. 1981) (dictum: price discrimination is principal target of per se rule).

44. See, e.g., *USM Corp. v. SPS Technologies*, 694 F.2d 505, 511 (7th Cir. 1982), cert. denied, 462 U.S. 1107 (1983) (dictum: because discriminatory royalty not a patent misuse, "unclear" why price discrimination through tying should be forbidden); *Casey v. Diet Center*, 590 F. Supp. 1561, 1570 (N.D. Cal. 1984) (price discrimination itself not generally unlawful; tying does not increase the social cost of monopoly when alternative metering devices available and is therefore not itself a ground for condemning a tie).

45. See ¶1711c-d.

chise. Such arrangements are not limited to franchisees, but can occur as well when a manufacturer helps finance a distributor. In any event, the parties have allocated the financial risk of the franchise or dealership, presumably to the party best able to bear them. The franchisor's return on this investment varies with the success of various franchisees, just as the stockholder's return varies with the success of the various firms in which he purchases stock.[46] Thus in the franchise case the franchisor may not know at the time of franchising which of two franchises will excel, but later he earns more from the franchisor who makes more sales and generates higher tied product sales. Because such allocations are common and efficient in perfectly competitive markets, antitrust law has no reason to interfere with them. This is true even if a tie-in is the vehicle for realizing a return on the investment by a manufacturer or franchisor and if that tie is illegal on some other ground. The absence of antitrust injury is even clearer than in the first situation, for the high subsequent payments by a relatively successful franchisee are no more antitrust injury than are high dividends paid by a particularly successful firm to its shareholders.

*Third* is a situation involving some elements of the two preceding ones. A fast-food franchisor invests in developing the reputation and goodwill of his trademark to promote his self-owned restaurants and to appeal to potential franchisees. Though not targeted to any particular franchisee, this investment has some similarities with the second situation. To the extent that the investment is already in place and the franchisor is attempting to draw in potential franchisees unsure of their success, it also resembles the first situation. In any event, antitrust injury is lacking.

**1769e. Nonforeclosing ties; unwanted tied product.** The unwanted tied product[47] seems to implicate one or the other of the two preceding Subparagraphs. In either event, the damage claim fails.

**1769e1. *All customers identical*.** When all buyers are forced to take a tied product they do not want and would not have pur-

---

46. In this case, the return is measured not as a dividend or percentage of profits, but as returns on some tied product whose use varies with the franchisee's sales. Measured ex post, these differential returns seem discriminatory, but considered ex ante they are not. For example, a $1000 investment in General Motors for a certain period might produce returns of fifteen percent, while a $1000 investment in Chrysler produces returns of ten percent. At the time the investment is made, however, the investor may have contemplated equal risk-adjusted returns in the two.

47. For example, an employer buying staff autos may forbid its drivers from listening to radios bundled with the car. Or a computer buyer may use its own proprietary software rather than that bundled with the machine.

439

chased elsewhere, tied-market foreclosure is zero and thus does not satisfy even the minimal requirements for per se illegality.[48] Moreover, such buyers are not injured in fact, for this tie simply increases the effective price of the tying product.[49] If that effective price exceeds the market price, no one would patronize the tying seller; if it does not, the effective price paid the defendant is the market price for his product. Hence, these buyers can claim neither per se illegality nor injury-in-fact.[50]

*1769e2. De facto discrimination but nonforeclosing tie.* To get a problem, we must assume illegal ties based on some foreclosure when many or most customers would otherwise buy the tied product elsewhere. Particular customers who do not want the tied product at all claim, as before, that the tie effectively forces them to pay "extra" for the tying product. They also claim to be victims of price discrimination, paying a higher effective price for the tying product than the defendant's customers who can use the tied product. To obtain damages, such plaintiffs must surmount each of three hurdles.

*First*, illegality for ties that foreclose should not dictate illegality for those ties that do not foreclose at all. Nor is there any administrative difficulty in determining which ties do not foreclose, for the plaintiff himself bases his claim of injury on being made to pay for tied goods that he would not buy from any source.

