UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
IN RE: GOOGLE DIGITAL ADVERTISING                      21-md-3010 (PKC)
ANTITRUST LITIGATION                                   21-cv-3446 (PKC)
                                                       21-cv-7001 (PKC)
                                                       21-cv-7034 (PKC)
                                                       23-cv-1530 (PKC)
                                                       23-cv-5177 (PKC)


                                                       OPINION AND ORDER
----------------------------------------------------------------x

CASTEL, Senior District Judge:

        Certain plaintiffs have moved for partial summary judgment against Google LLC

("Google") premised upon the findings and conclusions issued after a bench trial before Judge

Leonie M. Brinkema in the Eastern District of Virginia.[1]  United States v. Google LLC, 23-cv-

108 (LMB/JFA), 778 F. Supp. 3d 797 (E.D. Va. Apr. 17, 2025) (the "E.D. Va. Action").  Judge

Brinkema found that Google monopolized the worldwide markets for ad servers and ad

exchanges in violation of section 2 of the Sherman Act and unlawfully tied products in each of

these two markets in violation of sections 1 and 2 of the Sherman Act.

        Moving Plaintiffs assert that Google is foreclosed from relitigating substantially

identical issues that were actually and necessarily decided in the E.D. Va. Action under

principles of issue preclusion, also known as collateral estoppel.  Google opposes these motions

on various grounds.  For reasons that will be explained, the motions will be granted to the extent

indicated and otherwise denied.

---

[1] The "Moving Plaintiffs" are Associated Newspapers Ltd., Mail Media, Inc. (together, the "Daily Mail"), Gannett Co. Inc. ("Gannett"), Inform, Inc. ("Inform"), a group of named publishers who have proceeded as representatives of a putative class (the "Publishers"), and at least one advertiser proceeding as a representative of a putative class of Advertisers (the "Advertisers").  Each Moving Plaintiff also has named Alphabet Inc., Google's indirect parent, as a defendant, and the Publishers and Inform have also named YouTube LLC, an affiliate of Google, as defendant. Google was sole defendant in the E.D. Va. Action and this Opinion and Order addresses issue preclusion only as to Google.

The Court begins with an overview of the history of the proceedings and of the law governing issue preclusion. It will then apply issue preclusion principles to the Moving Plaintiffs' claims.

PROCEDURAL HISTORY OF THE GOOGLE DIGITAL ADVERTISING LITIGATION

The initial conditional transfer Order of the Judicial Panel on Multidistrict Litigation (the "JPML") transferred to this Court for coordinated pre-trial proceedings all federal actions against Google and others relating to Google's digital advertising business. (MDL 3010, ECF 126, Aug. 10, 2021.) This included the claims of the attorneys general of fourteen states, a publishers' class action, multiple advertisers' class actions and individual claims.

The Court, after hearing from the parties, concluded that it would utilize the states' Third Amended Complaint as the bellwether pleading for the defendants' motion to dismiss with the contemplation of conforming amendments by private parties after the motion was decided. In an Opinion and Order, the Court granted in part and denied in part the motion to dismiss the states' Third Amended Complaint. In re Google Digital Advertising Antitrust Litig., 627 F. Supp. 3d 346 (S.D.N.Y. 2022). The Court then granted other MDL plaintiffs the opportunity to amend their pleadings, which led to another round of motions to dismiss and rulings thereon. In re Google Digital Advertising Antitrust Litig., 721 F. Supp. 3d 230 (S.D.N.Y. 2024) (Daily Mail, Gannett, Publishers and Advertisers); Inform Inc. v. Google LLC, 2024 WL 988966 (S.D.N.Y., Mar. 7, 2024) (Inform).

Within four months of this Court's September 13, 2022 ruling on the bellwether motion to dismiss, the United States Department of Justice ("DOJ") and eight states filed the E.D. Va. Action on January 24, 2023, later amended to added nine additional states. Google described the overlap of the claims between this MDL and the E.D. Va. Action as "challenging

the same alleged conduct, under the same laws, seeking the same remedies, but in a different

court" and asserted that the E.D. Va. Action and the actions in this MDL were "substantively

identical cases." (E.D. Va. Action, ECF 44- at 8; id., ECF 50 at 6.) Google unsuccessfully

moved in the E.D. Va. Action to have that action transferred to this District for coordinated

proceedings. (Id. ECF 60.)[2]

Because of the manifest overlap in the claims and defenses, the parties to this

MDL and the E.D. VA. action, agreed to the terms of a Coordination Order that was entered as

an Order in both the MDL and the E.D. Va. Action. (ECF 564.) That Order provided for the

sharing of certain discovery materials and non-duplicative questioning of fact witnesses, subject

to certain limitations.

Separately, the state attorneys general in this MDL applied to have their case

transferred back to the transferor Court, the Eastern District of Texas, premised upon the State

Antitrust Enforcement Act of 2021 that was signed into law on December 29, 2022. On June 5,

2023, the JPML remanded the actions brought by the state attorneys general to the Eastern

District of Texas pursuant to the newly enacted law. (ECF 569-1.) The remand had no impact

on the private actions before this Court.

Fact and expert discovery in the actions before this Court are complete as to all

actions transferred to this MDL prior to December 2024.

During the pendency of the summary judgment motions, the Moving Plaintiffs

sought to amend their complaints to revise their allegation of a relevant geographic market to

---

[2] Judge Brinkema noted that the "[p]laintiffs do not dispute that the DOJ Action involves issues of fact and law that largely overlap with the MDL actions. . . ." (E.D. Va. Action, ECF 60 at 16.) But the Judge found that the balance of the convenience factors were neutral and that the governmental plaintiffs' choice of a forum different from where private class action litigation that might proceed at a slower pace was entitled to deference. (Id. at 13-14.) Judge Brinkema also noted that the statutory exemption of Sherman Act claims brought by the federal government from transfers by the JPML, 28 U.S.C. § 1407(f)-(g), reflected a legislative preference to allow the federal government to proceed in its own chosen forum. (Id.)

conform with Judge Brinkema's ruling.  In the E.D. Va. Action, plaintiffs took the position that the relevant geographic market for antitrust purposes was either worldwide or the United States. The action proceeded to trial on the two alternatives.  Judge Brinkema found that the relevant geographic market was worldwide.  Google argued that issue preclusion in the MDL was not appropriate on any issue because the Court in the E.D. Va. Action had found the relevant geographic market for antirust purposes was worldwide and the Moving Plaintiffs had mainly alleged a United States market.  The Moving Plaintiffs sought to amend their allegation of relevant geographic market supported solely by facts already alleged and examined in discovery and the findings in the E.D. Va. Action.  In granting the motions to amend, which the Court had invited, the Court noted that Google's expert in the MDL had addressed both the United States and worldwide markets, as he had done in the E.D. Va. Action, and thus concluded that there was no unfair prejudice to Google.  (Pre-Trial Order No. 18 (ECF 1190).)

Separately pending before this Court are motions by the Publishers and Advertisers for class certification.  The Publishers seek to certify two classes consisting of U.S.-based publishers who, during the relevant period, paid fees directly to Google or experienced reductions in advertising revenue received directly from Google (1) for services associated with selling advertising impressions on websites via Google's ad exchange (the "AdX Class"); and (2) for services associated with selling advertising impressions on websites via Google's AdSense Package (the "AdSense Class").[3]  (ECF 955.)  The Advertisers seek to certify a class consisting

---

[3] The Publishers acknowledge that the findings and conclusions in the E.D. Va. Action do "not establish any elements of the monopolization or tying claims for the AdSense Publishers Class, which relies on different product markets."  (ECF 1041 at 6 n. 5.)  Judge Brinkema concluded that AdSense and AdWords are two components of Google's advertiser ad network and that plaintiffs in the E.D. Va. Action had not proved that advertiser ad networks are a relevant market.  (Mem. Op. 54-60.)  The Court's analysis of issue preclusion does not apply to the claims of the putative AdSense Class.

of those who placed a display advertisement on a third-party website using Google Ads during the class period.  (ECF 965.)