*Second*, if the nonforeclosing ties are deemed illegal because the defendant's other ties do foreclose, the plaintiff seeking damages must still show that he was injured in fact by the discrimination.[51] To prove such injury, the plaintiff must show that defendant

---

48. See ¶¶1722b and 1724b. For example, dealers required to stock a manufacturer's full line would not be foreclosed to rival sellers at all if they would not stock a second brand in any event or only minimally if they stock other brands anyway.

49. That effective price equals the nominal price of the tying product plus the nominal price of the tied product plus the costs of handling and disposition minus its resale or salvage value. To simplify the present discussion, we largely ignore disposition or salvage costs or values — as, for example, for an unwanted but nontransferable tied service.

In some special cases, it is actually possible for the unwanted tied item to *decrease* the tying product price, such as when it would cost money to separate out the alleged tied items. But in such cases the tied item is generally not a separate product at all. See ¶1750.

50. See *Patterson Dental Co. v. McGaughey*, 1986-1 Trade Cas. ¶66,931 (D. Or. 1985) (no standing because no possible foreclosure of rival equipment suppliers when defendant lent money only to those buying certain dental equipment that the plaintiff said he did not want). The issue was not focused in *Barber & Ross Co. v. Lifetime Doors*, 810 F.2d 1276 (4th Cir. 1986), cert. denied, 484 U.S. 823 (1987) (successful tying claim by plaintiff buyer who did not claim that he would have purchased elsewhere the tied product of flush doors that defendant supplier insisted he buy in order to get desired six-panel doors; however, plaintiff claimed as damages his expenses in marketing and storing the unwanted flush doors; opinion is unclear, but suggests that these expenses were allowed as damages. See id. at 1278, 1281.).

51. Such proof failed in *Olmstead*, note 13, at 629-631 (service station argued that gasoline refiner required him to install a car wash that he did not desire at all; dismissal affirmed

| Injury-in-Fact, Causation, Antitrust Injury, and Damages | ¶1769 |

had no lawful, alternative mechanism for discriminating against them in the absence of illegal tying and that the resulting nondiscriminatory price would in fact be lower than what plaintiffs actually paid.[52] In all likelihood, such a case will be rare and proof will be difficult.

*Third*, the plaintiff must show that any such damage that he proves amounts to antitrust injury. The preceding practical considerations, together with the benefits for customers paying the lower effective price for the tying product, reinforce our doubts that it does. As we saw in ¶d, price discrimination is not a rationale for worrying about tying in the first place. Though broadly overinclusive in its reach, even tying's per se rule does not embrace the tied product that forecloses nothing because the customer would not otherwise purchase it from anyone.[53]

**1769f. "Indirect" buyers.** Although tied buyers will seldom obtain damages for an overcharge by the defendant supplier, their customers — so-called 'indirect purchasers' from the defendant — presumptively never do. The Supreme Court denies indirect purchasers overcharge damages as involving the courts in intractable problems of tracing and apportioning damages among successive buyers.[54] Thus, even assuming that an auto dealer had a damages action against the supplier defendant whose tying inflated the dealer's costs and prices, the dealers' customers would not, even if most of the overcharge was passed on to them.[55]

Those consumer plaintiffs might claim that the tie reflects a

---

because plaintiff failed to offer any evidence that the tie forced him to pay more than the market value of the package).

52. To find the price actually paid by the plaintiff, see note 49 concerning the costs of reselling, salvaging, or otherwise disposing of an unwanted tied product.