DISCUSSION

    A.  The Standard for Issue Preclusion.

        With the exception of a single action originally filed in this District, [4] this Court is the transferee court for all actions in this MDL.  On issues of federal law, this Court, as transferee court, applies the law of the Second Circuit.  Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) ("We have previously held that a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.") (citing Coker v. Pan American World Airways, Inc., 950 F.2d 839, 847 (2d Cir. 1991)).

        Issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748-749 (2001)).  The doctrine applies when the following four elements are satisfied: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 400 (2d Cir. 2011) (quotation marks omitted); Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir. 1997).  The burden of proof rests with the party seeking preclusion on all elements except the full and fair opportunity to litigate, on which the party

---

[4] Associated Newspapers Ltd., et al. v. Google LLC, 21-cv-3446 (PKC).

opposing preclusion bears the burden of proof.  Proctor v. LeClaire, 715 F.3d 402, 414 (2d Cir. 2013) (citing Kulak v. City of New York, 88 F.3d 63, 72 (2d Cir. 1996)).

In a case in which non-mutual offensive estoppel is sought, even if the four elements are satisfied, issue preclusion is not mandated because the doctrine is equitable in nature and equitable considerations may warrant denying preclusion.  CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 850 F.3d 58, 78 (2d Cir. 2017).

The parties in the actions before this Court have demanded a trial by jury.  As a matter of Seventh Amendment law, issue preclusion may apply even if the first proceeding was tried without a jury and the parties to the subsequent proceedings are otherwise entitled to a jury. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 337 (1979).

Issue preclusion may be decided on a summary judgment motion because it often turns on the application of legal principles to undisputed facts.  Phoenix Light SF Ltd. v. Bank of New York Mellon, 66 F.4th 365, 369 (2d Cir. 2023).  Summary judgment on "part of . . . [a] claim" is expressly permissible under Rule 56(a), Fed. R. Civ. P.  See In re Namenda Direct Purchaser Antitrust Litig., 15-cv- 7488 (CM), 2017 WL 4358244, at *16 (S.D.N.Y. May 23, 2017) (granting partial summary judgment in private antitrust suit as to key findings in prior civil suit brought by the New York Attorney General); Discover Financial Services  v. Visa U.S.A. Inc., 598 F. Supp. 2d 394, 401 (S.D.N.Y. 2008) (granting partial summary judgment in a private antitrust action based upon on preclusive determinations in a government civil antitrust action), order clarified on reconsideration, 04-cv-7844 (BSJ), 2008 WL 11516437 (S.D.N.Y. Oct. 1, 2008); see also GAF Corp. v. Eastman Kodak Co., 519 F. Supp. 1203, 1212-16 (S.D.N.Y. 1981) (granting summary judgment as to market definition and monopoly power issues).  Although the facts in the E.D. Va. Action were disputed at trial, there is no genuine dispute before this Court

as to the content of the finding and conclusions in the E.D. Va. Action. The claims and contentions in the actions that are part of the MDL are an indisputable matter of record, though the parties dispute their significance and import.

"Although the idea of issue preclusion is straightforward, it can be challenging to implement." B & B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138, 148 (2015). The Court on this motion is aided by two features of the E.D. Va. Action. Google itself has aptly characterized the claims in the E.D. Va. Action as "substantively identical" to the main claims asserted by plaintiffs in this MDL. (E.D. Va. Action, ECF 50 at 6.) Both this MDL and the E.D. Va. Action allege that Google monopolized or attempted to monopolize the market for digital advertising on both the publisher (or seller) side and the advertiser (or buyer) side in violation of section 2 of the Sherman Act and engaged in an unlawful tying of Google's publisher ad server ("DFP" or "DoubleClick for Publishers") to its ad exchange ("AdX") in violation of sections 1 and 2 of the Sherman Act.

In deciding whether to apply issue preclusion, the second court does not sit in review of the first court's work. "The fact that the [prior tribunal] may have erred . . . does not prevent preclusion." B & B Hardware, 575 U.S. at 157.[5]

B.  **Google Had a Full and Fair Opportunity to Litigate the Issues Actually Decided in the E.D. Va. Action.**

The Court will first address whether Google had a full and fair opportunity to litigate the claims and defenses in the E.D. Va. Action. Because this prong focuses on the first litigation and whether it provided the party against whom preclusion is sought a full opportunity

---

[5] B & B Hardware rejected an argument that issue preclusion ought not apply because of potential error on the part of the administrative agency whose decision was relied upon as grounds for issue preclusion, and approvingly cited the Restatement (Second) of Judgments § 28, Comment j, at 284 ("refusal to give the first judgment preclusive effect should not . . . be based simply on a conclusion that [it] was patently erroneous"). 575 U.S. at 157-58.

to present evidence and a procedurally and substantively fair forum, the Court is able to comfortably dispose of the issue. Google had the powerful incentive to defend the claims brought by the DOJ and the state attorneys general. It vigorously defended the claims in a forum that afforded it the full panoply of rights a party would expect in a proceeding in any United States District Court under the Federal Rules of Civil Procedure, Federal Rules of Evidence, Title 28 (Judiciary and Judicial Procedure) and custom and usage in federal courts.

In the DOJ's pre-suit investigation, Google produced "nearly 3 million" documents, third parties produced "nearly 5 million" documents, and 30 witnesses were examined. (E.D. Va Action, ECF 636.)

Magistrate Judge John F. Anderson ably supervised discovery in the E.D. Va. Action with a ten-month period for discovery, ultimately extended to twelve months. (Id., ECF 69, 546.) According to Google, "[b]etween September 8 and October 6, 2023, Google produced a total of 1,995,869 documents," which was "on top of roughly 3 million documents produced during the pre-complaint investigation and roughly 1 million additional documents produced in [the E.D. Va Action] before September 8. . . ." (Id., ECF 485 at 1.) Over the course of the entire discovery period, ten Google witnesses and twenty third-party witnesses were examined at deposition. (Id., ECF 636.)

Judge Brinkema set the trial date of September 9, 2024, seven months in advance. (Id., ECF 525.) The parties were in substantial agreement on a schedule for final pre-trial submissions. (Id., ECF 542.) Judge Brinkema commenced the testimonial phase of the liability bench trial on September 9, 2024, and continued for 15 trial days. Google and plaintiffs, after a brief rebuttal case, both rested on September 27, 2024. The evidence consisted of the testimony

of 39 live witnesses, excerpts from depositions of 20 witnesses and hundreds of exhibits.  (Id.,
ECF 1410 at 3.)

Judge Brinkema provided the parties an ample opportunity to review the trial
record and deferred closing arguments to November 25, 2024.  (Id., ECF 1350, 1390.)  The
Judge's Memorandum Opinion setting forth findings and conclusions spanned 115 pages and
issued on April 17, 2025, after a suitable period of deliberation.  (Id., ECF 1410.)

There were no motions to reconsider, modify or correct that Memorandum
Opinion.  The parties have proceeded to a remedies trial that began on September 22, 2025.