53. See ¶¶1722b and 1724b. By the same token, when the buyer is a dealer or other intermediary, rivals may not be foreclosed from access to customers even though they are foreclosed from that particular dealer. Not only would there be no substantial foreclosure to make the tie unreasonable, but zero foreclosure ousts even per se illegality. See ¶1725a-b. Indeed, the several courts that have found tying lawful on this account have emphasized its use to enhance competition by getting the defendant's tied product before consumers. See *Roy B. Taylor Sales v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), cert. denied, 115 S. Ct. 779 (1995) (not unlawful for defendant to require dealers in its hamburger patty machines to carry its patty paper when customers were free to purchase either product separately); *Smith Machinery Co. v. Hesston Corp.*, 878 F.2d 1290 (10th Cir. 1989), cert. denied, 493 U.S. 1073 (1990) (full-line force does not even prevent tied dealer from selling rival brands; in any event, of course, full-line forcing imposed on a dealer rarely forces the dealer's customers to purchase any more than a single model). Of course, legality eliminates any action by the unhappy dealer claiming that he was charged too much for the tied product. If the foreclosed dealers are the only present or future route to ultimate consumers, foreclosure would be 100 percent. In that event the tie would be illegal under the per se rule and presumptively so under the rule of reason. Still, the dealer as buyer would have to prove actual damages, as discussed in ¶b-c.

54. See *Illinois Brick v. Illinois*, 431 U.S. 720 (1977); ¶371 (rev.ed.).

55. See, e.g., *Link v. Mercedes-Benz of No. Am.*, 788 F.2d 918 (3d Cir. 1986).

¶1769    Tying Arrangements

manufacturer-dealer agreement,[56] that the dealer is therefore a co-conspirator, and thus that the plaintiffs are direct purchasers from a conspirator. That reasoning has been used to support a consumer suit against a dealer and manufacturer agreeing unlawfully on the dealer's resale price charged to consumers.[57] However, the key rationale for that consumer suit is that no tracing or apportionment need be done when the illegal price is the very one that the consumer pays the dealer. That rationale does not fit the consumer complaining that the illegal price charged the dealer by the manufacturer has been passed on to him. Hence, this consumer remains an indirect purchaser who is denied suit.

### ¶1770.  Suits by Would-Be Buyers

**1770a.  Introduction; finding the illegal tie; summary.**  We turn now to those would-be buyers who decline the defendant's tie but seek damages instead. Naturally, the first imperative is to find the allegedly illegal tie. If we find one, we must then consider the precise nature of the plaintiff's damage theory, whether the plaintiff has or can prove and reasonably quantify his injury-in-fact, and whether that injury has been "caused" by the unlawful tie. If the plaintiff prevails on each of those inquiries, he must still show the court how such injury constitutes antitrust injury.[1]

When a would-be buyer refuses a tied package there is no tied sale,[2] and no foreclosure either.[3] So even the minimal requirements for per se illegality are not met. Hence, would-be buyers claiming damages must base any tying claim on proof that the defendant has consummated illegal tying arrangements with his other customers. This Paragraph assumes that such arrangements can be proved. Even then the would-be buyer needs a theory connecting those illegal arrangements with his claimed injury, which must itself be proved.[4]

---

56. See Ch. 17D-2.
57. ' See ¶371h (rev. ed.).
¶1770  n.1.  See ¶¶360c, 362, 363, and 365 (rev. ed.).
2. See ¶¶1460b, 1753f. Section 3 requires a lease, sale, or contract of sale with a tying understanding, agreement, or condition. Though offering to sell on such a condition might fit that language, the courts have read the statutory language as requiring a consummated sale with a tying arrangement. See *Black Gold v. Rockwool Industries*, 729 F.2d 676, 684-685 (10th Cir.), cert. denied, 469 U.S. 854 (1984); *Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F.2d 1376, 1388-1389 (9th Cir. 1981), cert. denied, 454 U.S. 831 (1981); *Dillon Materials v. Albion Indus.*, 567 F.2d 1299, 1306 (5th Cir.), cert. denied, 439 U.S. 832 (1987). Similarly, Sherman Act §1 is inapplicable, for it requires some "contract, combination . . . or conspiracy," which the defendant and his recalcitrant customer have not formed.
3. See Ch. 17B.
4. See, e.g., *Black Gold*, note 2 (remanding for determination whether defendant had