Google does not assert that it did not have a full and fair opportunity to litigate the
issues decided in the E.D. Va. Action, except that Google argues that discovery continued for a
longer period in the MDL, thereby depriving it of use of this discovery in the trial.  That more
discovery materials were later obtained in this action that were not yet available for use in the
trial before Judge Brinkema did not undermine Google's full and fair opportunity to litigate in
that trial.  Google has not demonstrated that any of the later-developed evidence was outcome-
determinative on any claim.

Google has failed to come forward with evidence that it was denied a full and fair
opportunity to defend  the E.D. Va. Action.  This element is established.

C.  The Findings and Conclusions in the E.D. Va. Action
    Are Final in the Context of Issue Preclusion.

The April 17 Memorandum Opinion by Judge Brinkema decided all liability
issues in the E.D. Va. Action, leaving open the question of the relief for the proven violations.
The remedies are the subject of ongoing proceedings and no final judgment has been entered.
The formulation of the issue-preclusion standard in this Circuit speaks of the resolution of the
issue supporting "a valid and final judgment on the merits."  Republic of Ecuador, 638 F.3d at

400.  As will be demonstrated, finality in the context of issue preclusion is a flexible concept

under the law of the Second Circuit.

Judge McMahon, after thoroughly reviewing the law on the finality requirement,

concluded that under the Second Circuit's "fundamental holding" in "an interlocutory decision

can be given preclusive effect."[6]

Judge Friendly's opinion in Lummus sets out useful factors to be considered in

deciding whether a decision is final for preclusion purposes:

> Whether a judgment, not 'final' in the sense of 28 U.S.C. § 1291,
> ought nevertheless be considered 'final' in the sense of precluding
> further litigation of the same issue, turns upon such factors as the
> nature of the decision (i.e., that it was not avowedly tentative), the
> adequacy of the hearing, and the opportunity for review.  'Finality'
> in the context here relevant may mean little more than that the
> litigation of a particular issue has reached such a stage that a court
> sees no really good reason for permitting it to be litigated again.

Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961); see also

Zdanok v. Glidden Co., 327 F.2d 944, 955 (2d Cir. 1964) ("The mere fact that the damages of

[one set of] plaintiffs have not yet been assessed should not deprive that ruling of any effect as

collateral estoppel it would otherwise have."); Restatement (Second) of Judgments § 13 ("'final

judgment' includes any prior adjudication of an issue in another action that is determined to be

sufficiently firm to be accorded conclusive effect.").

Judge Brinkema's decision was far from tentative, avowedly or otherwise.  The

three-week trial, followed by closing arguments and submission of proposed findings, provided a

---

[6] Ferring B.V. v. Serenity Pharmaceuticals, LLC, 391 F. Supp. 3d 265, 286 (S.D.N.Y. 2019) (examining Circuit precedent and finding finality in an interlocutory ruling); see also Marsh & McLennan Agency LLC v. Williams, 22-cv-8920 (JPC), 2025 WL 1265817, at *13 (S.D.N.Y. Apr. 30, 2025) (applying collateral estoppel to a district court's ruling compelling arbitration of parallel claims by other similarly situated employees); The Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC, 16-cv-4270 (VM), 2019 WL 3940218, at *4 (S.D.N.Y. July 29, 2019) (following Ferring's analysis of Circuit precedent).

more than adequate hearing.  There will be an opportunity for appellate review of her findings and conclusions once final judgment is reached after the remedies trial.  "'[I]nability to obtain appellate review' refers, not to cases that are temporarily unreviewable because proceedings are ongoing, but rather to decisions that are, by law, unreviewable by their very nature."  Ferring B.V., 391 F. Supp. 3d at 285 (distinguishing dictum in Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir. 1986)).

If the finding of liability in the E.D. Va. Action were to be reversed on appeal, Rule 60(b), Fed. R. Civ. P., would provide Google with a remedy in any MDL member case in which issue preclusion was applied.  See Sherman v. Jacobson, 247 F. Supp. 261, 270 (S.D.N.Y. 1965) (Feinberg, J.) ("Should the Iowa decision ultimately be reversed, defendant will not be without remedy, Fed. R. Civ. P. 60(b), even if an appeal is pending in this circuit or has already resulted in affirmance.").[7]

The findings and determinations in E.D. Va. Action are the final word on Google's liability and will be capable of appellate review upon completion of the remedies trial and entry of final judgment.

D.  Judge Brinkema's Memorandum Opinion Set Forth the Issues
    "Actually" and "Necessarily" Decided in the E.D. Va. Action.

As noted, the second required element is that "the issue was actually litigated and decided in the previous proceeding" and the fourth required element is that "the resolution of the issue was necessary to support a valid and final judgment on the merits."  Republic of Ecuador, 638 F.3d at 400.  The "actually and necessarily determined" issues are often discussed in tandem,

---

[7] 18A Wright, Miller & Cooper, Federal Practice & Procedure & Proc. § 4433 (3d ed. 2021) ("[d]espite the manifest risks of resting preclusion on a judgment that is being appealed, the alternative of retrying the common claims, defenses, or issues is even worse.").

see, e.g., Montana v. United States, 440 U.S. 147, 153 (1979), though they capture different concepts.  An issue that was actually litigated but not decided ought not have preclusive effect because it lacks the benefit of the first fact finder's deliberation and judgment.  18 Wright, Miller & Cooper, Fed. Practice & Procedure § 4420 (3d ed. 2021).  Likewise, a finding that was "merely incidental" to the first fact finder's decision is not accorded preclusive effect because it may not have received the same careful consideration as a necessary determination.  Id. § 4421.

The E.D. Va. Action was tried to Judge Brinkema without a jury.  An obvious difficulty in applying issue preclusion to a monopolization claim in an action tried to a jury is discerning which type of anticompetitive conduct the jury actually and necessarily found as a predicate for its ultimate finding of monopolization.  Evidence of multiple patterns of anticompetitive behavior may have been placed before the jury for its consideration and the jury may have accepted some and rejected others.  Unless a special verdict form required the jury to specify which anticompetitive conduct was proven, issue preclusion may not be possible on any one of several types of conduct alleged in the subsequent action.

No such impediment is presented here.  The Court in the E.D. Va. Action stated with clarity what it did and did not find as anticompetitive behavior.  Thus, this Court need not parse the possible paths that the factfinder may have taken in an effort determine which facts were actually and necessarily decided.  Judge Brinkema's findings of fact and conclusions of law are precise and concise.

There is an important distinction between a finding of multiple anticompetitive acts that support a finding of monopolization, as is the case with Judge Brinkema's findings, and findings that are made in the alternative.  Neither side points to any alternative finding of Judge Brinkema and the Court discerns none.  While there is some debate in this Circuit whether a

finding or conclusion that is based upon independent alternative grounds is entitled to preclusive effect,[8] Google makes no claim that any finding or conclusion rested on independent alternative grounds.

E.   The Identity-of-Issues Element Is Satisfied in Substantial Part.

To meet the identity-of-issues element, it is not necessary that the issues be exactly identical; it is sufficient that "the issues presented in [the earlier litigation] are substantially the same as those presented by [the later] action." Zherka v. City of New York, 459 Fed. App'x 10, 13 (2d Cir. 2012) (brackets in original; quoting ITT Corp. v. United States, 963 F.2d 561, 564 (2d Cir. 1992)). The Supreme Court requires the Court to determine: "first, whether the issues presented by this litigation are in substance the same as those resolved [in the first action]; second, whether controlling facts or legal principles have changed significantly since the [prior action]; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." Montana v. United States, 440 U.S. 147, 155 (1979). As to the second inquiry, Judge Brinkema's Memorandum Opinion was issue on April 17, 2025, and the present summary judgment motions are under review within seven months of the decision. There have been no material changes in the legal principles governing the decision in the E.D. Va. Action. The third inquiry will be separately addressed below. See Part G.

The issues that are identical in both the DOJ's action and certain of the Moving Plaintiffs' actions are whether Google violated section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the worldwide markets for publisher ad servers and ad exchanges and violated sections 1 and 2 of the Sherman Act by unlawfully tying Google's

---

[8] Compare Gelb, 798 F.2d at 45 ("The general rule in this Circuit is that 'if a court decides a case on two grounds, each is a good estoppel.'"), and Irving National Bank v. Law, 10 F.2d 721, 724 (2d Cir.1926) (L. Hand, J.), with Halpern v. Schwartz, 426 F.2d 102, 106 (2d Cir. 1970).

publisher ad server (DFP) to its ad exchange (AdX).  Judge Brinkema resolved these issues

against Google and these findings and conclusions lie at the heart of the motions.[9]  (Mem. Op.

1.)  Each group of Moving Plaintiffs actions will be separately examined.

> 1.  The Publisher Movants' Allegations and the
>      <u>Findings and Conclusions in the E.D. Va. Action.</u>

The Publishers, Gannett and Daily Mail (collectively  the "Publisher Movants")

move for partial summary judgment on issue preclusion on the section 1 and section 2 claims.

a.  <u>Ad Servers and Ad Exchanges Are Separate Product Markets</u>. The Publisher Movants

allege that publisher ad servers are a separate product market.  (Publishers: ECF 1192 ¶¶ 113 -

115; Gannett: ECF 1197 ¶¶ 70-75; Daily Mail: ECF 1196 ¶¶ 55-60.)

Judge Brinkema found that "publisher ad servers for open-web display advertising

constitute a distinct relevant product market."  (Mem. Op. 43.)

The Publisher Movants allege that ad exchanges are a separate product market.

(Publisher Class: ECF 1192 ¶¶ 116-118; Gannett: ECF 1197 ¶¶ 83-87; Daily Mail: ECF 1196 ¶¶

68-71.)

Judge Brinkema found that "ad exchanges for open-web display advertising

constitute a distinct relevant product market."  (Mem. Op. 50.)

b.  <u>Ad Server and Ad Exchange Markets Are Worldwide.</u>  The Publishers allege that the

markets for ad servers and ad exchanges are either worldwide or the United States.  (Publishers:

ECF 1192 ¶¶ 121-126.)  Gannet and Daily Mail each alleges a global market for both ad servers

and ad exchanges.  (Gannett: ECF 1197 ¶¶ 76-77, 88-89; Daily Mail: ECF 1196 ¶¶ 72-73.)  The

Publishers exclude countries where the operation of ad tech companies is substantially restricted

---

[9] As noted, Judge Brinkema found a claim relating to advertiser ad networks to be not proven.

by government censorship of the internet (e.g., China) or U.S. economic sanctions (e.g., Iran) and Gannett and Daily Mail have similar exclusions.

Judge Brinkema found a worldwide market for both the ad server market and the ad exchange market. (Mem. Op. 68-69.) Judge Brinkema's worldwide market definition also excludes countries subject to U.S. economic sanctions and countries where government censorship restricts internet access. (Id. 68 n. 26.)

c. <u>Monopoly Power in the Publisher Ad Server and Ad Exchange Markets.</u> The Publisher Movants allege that Google has monopoly power in the ad server market and the ad exchange market. (Publishers: ECF 1192 ¶¶ 160, 176; Gannett: ECF 1197 ¶¶ 78-82, 90-95; Daily Mail: ECF 1196 ¶¶ 63-67, 74-78.)

Judge Brinkema found that "[p]laintiffs have proven that Google possesses monopoly power in the publisher ad server for open-web display advertising market." (Mem. Op. 73.) The Judge found that DoubleClick for Publishers, an ad server acquired by Google in 2008 for $3.1 billion, had at least 91% of the worldwide market for ad servers from 2018 to 2022. (Mem. Op. 26-27, 73-76.) The Judge also found monopoly power in the ad exchange market. (Mem. Op. 76-84.)

d. <u>Willfully Acquired or Maintained Monopoly Power.</u> Judge Brinkema found that Google willfully acquired or maintained its monopoly power not by growth or development as a consequence of a superior product, business acumen or historic accident and that the "procompetitive justifications . . . for its anticompetitive conduct are both invalid and insufficient." (Mem. Op. 104-112.)

Specifically, Judge Brinkema found that plaintiffs proved all four elements of their claim that Google unlawfully tied DoubleClick for Publishers to AdX (the "Unlawful

Tying"). (Mem. Op. 90-98.)  The Unlawful Tying was evidence of willfully maintaining a monopoly in aid of the plaintiffs' section 2 claim but it also supported the separate section 1 claim.  (Id.)  The Publishers allege that "Google tied its AdX Ad Exchange to its DFP Ad Server, and its DFP Ad Server to its AdX Ad Exchange (Act 1 and Act 2), thereby coercing publishers to enter contracts to license each of these products."  (ECF 1192 ¶ 395.)

Other Google ad tech policies found by Judge Brinkema to be anticompetitive and supportive of the monopolization claim included Google's requirement that publishers using DoubleClick for Publishers offer AdX a first opportunity to bid on each impression offered in the exchange's auction process ("First Look") with AdX deemed the winning bidder if it topped a minimum floor price without the opportunity for other ad exchanges to bid.[10]  (Mem. Op. 99.) The Judge found that "another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process" was a feature that gave AdX the ability to see competing exchanges' bids in what was otherwise sealed auction ("Last Look").  (Id. at 99-100.)  Judge Brinkema also found that "Dynamic Revenue Share" was anticompetitive conduct that allowed Google's AdX to adjust the percentage fee it charged by lowering the "take rate" on "competitive impressions that had received relatively high offers

---

[10] "First Look" is part of what several of the Publisher Movants refer to as "Dynamic Allocation."  In its complaint, the DOJ describes First Look, an aspect of Dynamic Allocation, as follows: "First, Google configured its publisher ad server to afford Google's ad exchange a 'first look' at all inventory the ad exchange was eligible to buy. Google's publisher ad server always called Google's ad exchange for a real-time bid before offering inventory to rival ad exchanges.  This placed Google's ad exchange at the top of every waterfall. . . ."  (ECF 1042-1 ¶ 114.) Gannett explained the First Look aspect of Dynamic Allocation with greater detail and complexity: "First, Dynamic Allocation required publishers to estimate an historical average CPM [price per one thousand impressions] (a 'static bid') for each non-Google exchange it used.  Second, once an impression became available, DFP sent the highest static bid as a 'price floor' to Google's exchange, AdX, and called AdX to run a real-time auction and submit a bid. AdX would win the impression if its real-time bid was higher (even one penny higher) than the highest static bid. Once AdX beat the highest static price, no other exchange was permitted to compete for the impression. Thus, with DFP, AdX was the only exchange that could bid in real time for each impression." (ECF 1197 ¶ 56.)  The concept as alleged by these Publisher Movants is the same as that found to be anticompetitive in the E.D. Va. Action. AdX was given a first opportunity to beat the publisher's static bid and, if it did, the auction was over with AdX the winner, and no other ad exchange had the opportunity to top the AdX bid.

from third-party exchanges via header bidding." (<u>Id.</u> at 35, 100.)  In about 2019, Google

eliminated the Last Look policy but instead implemented "Unified Pricing Rules" that prohibited

publishers using DoubleClick for Publishers from setting higher price floors for AdX auctions

that for other exchanges.  (<u>Id.</u> at 37.)  Judge Brinkema found the Unified Pricing Rules to be

anticompetitive behavior.  (<u>Id.</u> at 100-101.)

   The Publisher Movants have challenged in their complaints an array of

anticompetitive conduct that Judge Brinkema found to be anticompetitive.  (<u>Publishers</u>: ECF

1192 ¶¶ 201-222, 395 (Unlawful Tying),  ¶¶ 21, 254-68 (First Look),  ¶¶ 21, 294 (Last Look), ¶¶

17, 24, 288-97 (Dynamic Revenue Share), ¶¶ 326-33 (Unified Price Rules); <u>Gannett</u>:  ECF 1197

¶¶ 106-09, 246, 261-62, 274-280 (Unlawful Tying), ¶¶ 56-59 (First Look), ¶¶ 59-63, 140-50

(Last Look), ¶¶177-86 (Dynamic Revenue Share),  ¶¶ 218-230 (Unified Price Rules); <u>Daily</u>

<u>Mail</u>: ECF 1196 ¶¶ 89-91, 93-100, 238, 252-53, 257-59, 266-71 (Unlawful Tying), ¶¶ 42-44

(First Look), ¶¶ 45-48, 117-27 (Last Look), ¶¶ 146-55 (Dynamic Revenue Share), ¶¶ 203-10

(Unified Price Rules).)

   The Publisher Movants have shown the substantial identity of the following issues

to the findings and conclusions in the E.D. Va. Action: (1) the existence of separate and distinct

markets for publisher ad servers and ad exchanges, (2) that the publisher ad server and ad

exchange markets are worldwide in scope, excluding countries restricting access to the internet

or subject to U.S. sanctions, (3) that Google has willfully acquired and maintained its monopoly

power in the ad server and ad exchange markets through the following anticompetitive conduct:

Unlawful Tying, First Look, Last Look, Dynamic Revenue Share and Unified Pricing Rules.

The Publisher Movants have also shown identity of issues its section 1 Unlawful Tying claim

and the findings and conclusions in the E.D. Va. Action of Unlawful Tying of Google's DoubleClick for Publishers and AdX.

>    2.    Inform's Allegations and the Findings and
>          Conclusions in the E.D. Va. Action.

Inform "was an online video publisher whose videos typically ran on the websites of non-party news publications.  For example, alongside a newspaper's story about wildfires, a reader could view an Inform-produced video about wildfire risks that featured an advertisement for property insurance.  Inform alleges that it was driven out of business by Google's anticompetitive conduct."  (ECF 709 at 1; Inform, 2024 WL 988966, at *1 (granting in part and denying in part Google's motion to dismiss Inform's claims).)

Inform alleges the existence of separate markets for publisher ad servers and ad exchanges that are either U.S. or worldwide in scope.  (ECF 1195 ¶¶ 117, 127.)[11]  It alleges that Google has monopoly power in each of these markets.  (ECF 1195 ¶¶ 124-26, 132-35.)  These allegations substantially track Judge Brinkema's findings of the existence of a worldwide market in ad servers and ad exchanges and that Google had monopoly power in each.  (Mem. Op. 68-69, 76-84.)

Inform also alleges that Google maintained its monopoly power through the following anticompetitive conduct: ECF 1195 ¶¶ 168-77 (Unlawful Tying), ¶¶ 189-197 (First Look), ¶¶ 213-16 (Last Look), and ¶¶ 224-28 (Dynamic Revenue Share).  There is substantial identity between Inform's allegations and Judge Brinkema's findings and conclusions that each of these practices was anticompetitive and for the purpose of acquiring or maintaining Google's monopoly power in the ad server and ad exchange markets.  Inform's claim that Google

---

[11] Though not relevant to the motion, Inform also alleges the existence of separate markets for online video advertising and instream online video advertising.  (ECF 1195 ¶¶ 108-14.)

unlawfully tied its publisher ad server to its ad exchange is substantially identical to Judge

Brinkema's findings that Google unlawfully tied its Double Click for Publishers to AdX in

violation of section 1 of the Sherman Act.

> 3. The Advertisers' Allegations and the Findings
> and Conclusions in the E.D. Va. Action.

In addition to the ad exchange market, the Advertisers' complaint (ECF 1198)

alleges two markets that were not at issue in the E.D. Va. Action, specifically "Buying Tools for

Small Advertisers" and "Buying Tools for Large Advertisers." The Advertisers seek no

preclusive relief with respect to these two markets. They seek issue preclusion on the definition

of the ad exchange market, Google's monopoly power in that market and the issue of whether

implementation of Unified Pricing Rules was anticompetitive conduct that enabled Google to

willfully acquire or maintain monopoly power. On Google's motion to dismiss, this Court ruled

that the Advertisers alleged antitrust standing sufficient to pursue a monopolization claim in the

ad exchange market. (ECF 701 at 13-15; In re Google Digital Advertising Antitrust Litig., 721

F. Supp. 3d at 246-48.)

The Advertisers have alleged that ad exchanges are a separate, relevant market for

the purpose of one of their section 2 claims (ECF 1198 ¶¶ 45-56, 340-347) and that the market is

worldwide with the same carve-outs for countries with restricted internet access or subject to

U.S. sanctions. (Id. ¶¶ 57-58.) [12]  These allegations substantially track Judge Brinkema's

findings of a distinct market for ad exchanges for open-web display advertising with "unique

functionality" and without other "reasonably interchangeable" ad tech tools or buying methods.

(Mem. Op. 50-54.) Judge Brinkema also found the relevant geographic market for ad exchanges

---

[12] "The ad exchange helps these ad buyers formulate their real-time bids by sharing information about the impression, including the website on which the impression appears, attributes about the user who is visiting the site, and the pricing information that the ad exchange has received from the publisher ad server." (Mem. Op. 17.)

to be worldwide with the same carveout for countries where the operation of ad tech companies is substantially restricted by the government or is subject to U.S. economic sanctions.  (Id. 67-71.)

The Advertisers allege that Google has monopoly power in the ad exchange market.  (ECF 1198 ¶¶ 64-79.)  As noted, Judge Brinkema found that Google had monopoly power in the ad exchange market, and, as discussed below, evaluated both sides of the ad exchange market in reaching this conclusion.  (Mem. Op. 76-87.)

The Advertisers allege that Google acquired or willfully maintained a monopoly in the ad exchange market through the imposition of Unified Pricing Rules.  (ECF 1998 ¶¶ 244-56.)  At present, Cliffy Care Landscaping, LLC ("Cliffy Care") and the Hanson Law Office are the only named plaintiffs in the Advertisers' suit, a putative class action.  (Id. ¶¶ 14-21.)

Cliffy Care alleges that it purchased display advertising through Google Ads between September 2018 and the present.  Google Ads, previously known as "AdWords," is a buying tool for small advertisers, which is a relevant product market separate from ad exchanges. (Id. ¶¶ 6, 83-104.)  There is no allegation that Cliffy Care was a direct purchaser of advertising through an ad exchange.  Regardless, the claim of Cliffy Care has been stayed pending arbitration.  ECF 903; Stellman v. Google, 763 F. Supp. 3d 563 (S.D.N.Y. 2025).

As to the other named plaintiff, the Hanson Law Office, this Court dismissed all of its claims directed to conduct that post-dates September 6, 2016, expressly including the Unified Pricing Rules.  (ECF 701 at 21-22; 721 F. Supp. 3d at 251.)

Judge Brinkema found that the Unified Pricing Rules constituted anticompetitive conduct in the ad server and ad exchange markets.  (Mem. Op. 100-01.)  Because Unified Pricing Rules were not in effect while the Hanson Law Office was a buyer of advertising in the ad

exchange market and because Cliffy Care's claim is stayed pending arbitration and it is not alleged to have been a buyer of advertising in the ad exchange market, neither has antitrust standing in the Advertisers' action to assert a claim premised upon Unified Pricing Rules.[13]

The Advertisers' allegation of the existence of a separate worldwide market for ad exchanges is substantially identical to the finding of such a market in the E.D. Va. Action.

F.  Google's Arguments Do Not Undercut the Application of Issue Preclusion.

Google asserts several arguments, specific to the unlawful tying arrangement and other anticompetitive conduct that foreclose a finding that issues raised in the Moving Plaintiffs' actions are substantially identical to those found by the Judge in the E.D. Va. Action. Google refrains from asserting that Judge Brinkema's findings and conclusions should be denied preclusive effect because they are erroneous.[14]  Instead, Google asserts that Judge Brinkema followed  Fourth Circuit standards that would not apply under the law of the Second Circuit, whose precedents control in this MDL.  Each argument will be separately considered but the Supreme Court has cautioned that issue preclusion may not be defeated based on the different manner of application of a single federal statutory standard.  B & B Hardware, 575 U.S. at 154. The Court's holding arose in the context of a purported conflict in the application of the "likelihood of confusion" standard applied by the Trademark Trial and Appeal Board ("TTAB") of the Patent and Trademark Office and that of the Eighth Circuit's standard:

> [I]t [does not] matter that the TTAB and the Eighth Circuit use different factors to assess likelihood of confusion.  For one thing, the factors are not fundamentally different, and "[m]inor variations in the application of what is in essence the same legal standard do

---

[13] While playing no part in the Court's decision on the present motion, Google has asserted in another submission that Hanson was only an indirect purchaser of ad exchange services from Google.  (ECF 950 at 6.)

[14] As previously discussed, asserted error by the first tribunal does not provide a valid basis to avoid issue preclusion in the second action.  B & B Hardware, 575 U.S. at 158 (citing Restatement (Second) of Judgments § 28, Comment j, at 284 ("refusal to give the first judgment preclusive effect should not . . . be based simply on a conclusion that [it] was patently erroneous").)

> not defeat preclusion." More important, if federal law provides a single standard, parties cannot escape preclusion simply by litigating anew in tribunals that apply that one standard differently. A contrary rule would encourage the very evils that issue preclusion helps to prevent.

B & B Hardware, 575 U.S. at 154 (internal citation omitted).

In this MDL and in the E.D. Va. Action, district courts in the Second and Fourth Circuits apply the same statutory standards, sections 1 and 2 of the Sherman Act, and the same controlling Supreme Court precedents. That the statutory standards are applied "differently" does not foreclose issue preclusion. Even at that the variations between the law of the two Circuits are minor and, in all instances, Judge Brinkema's findings and conclusions are consistent with the standards of either Circuit.

1. There Was No Inconsistency with Second Circuit Law in the Application of "Refusal to Deal" Principles

The Supreme Court acknowledges that, as a general matter, market participants may refuse to deal with whomever they choose. See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004) ("Trinko") ("[A]s a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (quotation marks omitted). Google endeavors to cast Judge Brinkema's rejection of Google's asserted refusal to deal defense to various anticompetitive acts as differences in the standards applied to conduct in the Second and Fourth Circuits. But Judge Brinkema explained her reasoning, which does not implicate any difference between the two Circuits:

> The refusal to deal doctrine in Trinko does not apply to Google's conduct at issue. Courts have declined to "extend[ ] a refusal-to-deal-with-rivals analysis" to anticompetitive restraints that a

22

> monopolist places on its customers, as opposed to its competitors. . . . Courts have also "contrast[ed]" the "[r]efusal to deal doctrine" from "a monopolist's more direct interference with rivals," such as "limit[ing] the abilities of third parties to deal with rivals (exclusive dealing)" or "requir[ing] third parties to purchase a bundle of goods rather than just the ones they really want (tying)." Here, Google has engaged in tying that effectively has compelled its publisher customers to use DFP if they want to use AdX and receive real-time bids from AdWords advertisers.

(Mem. Op. 102-03; citations omitted.)

Google seizes on the Judge's correct observation that "[u]nlike in Trinko, Google's ad tech business has not operated in a highly regulated industry. . . ." (Id. at 103.) The Judge further observed that operating in a regulated market was, in the Fourth Circuit's view, an "important distinction." (Id. 102 (citing Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337, 363 (4th Cir. 2024).)

The supposed variance with the Second Circuit's analysis of Trinko arises from an overreading of the Second Circuit's holding in In re Elevator Antitrust Litigation, 502 F.3d 47, 53 (2d Cir. 2007), which addressed an argument that Trinko only applies in a regulated industry: "these considerations were not essential to Trinko's holding. And neither of two other Supreme Court cases dealing with this exception involves a regulated industry. See Aspen Skiing, . . . (ski resorts);[15] Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451 (1992) (photocopiers)." The Second Circuit held that Trinko does not require the existence of a regulated industry, an unremarkable conclusion consistent with Fourth Circuit law and Judge's findings in the E.D. Va. Action. The Second Circuit never suggested that a regulated industry is not an important consideration but simply the absence of a regulated industry is not a controlling factor. Google's argument based upon a Circuit variance is utterly without merit.

---

[15] Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601 (1985).

2.  Google's Assertion of Inconsistency with Second Circuit
Law on Two-Sided Transaction Platforms Is Meritless.

Google argued in the E.D. Va. Action that the digital ad tech ecosystem

constitutes a single two-sided market.  Judge Brinkema considered and rejected Google's

argument.  (Mem. Op. at 60-67.)  Google urges that the Judge's finding conflicts with Second

Circuit law and this Court concludes that it does not.

The premise of the Google's argument in the E.D. Va. Action was the holding in

Ohio v. American Express Co., 585 U.S. 529, 535-36 (2018) ("Amex"). [16]  Judge Brinkema

acknowledged that there was some resemblance between Google's ad exchange and the two-

sided platform in Amex  but there were also important differences.  Specifically, the

Memorandum Opinion noted that "ad exchanges do not merely provide technology to facilitate

transactions between buyers and sellers, but also function as auction houses by evaluating

multiple potential buyers and selecting the buyer with the highest wiliness to pay."  (Mem. Op. at

64 n.24.)  It noted that "in analyzing whether Google has monopoly power, the Court will

'[e]valuat[e] both sides' of the ad-exchange market."  (Id. at 64.)  It then evaluated the publisher

side and the advertiser side of the ad exchange in assessing monopoly power. [17]

The Second Circuit's decision in US Airways, Inc. v Sabre Holdings Corp., 938

F.3d 43, 61 (2d Cir. 2019), to which Google points, was derived from Amex with no relevant

---

[16] The two-sided nature of the credit card transaction platform in Amex functioned as follows: "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder."  Id. at 545.

[17] It is simply untrue that Judge Brinkema's findings on monopoly power did not address the advertiser side of the ad exchange market, as Google argues.  (ECF 1080 at 24.)  See, e.g., Mem. Op. 78 ("Google employees have recognized the durability of AdX's pricing by describing how the exchange's market power left both publishers and advertisers with very little choice but to keep using it."); id. at 80 ("Another direct sign of monopoly power is that Google has used its market power in adjacent segments of the ad tech ecosystem to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges."); id. at 81 ("These practices on both the advertiser buy side and publisher sell-side are evidence that Google could set its terms of dealing with its customers 'without considering rivals[,]' and constituted behavior that is 'difficult to explain unless' Google had monopoly power.").

principle of significance not found in Amex.  Judge Brinkema relied upon Amex and in doing so, the Judge did not apply an analysis different than what would be applied in the Second Circuit. Judge Brinkema's reasoning appears consistent with both U.S. Airways and Amex.  (Mem. Op. 60-67.)

> 3.  This Court's Prior Ruling Did Not Foreclose an Analysis of
>     the Relative Procompetitive and Anticompetitive Effects

 Google extracts a snippet from a prior decision of this Court to argue that the findings in the E.D. Va. action are at odds with this Court's holding.  In the course of ruling on a motion to dismiss, this Court defined anticompetitive conduct as  "'conduct without a legitimate business purpose that make sense only because it eliminates competition.'"  627 F. Supp. 3d at 379 (quoting In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014)).  From this, Google concludes that this Court meant that any slight legitimate business purpose justifies otherwise anticompetitive conduct without further analysis.

At the motion to dismiss stage, it was not necessary for this Court to discuss the Microsoft framework for evaluating procompetitive benefits and anticompetitive harms, which are more properly assessed at summary judgment or trial.  The Microsoft standard is followed by the Second Circuit and by Judge Brinkema.  See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 652 (2d Cir. 2015) (citing United States v. Microsoft Corp., 253 F.3d 34, 58-60 (D.C. Cir. 2001) (en banc)); Mem. Op. 85.  The Microsoft framework is controlling law on the Moving Plaintiffs' claims and was applied in the E.D. Va. Action.

Judge Brinkema considered Google's evidence and argument that the procompetitive benefits of the acts or practices challenged by the DOJ were not outweighed by their anticompetitive effects.  After analyzing the rational for the various challenged acts (other than the two acquisitions that were not otherwise anticompetitive), the Judge concluded that

"[t]he procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects." (Mem. Op. 112.) Having litigated and lost on a procompetitive balancing, Google cannot escape preclusion in those of the Moving Plaintiffs' actions challenging the same acts or practices.

> 4. Google's Argument about the Tying Claim Fails

Google correctly notes that the elements of a tying claim are stated somewhat differently in the Second and Fourth Circuits. In the Fourth Circuit, the plaintiff must plead and prove four elements: "'(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce.'" (Mem. Op. 90-91) (quoting Service & Training, Inc. v. Data General Corp., 963 F.2d 680, 683 (4th Cir. 1992)). The Second Circuit has an express requirement, not found in the Fourth Circuit's formulation, that the plaintiff plead and prove that "the tie-in has anticompetitive effects in the tied market . . . ." Kaufman v. Time Warner, 836 F.3d 137, 141 (2d Cir. 2016).

The Second Circuit's requirement that a plaintiff show anticompetitive effects in the tied market is "not fundamentally different" from the Fourth Circuit standard and would not weigh against applying issue preclusion. See B & B Hardware, 575 U.S. at 154. The Fourth Circuit requirement that a plaintiff show that the seller "restrain[ed] competition in the tied product market" and that the tie had a "not insubstantial impact on interstate commerce," Service & Training, 963 F.2d at 683, is not meaningfully different from Kaufman's requirement that the

product tie has anticompetitive effects in the tied market.  The Second Circuit merely makes more explicit the principle that the unlawful product tie must have an anticompetitive effect in the market of the tied product, a trait of anticompetitive tying that has been noted by the Supreme Court.  See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12-13 (1984) ("By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market.") (quotation marks omitted), abrogated on other grounds by, Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006).

Google's argument fails for the additional and more fundamental reason that Judge Brinkema, indeed, found anticompetitive effects in the publisher ad server market as a consequence of Google's tying arrangement:

> Google has acted in accordance with its dominant market position and these high barriers to entry and expansion.  For example, Google degraded some DFP features [i.e., the publishers ad server], such as by removing publishers' ability to set a higher price floor on AdX [i.e., the ad exchange] as part of its Unified Pricing Rules update, despite negative publisher feedback.

(Mem. Op. 75.)  The tying of DFP to AdX permitted Google to impose the Unified Pricing Rules that prohibited publishers from setting price floors for AdX that were higher than for other exchanges.  (Id. at 37-39.)  Judge Brinkema found that for some of Google's largest customers, the Unified Pricing Rules "reduced their ability to control ad pricing, maintain ad quality and diversify their sources of revenue."  (Id.)  The Judge found that "[p]ublishers viewed Unified Pricing Rules as not in their best interests, but felt stuck using DFP given its tie to AdX."  (Id. at 100.)

Judge Brinkema also found that publishers that used Google's DFP ad server "understood the coercive power of the AdX-DFP tie," "felt locked-in by dynamic

allocation in DFP," and remained "stuck using DFP" after an attempt to implement heading bidding as a "technical workaround that partially diminished the power of the AdX-DFP tie." (Id. at 93-94.) The Judge found that the publishers' attempt "to erode DFP's dominance" through header bidding "failed," however, because Google implemented Last Look and other measures that "enhanced the power of the AdX-DFP tie." (Id.)

The supposed gap between Second and Fourth Circuit law is bridged by Judge Brinkema's findings on the impact of the coerced used of AdX, including its Unified Pricing Rules, on the market for publisher ad servers. The legal conclusion flows that tying DoubleClick for Publishers to AdX had anticompetitive effects in the ad server market and, because all other elements of an unlawful tying arrangement have been established by Judge Brinkema's findings and conclusions, the unlawful tying claim may be given preclusive effect as an independent section 1 claim and as anticompetitive conduct on the section 2 claim.

5.  Each Challenged Act Was Separately Analyzed.

Cherry picking language from the Memorandum Opinion and Fourth Circuit precedent, Google suggests that Judge Brinkema only engaged in a "holistic assessment" of all alleged anticompetitive conduct and dispensed with an analysis of each alleged anticompetitive act.[18] Because each anticompetitive act must be separately scrutinized, Google argues that the Judge's findings were not compliant with Second Circuit law and prior opinions of this Court. But Google does an injustice to the careful findings in the E.D. Va. Action. Each act or practice

---

[18] "A holistic assessment of whether a monopolist's conduct 'harm[ed] the competitive process and thereby harm[ed] consumers' is thus the touchstone for determining whether a monopolist alleged to have engaged in an exclusionary campaign violated Section 2 of the Sherman Act." (Mem. Op. 86 (quoting Duke Energy, 111 F.4th at 355).)

that was alleged to be anticompetitive was independently scrutinized.  For example, the acquisitions of DoubleClick for Publishers and Admeld were not found to be anticompetitive.  (Mem. Op. 87-90.)  There is no suggestion in the Memorandum Opinion that the Court found these acquisitions or any other conduct independently lawful but nevertheless considered them as support for the monopolization claim.  In other words, the Court did not apply a "monopoly broth" standard.

A careful review of the Judge's Memorandum Opinion reflects that each of the five acts, Unlawful Tyng, First Look, Lask Look, Dynamic Revenue Sharing and Unified Pricing Rules, were independently found to be anticompetitive and that any procompetitive benefits were not outweighed by the anticompetitive harm.  Each of the five stands as a separate and independent finding.

6.  It Is Proper to Consider the Allegations of the Moving Plaintiffs'
    Complaints Against the Findings and Conclusions.

Google's briefing in opposition to the present motions for summary judgment cites at times to a Moving Plaintiff's complaint as support for a claim that an identical issue was not decided in the E.D. Va. Action.  (E.g., ECF 1080 at 34-35, 55.)  For example, its focus on the Moving Plaintiffs' failure to allege a worldwide market led to a round of motions to amend.[19] But Google elsewhere in its brief recasts the nature of a Moving Plaintiff's claim based upon testimony of witnesses, reports of experts or other material.  (See, e.g., id. at 22, 37, 53, 59.) Allegations in a Moving Party's operative pleading is as an authoritative source of the party's claim in this action.  No final pretrial order or ruling on a motion in limine has yet limited the

---

[19] "[T]he Court should look to the operative complaint, not to a hypothetical amended complaint. . . ."  Id. at 36.

Moving Plaintiffs in their decisions as to the evidence they wish to offer or refrain from offering at trial in support of the allegations of their complaints.

G. <u>Applying Nonmutual Offensive Issue Preclusion Is Not "Unfair" to Google.</u>

The doctrine of issue preclusion is equitable in nature and, in a case where the parties to the first action are not identical (nonmutual) and one party seeks to use it affirmatively (offensively) to preclude the opposing party from litigating issues, the Court must also consider whether in fairness it ought to grant preclusion.[20] "[N]o one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas.  In the end, decision will necessarily rest on the trial courts' sense of justice and equity."  <u>Blonder-Tongue Laboratories, Inc. v. Univ. of Ill. Foundation,</u> 402 U.S. 313, 333-34 (1971).

The case brought by the DOJ and state attorneys general in the E.D. Va. Action had massively high stakes for Google.  One of the world's largest  companies, measured by market capitalization and earnings, had the incentive to aggressively defend a government enforcement action that sought its breakup.  At the time that it went to trial before Judge Brinkema, Google was actively defending the Moving Plaintiffs' actions in the MDL.  Thus the risk of issue preclusion was apparent.  The prior adjudication does not arise in a minor dispute with unforeseen consequences that is now being cited to preclude a defense in a case of massive importance.  Nor are the findings and conclusions in the E.D. Va. Action stale and out of date: the motions for partial summary judgment were filed in the MDL a little over two months after Judge Brinkema ruled.  There are no prior adjudications in favor of Google on the issues presented that are inconsistent with the findings and conclusions in the E.D. Va. Action.  .

---

[20] "Even if a court concludes that all four prongs of the nonmutual offensive collateral estoppel analysis have been established, it must still assure itself that it is fair to apply the doctrine."  <u>Bifolck v. Philip Morris USA Inc.</u>, 936 F.3d 74, 84 (2d Cir. 2019) (citing <u>Parklane Hosiery</u>).

Application of issue preclusion will foster efficiency, not jury confusion, in the trial of the Moving Plaintiffs' actions.  Bifolck, 936 F.3d at 84-85.

Issue preclusion in a private civil action based upon the outcome of a DOJ enforcement action is neither exotic nor unforeseeable.  Sections 1 and 2 of the Sherman Act and the provisions of the Clayton Act permitting a private right of action are creatures of statute.  In 1980, Congress amended section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), to make it plain that the doctrine of issue preclusion was available based on the outcome of a DOJ enforcement action: "[n]othing contained in this section shall be construed to impose any limitation on the application of collateral estoppel. . . ."  Antitrust Procedural Improvements Act of 1980, Pub. L. 96-349. [21]

That the first decision was reached after a bench trial and the Moving Plaintiffs' actions will be tried to juries no more impacts the fairness of the application of issue preclusion than it did in Parklane Hosiery, 439 U.S. at 333, where the findings of the district court in a bench trial provided the basis for issue preclusion of a securities fraud class action claim triable to a jury.

Google's assertion that the Moving Plaintiffs produced additional discovery in their actions that was unavailable to it in the trial of the E.D. Va. Action has not been shown to have significance. Google has failed to demonstrate how this additional discovery would have made a meaningful difference in the E.D. Va. Action and, to date, it has not moved for relief from the findings and conclusions of Judge Brinkema on the grounds of newly-discovered

---

[21] Google suggests that the amendment is intended to apply to civil enforcement actions in which a final judgment has been reached. Quite the contrary, the language of the amendment, "[n]othing contained in this section shall be construed to impose any limitation," makes it plain that the first sentence of section 16(a) concerning civil enforcement actions in which a final judgment has been reached is not an impediment to the application of the doctrine of collateral estoppel.

evidence from this MDL.  Nor do expert reports from Moving Plaintiffs' concerning plaintiffs'

own presence and activities in the relevant markets provide a reason to deny preclusion.  Nothing

in this Court's ruling on preclusion relieve the Moving Plaintiff's burden of proving antitrust

injury and damages.  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

See, e.g. ECF 1080 at Parts IV.B and V.D.3.

There is no unfairness to Google in giving preclusive effect to certain findings

and conclusions in DOJ civil enforcement action in the E.D. Va. Action in the Moving Plaintiffs'

private antitrust actions.

CONCLUSION

1.    The Publisher Movants' motions for partial summary judgment are

GRANTED to the extent that Google is precluded from relitigating, inclusive of the balancing of

procompetitive benefits and anticompetitive effects, the following findings and conclusions in

the E.D. Va. Action: (1) the existence of separate and distinct markets for publisher ad servers

and ad exchanges, (2) that the ad server and ad exchange markets are worldwide in scope,

excluding countries restricting access to the internet or subject to U.S. sanctions, (3) that Google

has engaged in the following anticompetitive conduct which support's the Publisher Movants'

claim that it willfully acquired and maintained its monopoly power in the ad server and ad

exchange markets: Unlawful Tying, First Look, Last Look, Dynamic Revenue Share and Unified

Pricing Rules, and (4) that Google has unlawfully tied DoubleClick for Publishers and AdX in

violation of section 1 of the Sherman Act.  The Publisher Movants' motions are otherwise

DENIED.

2.    Inform's motion for partial summary judgment is GRANTED to the extent

that Google is precluded from relitigating, inclusive of the balancing of procompetitive benefits

and anticompetitive effects, the following findings and conclusions in the E.D. Va. Action: (1) the existence of separate and distinct markets for publisher ad servers and ad exchanges, (2) that the ad server and ad exchange markets are worldwide in scope, excluding countries restricting access to the internet or subject to U.S. sanctions, (3) that Google has engaged in the following anticompetitive conduct which supports Inform's claim that Google willfully acquired and maintained its monopoly power in the ad server and ad exchange markets: Unlawful Tying, First Look, Last Look and Dynamic Revenue Share, and (4) that Google has unlawfully tied DoubleClick for Publishers and AdX in violation of section 1 of the Sherman Act.  Inform's motion is otherwise DENIED.

3.    The Advertisers' motion for partial summary judgment is GRANTED to the extent that Google is precluded from relitigating the following findings and conclusions in the E.D. Va. Action: (1) the existence of separate and distinct markets for publisher ad servers and ad exchanges and (2) that the ad server and ad exchange markets are worldwide in scope, excluding countries restricting access to the internet or subject to U.S. sanctions.

The motions to provisionally seal submissions in connection with the partial summary judgment motion subject to the filing of redacted versions on the public docket are GRANTED.

The Clerk is respectfully requested to terminate the motions at 21-md-3010, ECF 1038, 1040, 1045, 1046, 1049, 1073, 1083, 1089; 21-cv-3446, ECF 146, 148, 153, 163; 21-cv-7001, ECF 264; 21-cv-7034, ECF 194, 223, 233; 23-cv-1530, ECF 108; and 23-cv-5177, ECF 84, 86, 91, 101.

33

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
October 27, 2025